In the Matter of **FLYING W AIRWAYS, INC. and Its Wholly Owned Subsidiary, Red Dodge Aviation, Inc., Debtors in Proceedings for Reorganization Under Chapter X of the Bankruptcy Act.**

No. 70–589.

United States District Court, E. D. Pennsylvania.

Feb. 3, 1972.

See also D.C., 328 F.Supp. 1256, 332 F.Supp. 56.

Lewis H. Gold, Adelman & Lavine,
Philadelphia, Pa., for Trustees.

Neil G. Epstein, Ewing & Cohen, Philadelphia, Pa., for Debtors.

Spencer Ervin, Jr., Tate & Ervin, Philadelphia, Pa., for E. B. R. Corp.

Pace Reich, Modell, Pincus, Hahn & Reich, Philadelphia, Pa., for Shareholders Group.

Raymond W. Midgett, Jr., Neal Colton, Dechert, Price & Rhoads, Philadelphia, Pa., for Girard Bank and Farmers Bank of the State of Delaware.

Martin I. Lubaroff, Richards, Layton & Finger, Wilmington, Del., for Farmers Bank of the State of Delaware.

J. Grant McCabe, III, L. Carter Anderson, Rawle & Henderson, Philadelphia, Pa., and Frank L. Bate, J. William Barba, Shanley & Fisher, Newark, N. J., for PSL Air Lease Corp.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT

This is a Chapter X bankruptcy reorganization matter. It presents a myriad of complex issues, with each of which we shall deal in this lengthy opinion. The case is capped, however, by an ultimate question: is there a reasonable prospect of success of the reorganization proceedings? If there is such prospect, then the Court should act in two directions:

*First,* it should adhere to a turnover order entered by this Court on September 25, 1970 requiring the Girard Trust Bank and the Farmers Bank of the State of Delaware ("Banks"), secured creditors of reorganization debtor Flying W Airways, Inc. ("Flying W"), to turn over to Robert C. Duffy and Eugene M. Bernstein, trustees of Flying W, two Lockheed L–100–20 Hercules aircraft, denominated N30-FW and N40FW.[1] These aircraft,

which are owned by Flying W and are presently being operated by its wholly owned subsidiary, Red Dodge Aviation ("Red Dodge"), the other reorganization debtor, are the vehicles by which the debtor's principal business—the carriage of cargo from Anchorage and Fairbanks to the oil rich North Slope of Alaska ("Slope")—is carried out; moreover, these aircraft are the security for a large loan from the Banks to Flying W.

*Second,* the court should grant the trustees' petition to extend the time within wihch to file a plan of reorganization from December 13, 1971 (by which date the trustees were heretofore ordered to file but were unable to file a plan) to some suitable date in the future.

On the other hand, if a reasonable prospect of success of the reorganization proceeding does not exist, then the court should order the trustees to return the aircraft to the Banks, and should refuse to extend the time for filing a plan of reorganization. Such actions would abort the chapter X proceedings and lead to the liquidation of the debtors.

The issues which we here adjudicate arise in large measure out of a mandate given to us by the United States Court of Appeals for the Third Circuit in an Opinion filed May 11, 1971 In The Matter of Flying W Airways, Inc., Debtor, 3rd Cir., 442 F.2d 320. In its opinion, the Court of Appeals remanded the case to us:

"* * * so that the district court may conduct promptly a plenary hearing to consider fully whether adherence to and enforcement of its ex parte turnover order would facilitate a successful corporate reorganization, while minimizing the likelihood of loss to the secured creditor. Among the factors that the district court should consider are the probability of success of the

---

1. The turnover order was entered by Judge C. William Kraft, Jr. and was complied with by the Banks, who turned the aircraft over to the trustees. Judge Kraft assumed senior status on November 11, 1970, and this matter was assigned to the docket of the undersigned upon his assumption of office on December 11, 1970.

**32**

reorganization, whether the debtor has any equity in the airplanes and the relationship of the trustees' possession of the airplanes to the trustees' reorganization efforts. Should the district court decide to adhere to its turnover order, it should consider the appropriate use of income and profits from the operations of the airplanes, with a view toward fashioning an order designed to minimize the possibility of loss to the secured creditor. Any district court order permitting the trustees to retain possession of the airplanes should also require the trustees to obtain adequate insurance coverage for the airplanes." (footnote omitted) 442 F.2d at 323–324.

We have conducted the plenary hearing as we were bade by the Court of Appeals. Out of it developed some 4,400 pages of testimony, replete with financial data, and hundreds upon hundreds of documentary exhibits, many of which are voluminous in character. The major portion of this record was developed on the issues remanded for our consideration by the Court of Appeals. However, two other significant matters were included within the parameters of the plenary hearing:

*First:* the debtor, Flying W, has raised the question of whether it was in fact in default on its obligation to the Banks with respect to installment payments on the aircraft loan when the chapter X petition was filed. Flying W, with the support of the trustees,[2] claims that it was not in default: (1) because of the existence of a tripartite agreement (the "refinancing agreement") among itself, the Banks, and PSL Air Lease Corp. ("PSL"), a subsidiary of Pepsico, Inc., which relieved Flying W of its obligation to the Banks through the vehicle of the sale of the aircraft to PSL which would in turn lease them to Flying W, and the refinancing of the aircraft by means of a loan from the Banks to PSL which would pay off the Flying W loan; and (2) because the Banks and PSL breached the alleged agreement. Alternatively, Flying W asserts that the Banks and PSL are estopped from denying the agreement's existence or asserting default on the loan, because of their own inequitable conduct. The Banks and PSL, conceding that negotiations took place looking towards a refinancing agreement, deny that any such agreement was ever reached; they further deny that they were guilty of any inequitable conduct. However, if Flying W is correct in either of the just recited contentions, then Flying W was not in default of its obligations to the Banks at the time of the filing of the reorganization petition, may not be in default even now (the Banks and PSL might also be liable in damages to Flying W), and if there is no default, there can be no turnover of the aircraft. Therefore, the question raised by these contentions is a threshold question which we were not only forced to consider during the plenary hearing, but must deal with in this Opinion *before* reaching the question of prospects of success.

*Second,* trustees raised the question of whether or not they are entitled to the granting of their petition for a turnover order against the Provident Bank of New Jersey and the First National Bank of Beverly, New Jersey ("New Jersey Banks"), which hold some $50,000 in funds claimed by PSL to be security for Flying W's obligations to PSL under a certain lease agreement for a third Hercules Lockheed aircraft denominated N50FW, which is owned by PSL and was leased to Flying W and used by it in Alaska. This matter was considered because the issues involved in its determination were essentially covered during the plenary hearing, and because the in-

2. The debtors have been independently represented by counsel throughout the proceedings. While, for the most part, the debtors have agreed with the position of the trustees, from time to time they have asserted the debtors' rights in a manner inconsistent with the position of the trustees.

fusion of $500,000 in working capital, if the New Jersey Banks were ordered to turn over the funds, might be relevant to prospects of success.

The plenary hearing was conducted in two stages: the first from June 21 to July 2, 1971 and August 25 to 27, 1971 dealing principally with prospects of success, and the second from September 21 to 27, 1971 dealing principally with the alleged refinancing agreement. We have also conducted an extended hearing on the trustees' application to extend the time for filing a reorganization plan. The evidence adduced at that hearing dealt principally with prospects of success. We consider that evidence on the question of turnover of the aircraft and also consider the evidence developed on the question of prospects of success at the plenary hearing in deciding the trustees' application to extend time.

The case has been a fascinating one. In a way, more than a case, it is a saga, in which a once viable business enterprise, seemingly on the threshold of a bonanza, has become a victim of an historic collision, occurring on the Arctic's trackless waste, between man's quenchless thirst for the oil which he needs to power his combustion engines, and the dawning age of ecology. The bonanza was the lucrative cargo carriage business, then in its nascent stage, which had been generated by the commencement of oil drilling operations on the Slope, and which was expected to be brought to fruition by the "imminent" issuance of the permit for construction of the forty-eight inch trans Alaska pipeline which would transport the oil from the Slope across the Brooks Mountain Range and on to Valdez on the south coast of Alaska with its ice-free port and railhead. The age of ecology, on the other hand, dawned in the late 1960's and has now spread across the land, focusing nationwide attention upon the Slope's treeless tundra, the permafrost beneath, and the massive herds of caribou which migrate each year through the masses in the Brooks Range to bear their calves upon the Slope. The ecolo-

gists' aim is to preserve nature's delicate balance from the threat of destruction by the pipeline construction and oil production activities.

The ingredients in this historic collision are not the determinative factors in this lawsuit. They do, however, provide the backdrop and the perspective which one must at least understand before deciding the issues involved, hence this brief prologue.

The Brooks Mountain Range runs some 600 miles east to west across northern Alaska. It has been called America's last wilderness. North of the Brooks Range, the land slopes in a wide, gentle plain to the shores of the Arctic Ocean. This vast flatland, stretching from the Bering Sea to the Canadian border, is known as the North Slope. The surface of the Slope is know as the tundra, a thin vegetation mat composed of the fragile interrelationship of mosses, lichens and grass. Below the tundra is the permafrost—permanently frozen earth, which prevents deep-rooted plant life from growing. Any scraping of the tundra insulation can lead directly to spring and summer melting of the permafrost, which in turn causes erosion. Erosion results in a slowing of the growing cycle, and, arctic plant life, once disturbed, can take a long period of time to revegetate in the affected area. The ecologists fear scraping of the tundra by the construction equipment which will be involved in the construction of the pipeline; they also fear that the heat generated by the oil removed hot (150° F.) from the ground will escape from the drilling rig or the pipeline and melt the permafrost through which much of the pipeline must be built, causing subsidence and caveins.

In the summer, when the tundra thaws, much of the Slope is a swampland which even breeds mosquitos; the temperature averages forty degrees above zero, and often reaches seventy degrees. In the winter, however, the Slope is a land of harsh and frozen desolation, its climate inhospitable to man. The sun is up for but two hours per day, and the biting winds of the polar icecap send tempera-

tures plummeting to 55 and 60 degrees, and often even 70 degrees below zero, where they remain for many months.

The Slope is the home of an abundance of wildlife. It is estimated that some 400,000 caribou migrate yearly to the Slope. There they join countless bear, moose, dall sheep, fox, hare, squirrel, lemming, and wolf, as well as geese, duck and numerous other species of water fowl. Moreover, the Slope is traversed by some 350 rivers which spawn a variety of fish. The ecologist fear that the pipeline will obstruct the migration of the caribou, that oil spills will pollute the rivers and destroy the fish, and that any upsetting of nature's balance will make the Slope as inhospitable to wildlife as it is to man.

It had been suspected for many years that oil deposits might lie under the Slope. Shortly after the turn of the century, the United States Geologic Survey made a report on geologic conditions in the area, with a view to the location of oil. The first intensive exploration for oil and gas on the Slope came after the Second World War and was conducted by the United States government, concerned over the security of the nation's oil supplies. In 1958, oil exploration by private oil companies commenced. After many failures, in July of 1968 Arco and Humble reported a major strike near Prudhoe Bay. In the months that followed, other oil companies made similar discoveries in the Prudhoe Bay Field. It was soon estimated that the eons of geologic development had resulted in the trapping of some ten billion barrels of recoverable oil in the Prudhoe Bay Field. Other oil fields were soon discovered on the Slope and the estimates ran to a total of 30 billion barrels of recoverable oil and many billion cubic feet of recoverable gas. The oil discovery appeared to be the most important in the history of North America.

Understandably, the strike had enormous impact upon the State of Alaska, creating an atmosphere reminiscent perhaps of the days when gold was discovered there at the turn of the century.

On September 10, 1969, the State of Alaska auctioned off oil leases on the Slope. Various major oil companies participated in the bidding and shortly thereafter commenced oil drilling operations on the tracts for which they had successfully bid. The drilling operations, however, required logistical support: construction materials to build the network of facilities necessary to conduct the drilling operations and to accommodate the men who were to work on the Slope; drill casing for the rigs which have to bore many thousands of feet to reach the oil; and fuel for power and heat, without which the drilling operations cannot be carried on nor life sustained. Similar logistical support was expected to be required for the men constructing the pipeline should the pipeline permit be issued.

Because of the climatic conditions on the Slope, there is only one feasible way to consistently supply this logistical support: by air. Red Dodge Aviation possesses a contract carrier certificate issued by the Alaska Transportation Commission to transport cargo from Anchorage and Fairbanks to the Slope. Red Dodge carries cargo under contract with various oil and construction companies, utilizing the two Lockheed Hercules aircraft, N30FW and N40FW which are the subject matter of the turnover petition before us. Shortly after the oil strike, negotiations were concluded for the sale of Red Dodge Aviation stock by its then owner, Earl "Red" Dodge, to Flying W, theretofore a New Jersey based executive jet and charter flight operator with extensive real estate holdings, including an airfield on which was located the so-called "Flying W Ranch". Flying W was and is a publicly held corporation whose stock is traded over the counter; presently there are some 1700 shareholders located all over the United States.

As the facts which we find from the plenary hearing will show (see *infra*), following the acquisition of Red Dodge, Flying W embarked on a major financial commitment in Alaskan cargo aviation. Infected, at it were, by the exuberant

Klondike-like spirit which gripped Alaska in the fall of 1969 when the oil lease sale was held in Anchorage, and anticipating the early issuance of the permit to the Alyeska [3] Pipeline Company, a consortium formed by the oil companies for the construction of the trans Alaska pipeline, Flying W staked its corporate future in the Frontier State. Five of Flying W's major shareholders, Edwin, Brooke and Robert Matlack, and James and William Whitesell, through the instrument of personal guarantees of corporate obligations, staked their personal fortunes there as well.[4] Perhaps the most graphic illustration of the exuberant spirit, in view of the difficulties visited upon Flying W by its involvement with three Lockheed Hercules aircraft, is the fact that, during the winter of 1969, Flying W placed orders for two *additional* Hercules aircraft with delivery scheduled for the spring of 1970!

The events occurring since the fall and winter of 1969 are the sinews of this lawsuit. Suffice it to say, for purposes of this prologue, that the question of the trans Alaska pipeline has become a national cause celebre and that, because of the objections raised by the ecologists, both in the form of public discourse and of litigation, the pipeline permit has not been issued by the Interior Department, and no one knows when it will be; nor, for that matter, can anyone be certain of the ultimate pipeline route.[5] As the result of the delay, the level of activity on the Slope has fallen off from the original flurry, and with it has fallen off the business of Red Dodge Aviation. These events have led Red Dodge and its parent, Flying W, into bankruptcy reorganization court.

This has been a vexatious litigation, but, after all, the stakes are high. The shareholders of Flying W have their entire investment on the line and several of them have their personal fortunes at stake because of their guarantees of corporate obligations. The Banks, which seek recovery of the aircraft which are their security for a loan balance of well over $7 million on which no principal or interest has been paid for over two years, are properly concerned about impairment of their security by continued flying operations; they contend that they are being deprived of fundamental rights by continuation of reorganization proceedings which they believe to have no reasonable prospect of success. PSL, owner of the N50FW, which Red Dodge formerly used in Alaska, and of three spare aircraft engines, which Red Dodge is presently using, has huge claims as well as the engines at stake. And, needless to say, the general creditors whose claims total some $3,258,073 must be concerned about the outcome, for the general creditors will probably be "wiped out" along with the shareholders if the reorganization aborts. However, it is regrettably impossible to reconcile and accommodate in this adjudication the interests of all of the contending parties.

Many of the facts set forth in this prologue are not of record. Most of those which are not of record are matters of a judicial or of common knowledge.[6] In any event, the facts just recited are only at the threshold. We have related them because they are necessary to an understanding of those findings of fact which we now make and the conclusions of law which we draw therefrom.

---

3. "Alyeska" was the name originally given to Alaska by the Indians. It means "the great land".

4. Most of the Matlack's guarantees were effected through the vehicle of their family holding corporation. EBR Corporation. EBR has been represented by counsel in these proceedings.

5. The Interior Department has been studying the matter in enormous depth, and that study is still continuing. The role of the pipeline in this proceeding is discussed *infra* at page 84, et seq.

6. See, *inter alia*, "*Will Oil and Tundra Mix?*", National Geographic, Vol. 140 No. 4, October 1971; *North Slope Alaska: Man and the Wilderness,* published by BP Alaska, Inc., 1971; Encyclopedia Americana, 1970 "Alaska"; "Tundra", and the daily newspaper.

Because of the protracted and complex nature of the case, the high stakes involved, and the high probability of an appeal, we have set forth extremely extensive findings. We feel that the parties and the reviewing court are entitled to no less. This Opinion will constitute our findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

## II. PROCEDURAL HISTORY OF THE CASE

According to the docket of the clerk of the court, there have been over 230 papers docketed in the case to date. Full understanding of the case requires that we set forth a procedural history by describing the more significant aspects of the proceedings.

### A. *The Flying W Petition, and Order Number One*

On September 24, 1970, at 9:25 a. m., Flying W filed with this Court a petition for reorganization under chapter X of the bankruptcy act. On the same day, Judge Kraft entered an order appointing the trustees, which, *inter alia,* provided:

"4. That Robert C. Duffy, Esq., and Eugene M. Bernstein . . . be and are hereby appointed trustees of the estate of the said Debtor and that the said trustees upon filing a bond as hereinafter provided shall be vested with all of the right, title and interest of the Debtor, as of the date of the filing of the said Petition for Reorganization, in all of its property . . .";

"5. That the said trustees shall qualify by entering into bond to the United States in the sum of $100,000 with such sureties as shall be approved by the Court . . .";

"11. That the said trustees shall be vested with full power and authority, and he is hereby instructed and directed to take all the properties, assets and business of the Debtor, real and personal, wherever situated and of whatever nature, into his exclusive possession and control, *and the Girard Trust Bank, Farmers Bank of the State of Delaware,* PSL Air Lease Corporation, or any other person, their officers, directors, agents, employees, attorneys, nominees, successors, assigns, or other representatives, be and they *are hereby jointly and severally, ordered and directed to surrender and turn over to the possession and control of the trustee any of the above properties, assets and business of the Debtor, real, personal or mixed, now in its or their possession and control,* and the said Girard Trust Bank, Farmers Bank of the State of Delaware, PSL Air Lease Corporation, or any other person, and each and every of its or their said officers, directors, agents, employees, attorneys, nominees, successors, assigns, and other representatives, be and they [sic] hereby jointly and severally restrained, enjoined and stayed from, in any manner whatsoever, interfering with or disturbing the trustee's right to exclusive possession and control of said properties, assets and business, real, personal or mixed." (emphasis added).

The trustees' bond was approved by the Court and filed on September 25, 1970. On November 4, 1970, the Banks filed an answer to the petition for reorganization, averring that there was no reasonable prospect of success and that the petition was not filed in good faith. The answer also asked dismissal of the reorganization petition.

### B. *Turnover Proceedings in re N30FW and N40FW*

Shortly after the entry of order number one, and despite notice of its provisions (see *infra*), the Banks caused the N30FW and N40FW to be flown from Alaska to Wilmington, Delaware. On September 25, 1970, the trustees petitioned the Court that the Banks be ordered to return the aircraft to the trustees in Alaska. Judge Kraft conducted a brief hearing on the matter. During the course of the hearing, the Banks moved to vacate the turnover portion of order number one and requested a ple-

nary hearing on the motion to vacate. Judge Kraft refused to conduct a plenary hearing, denied the motion to vacate, and entered an order requiring the Banks to return the aircraft to Alaska at their sole cost and expense. The Banks appealed Judge Kraft's order, and on May 4, 1971 the Court of Appeals filed its opinion and judgment ordering the plenary hearing. In their November 4, 1970 answer, the Banks also requested reclamation of the N30FW and N40FW. This prayer raised essentially the same issues as were heard in the plenary hearing.

### C. The Red Dodge Aviation Petition and Consolidation of Proceedings

On September 29, 1970, Red Dodge Aviation, Inc. filed with this Court a petition for reorganization under chapter X of the Bankruptcy Act. On the same day, the Court approved the petition, appointing as trustees Messrs. Bernstein and Duffy, the trustees of Flying W, and fixing bond at $25,000. The bond of the trustees was filed on October 7, 1970. On December 29, 1970, the Court ordered the reorganization proceedings of Red Dodge consolidated with those of Flying W under the above caption.

### D. Order of Reference to Referee as Special Master

On October 2, 1970, Judge Kraft ordered that all matters in the proceedings were to be referred to Referee in Bankruptcy Emil F. Goldhaber, as special master. On January 15, 1971, the undersigned referred certain petitions to Referee Goldhaber to hear and report and reaffirmed Judge Kraft's general Order of Reference. However, since the advent of the Court of Appeals mandate, most of the matters of substance in connection with the proceeding have been recalled by the Court from the Referee.

### E. Petition for Turnover Order in re New Jersey Banks

The trustees' petition for turnover of the $500,000 held as a deposit to secure Flying W's obligations to PSL with respect to the N50FW lease was first referred to Referee Emil F. Goldhaber as special master to hear and report. Referee Goldhaber made a partial record, but, because of the overlapping of issues with the plenary hearing, the matter was recalled by the Court during the course of the plenary hearing and will be adjudicated in this opinion.

### F. PSL's Petition for Reclamation of Engines

On December 11, 1970, PSL filed a petition for reclamation of: (1) three spare Allison engines usable interchangeably on the N30FW and N40FW; and (2) certain Hercules loading equipment. This matter is pending before Referee Goldhaber. The matter is significant because one of the original N40FW engines is now on the N50FW which is in storage at Lockheed, Georgia, and therefore the reclamation of all of the spares which are in actual use in Alaska might abort the reorganization proceedings regardless of any other aspect of the case, because of the insufficiency of engines in Alaska.

### G. Proceedings Involving the Alaska Transportation Commission

Several petitions have been filed by the trustees throughout the course of these proceedings seeking to stay proceedings instituted by Alaska Airlines and/or Interior Airways, Red Dodge's principal competitors, in either Alaskan state courts or before the Alaska Transportation Commission. These Alaskan proceedings have questioned the legality of Red Dodge's operations under its air carrier certificate, and an adverse result to Red Dodge could abort the chapter proceedings. The trustees also sought to stay an investigation by the Commission into the competitive situation involving Hercules operators. On two occasions the Court has stayed proceedings in Alaska. It is sufficient to say that, as of this date, the proceedings have not threatened Red Dodge's certificate.

### H. *Section 167 Investigation*

Pursuant to petition of both the trustees and the Banks, the Court ordered the trustees to conduct an investigation under section 167 of the Bankruptcy Act. The investigation was conducted, and a section 167 report was filed. The Banks filed objections to the report, alleging that it was inadequate in certain particulars. The Court deemed it unnecessary to act upon the Banks' objections in view of the voluminous record developed at the plenary hearing which has illuminated the condition of the reorganization debtors far better than even the most comprehensive section 167 report.

### I. *Medford Real Estate*

Pursuant to petition of the trustees, and after two lengthy hearings, the Court, on July 8, 1971, granted permission to the trustees to dispose of the Flying W Ranch, including the motel property, airfield and the equipment, for the sum of $708,000.00. The Court approved the sale: (1) because the maintenance of the Medford facility, which was non-operational, was a considerable financial burden ($6,000 a month expense) on the estate, and the sale thereof would lessen that burden; and (2) because it was persuaded that the offer was a good one, representative of the market value of the real estate.[7] Settlement has been held and the proceeds of sale held in escrow pending order of the Court with respect to distribution.

### J. *Petition for Appointment of Counsel for the Debtors*

The debtors have actively participated in the proceedings through counsel. However, in an opinion which may be found at D.C., 332 F.Supp. 56, the Court denied the petition of the debtors for *formal* appointment of counsel, holding that:

> "the Bankruptcy Act does not confer power upon the Court to formally appoint counsel for a debtor out of possession in a chapter X proceeding, except in the instance where counsel, for good cause and with the court's acquiescence, is acting as de facto counsel for the trustee."[8]

### K. *Filing of Claims*

The Court ordered that proofs of claim by creditors be filed with Referee Goldhaber by September 15, 1971 and that proofs of interest as stockholders be filed with Referee Goldhaber by November 1, 1971.

262 creditors' claims totalling $15,576,410.68 have been filed with the referee. This figure includes both secured and unsecured claims but does not include the claims of EBR Corporation and the Whitesells. The secured claims total over $12 million; the priority claims total $174,400, and the balance of the claims are unsecured. Some 1650 shareholders have filed proofs of interest representing 2,214,698 shares.

### L. *Order in re Filing of Reorganization Plan*

As indicated above, the Court, on September 3, 1971, entered an order that by December 13, 1971 the trustees file a Plan of Reorganization or a report of why such a plan could not be effected, and that a hearing be held on such plan or report on January 3, 1972. On December 8, 1971, the trustees petitioned the Court to extend the time for filing

---

7. As a matter of fact, the courtroom became the site of intensely competitive bidding during the first hearing, resulting in a vastly increased offer! EBR, the third mortgagee of the property, appealed the Court's approval of the sale but has withdrawn its appeal.

8. The Court has permitted two interventions in this matter: (1) a group of shareholders (the Whitesell interests); and (2) of the Securities and Exchange Commission ("S.E.C."). Counsel for the Whitesells, the S.E.C., the First Pennsylvania Bank (first mortgagee of the New Jersey real estate), EBR Corp., the New Jersey banks, Alaska Airlines and Interior Airways have appeared from time to time. However, the litigation has been carried on principally by counsel for the trustees, the debtors, the Banks and PSL.

a plan. We thereupon stayed our order of September 3, 1971 and have held a hearing on the trustees' petition.

### M. *Interim Compensation*

On November 1, 1971, pursuant to petition by the trustees, the Court allowed interim and partial compensation in the sum of $15,000.00 to the trustees, $20,000 to counsel for the trustees, and $8,000.00 to Laventhol, Krekstein, Horwath & Horwath, accountants employed by the trustees. The S.E.C. supported the trustees' position that the interim compensation was fair and reasonable and necessary to the continuance of the proceedings.

### III. THE BUSINESS AND PROPERTY OF THE DEBTORS AND THEIR FINANCIAL CONDITION PRIOR TO THE FILING OF THE PETITIONS FOR REORGANIZATION

We find the following facts with respect to the business and property of the debtors, and their financial condition prior to the filing of the petitions for reorganization.

Flying W Airways, Inc. is organized under the laws of the State of New Jersey and is a publicly held corporation.[9] As of September 24, 1970, 2,555,335 shares of its common stock were issued and outstanding, and registered in the name of approximately 1700 shareholders. Until the spring of 1969, Flying W was engaged in various business activities, including aviation sales, charter flying, flight training, operation of an airport, motel and restaurant, and rental of industrial and office buildings and land development. To conduct these activities Flying W had a fleet of seven (7) executive jet and propeller powered cargo aircraft and seven (7) small and medium size propeller powered cargo aircraft. In addi-

tion, Flying W operated the Flying W Ranch in Medford, New Jersey and an office building in Cinnaminson, New Jersey, which was under lease to R.C.A. These activities were conducted through various subsidiary corporations owned by Flying W. Of the several subsidiaries, only Longhorn Airways, Inc., Thunderbird Airways, Inc. and Continental Aircraft Sales, Inc. remain in existence today. None of these corporations are operating entities, they have been dormant for some period of time, and they are without operating assets.

On April 16, 1969, Flying W entered into an agreement with Earl "Red" Dodge, the sole shareholder of Red Dodge Aviation, Inc., a corporation organized in January 1968 under the laws of the State of Alaska, to acquire from him all of the outstanding stock of Red Dodge Aviation, Inc. in exchange for 104,000 shares of the common stock of Flying W. At the time of this acquisition, which was consummated in May 1969, Red Dodge held Alaska Air Commerce Certificate Number 16 which authorized it to operate fixed wing aircraft as a contract carrier of cargo within the state of Alaska. Red Dodge is also certified by the Federal Aviation Agency as a commercial operator for carriage of cargo only under Part 121 of the Federal Aviation Act. This certificate is issued annually and has been renewed each year. After the acquisition of Red Dodge, Flying W pursued contract cargo operations within the State of Alaska as its major line of business, and disposed of its propeller driven equipment and replaced it with jet-prop and pure jet aircraft.

As of September 24, 1970, the date of the filing of its reorganization petition, Flying W's principal assets were: its stock interest in its wholly-owned subsidiary, Red Dodge; the two Lockheed Hercules L–100–20 aircraft N30FW and N40FW, which were used by Red

---

9. Flying W's principal office is in Philadelphia. The petition for reorganization was therefore filed in this District pursuant to 11 U.S.C. § 528, and the petition with respect to Red Dodge, a wholly owned subsidiary, was filed here pursuant to 11 U.S.C. § 529.

Dodge;[10] a leasehold interest in a North American Sabreliner jet airplane, which Flying W sub-leased to Philco-Ford as an executive airplane;[11] and parcels of improved real estate in Cinnaminson and Medford, New Jersey.

The Cinnaminson property, which is leased by Flying W to RCA Corporation under agreements expiring June 30, 1972, consists of seven acres on which is located an office building of 144,000 square feet. The property is subject to three mortgages: a first mortgage to the First Pennsylvania Bank of approximately $575,000; a second mortgage to Charlotte Aircraft Corporation (a supplier of used aircraft parts) of approximately $224,-000; and a third mortgage to EBR Corporation of approximately $2,300,000. The annual rent amounts to $278,279.11, which is assigned to First Pennsylvania Bank. The trustees are studying the possibility of selling the Cinnaminson property to RCA.[12]

The Medford property, known as the Flying W Ranch, consists of 144 acres and contains, *inter alia*, two air strips, a motel, restaurant, bar, office buildings, and two large hangars. The property is subject to three mortgages: a first mortgage to First Pennsylvania Company of approximately $500,000; a second mortgage to Chan-Air Corporation (a subsidiary of PSL) of approximately $160,000; and a third mortgage to EBR Corporation of approximately $2,300,000. As noted above, the trustees have proposed and the Court has approved a sale of the Medford property for $708,000.

Red Dodge's business is essentially that of a contract air carrier of cargo. Under its certificate from the Alaska Transportation Commission, authorizing it to conduct such a business within Alaska, Red Dodge flies from Anchorage and Fairbanks to the North Slope and largely to air strips in the vicinity of Prudhoe Bay. Its principal customers are oil companies and oil well drilling or construction companies. Red Dodge does lease some hangar space to others and does have some fuel sales business, but those aspects of its business are minor. Red Dodge uses the N30FW and N40FW for the carriage of cargo. The firm also owns a B–25 World War II bomber it uses during the summer under contract with the Bureau of Land Management in Alaska for fire prevention, observation and spraying. In addition to this equipment, Red Dodge has four spare Allison engines which may be used interchangeably on the Hercules aircraft; three are leased from PSL and one is owned by Flying W. Red Dodge also uses spare parts for Hercules aircraft which are owned by Flying W.

Red Dodge has various facilities at the Anchorage Airport from which its flying operations are directed. Its hangar, known as the Cordova Hangar, is currently the subject of litigation between Red Dodge and The Cordova Development Company over ownership. Red Dodge leases ground at the airport adjacent to the hangar, for staging and the storage of supplies. It also leases four parcels of real estate directly from the State of Alaska. On one parcel sits a partially constructed hangar, about 40% complete; if finished, it would be the largest hangar in the State of Alaska and would permit indoor maintenance work on Hercules aircraft. However, at the time of the filing of the reorganization petition, the trustees had incurred an obligation of $235,000 to the general contractor it had engaged for this purpose, and the cost of completion would be in excess of $500,000, which Red Dodge can-

---

10. The N40FW was formally leased by Flying W to Red Dodge; no formal lease was ever executed with respect to the N30FW.

11. The trustees have disposed of Flying W's leasehold interest in the Sabreliner pursuant to the Order of the Court entered June 30, 1971.

12. Counsel for the trustees has represented to the Court that a year-old appraisal placed a value of $1.7 million on the property and that the trustees believe the property to be worth at least that amount.

not now afford. At the Fairbanks airport, Red Dodge leases an office facility and an adjacent staging area. For a period during the winter of 1970–71, the trustees leased a hangar at Fairbanks so that aircraft maintenance work might be done inside.[13]

The Hercules aircraft (often referred to in the record as "Herks") are, in and of themselves, of paramount importance in these proceedings, hence the following description. The Hercules aircraft is a high-wing monoplane powered by four Allison turbojet engines which drive propellers. Its cargo compartment is aft-loaded at truckbed height which permits loading and unloading more quickly and less expensively than side-loaded cargo aircraft. Lockheed has built the military version of the Hercules, the C130, for 15 years. Lockheed's commercial program started in 1966. The commercial Hercules has progressed from the basic L–100 model through the L–100–20 (the so-called stretched Hercules) and L–100–30 [13a] (the so-called superstretched Hercules).

The Hercules L–100–20 is 106 feet long, has a wing span of 132 feet and a gross weight of 155,000 pounds. It can carry a payload of approximately 50,000 pounds approximately 2,100 nautical miles. The main cargo compartment is 49 feet long, can take objects 108 inches high by 120 inches wide, and has a volume of 4,400 cubic feet. The three models of commercial Hercules differ from each other principally in the length of their cargo compartments. The cargo compartment is about 41 feet long in the L–100, and about 55 feet long in the L–100–30. Each of the three models of commercial Hercules can carry about the same weight of cargo.

The Hercules was designed for the support of military front-line combat situations requiring short take-off and landing capabilities and the capacity to carry heavy loads. The Hercules L–100–20 is extremely well-suited for the carriage, from Fairbanks and Anchorage to the North Slope, of pipe used in oil well drilling operations (and prefabricated huts for drilling sites) because it can accommodate a 48 foot length of casing used in oil drilling, and because the short take-off and landing capability enables the Hercules to utilize the relatively short landing strips on the North Slope. Economic considerations require that as long a piece of pipe as possible be transported. For example, neither the DC–8 nor the Boeing 707, which are used for cargo and have large payloads, would be suitable for Slope cargo operations, because they load from the side and at greater than truck bed height, and because they lack short take-off and landing capability. No other aircraft is as well-suited as the Hercules for operations on the Slope.

The principal customers of Red Dodge during the period of the reorganization have been the oil companies which have been conducting drilling operations on the Slope: BP Alaska, Inc., Humble Oil and Refining Company, McCulloch Oil Corporation, Forest Oil Corp. and the Atlantic Richfield Co. Other major customers have included the State of Alaska, Hamilton Brothers (a construction firm), Brinkerhoff Drilling Company, Rivers Construction Company, Frontier Rock & Sand, Rock Island Oil Company, and Burgess Construction Company. For a

---

13. The Court permitted the rejection by the trustees of an executory sublease for another Fairbanks facility because it did not permit indoor maintenance work in the wintertime, thereby rendering it of limited value to the estate. Temperatures in Fairbanks in wintertime average –40°F. *See* In The Matter of Flying W Airways, D.C., 328 F.Supp. 1256 (1971). Because of adverse financial conditions, the hangar was not rerented for 1971–72.

13a. A Hercules L–100 can be "stretched" into an L–100–20 in a shop operation at Lockheed Georgia in Marietta by the insertion of "plugs" fore and aft of the wing. The N50FW, for example, was "stretched" in this manner. The N30FW and N40FW were built as "stretched" Hercules.

long period of time, BP was Red Dodge's principal customer. However, since the conclusion of the plenary hearing, Red Dodge has lost BP's business to Interior Airways (see *infra*). The cargo carried for BP Alaska, Inc. included drilling rig material, oil casing and drill stems, and was hauled principally from Fairbanks to Prudhoe Bay. The same type of cargo is carried for Humble to Mikkelson Bay, approximately 80 miles east of Prudhoe Bay, and for Forest Oil Corp. to Kemick, approximately 150 miles southeast of Prudhoe Bay. Red Dodge hauls the same type of cargo for McCulloch Oil to Finn Creek, which is also on the Slope. Red Dodge hauls drilling rigs, trucks and fuel for Brinkerhoff Drilling Company, which performs the drilling operations in Alaska for McCulloch Oil Corp. Red Dodge hauls heavy construction equipment, such as road graders, caterpillers, trucks and trailers for the State of Alaska, Rivers Construction Company and Frontier Rock & Sand. From time to time, however, Red Dodge hauls other cargo, such as fish. Approximately 85% of Red Dodge's business is attributable to no more than 10 oil companies or oil well drilling companies.

As of June 29, 1971, during the plenary hearing, the only companies with which Red Dodge had written contracts for the carriage of cargo were Atwood Enterprises, BP Alaska, Inc., Brinkerhoff Drilling Co., Inc., Petroleum Distributing Company, Inc. and McCulloch Oil Corp. The typical Red Dodge Oil contract obligates it to provide L–100–20 aircraft upon request of the customer but does not require the oil company to make any payment to Red Dodge other than those arising from the use of the aircraft. The contract provides that the customer is obligated to use Red Dodge for the carriage to the Slope of its cargo requiring the use of a Hercules L–100–20, and is terminable at any time by the customer upon a short written notice.

The amount of air cargo carried to the North Slope is, in large measure, seasonal. The peak months are in the late fall and winter when the ground surface is solid ice and snow. Supplies and equipment are then carried from the airstrips to the drilling or operational sites over the ice and snow. In the summer, however, most of the airstrips on the Slope, which are constructed on tundra with overlying gravel, are too soft to land on. The flights fall off in May and June; July and August are light, and the flights begin to pick up in September. While there are some all-weather roads (just as there are some all-weather airfields), to protect the tundra, there are governmental restrictions limiting permits for additional roads and operations after the tundra thaws. When the thaw comes, many drilling or operational sites are closed because they become inaccessible except by helicopter.

The N30FW and N40FW are being financed by the Girard Trust Bank ("Girard") and Farmers Bank of the State of Delaware ("Farmers"). Girard and Farmers are the joint holders, as mortgagees, of an Aircraft Chattel Mortgage—Security Agreement ("Mortgage Agreement") executed by Flying W on April 10, 1969, and amended by a written agreement ("Mortgage Amendment") dated May 7, 1969 (the Mortgage Agreement as so amended is hereinafter called "Mortgage"). N30FW and N40FW are the Federal Aviation Agency ("FAA") registration numbers for the Lockheed Hercules aircraft serial numbers 4302 and 4303, which are referred to in the mortgage by FAA registration numbers N7952S and N9237R. The Mortgage Agreement was recorded with the FAA on April 16, 1969 (assigned FAA Conveyance Number G47069) and the executed Mortgage Amendment was recorded with the FAA on May 16, 1969 (assigned FAA Conveyance Number D43884). At the time of its execution, the Mortgage secured the payment by Flying W of its promissory note dated April 10, 1969 in the principal amount of $7,500,000 with interest thereon (payable over a term of eight years) and

the payment and performance by Flying W of its other obligations recited in the Mortgage. The loan received by Flying W from the Banks was used by Flying W to purchase the aircraft and certain spare parts. The total amount of the loan was $7,323,796.07.

On November 3, 1969, Flying W did not pay the installments of principal and interest then due. The principal balance on that date was $7,055,938.91. Interest had been paid to October 1, 1969. Since October 1969, the following payments on account of interest were made by Flying W on or about the dates and in the amounts as follows: March 9, 1970, $64,952.59; April 6, 1970, $69,-592.06; and May 12, 1970, $64,952.06. Although Flying W has made no payment on account of principal since November 3, 1969, the principal balance was reduced by a set-off of two bank accounts in the combined amount of $42,906.00 maintained by Flying W with Farmers Bank. As of September 24, 1970, the date of filing the reorganization petition, the unpaid principal balance exceeded $7,013,000. As of that date, the books of Flying W, prior to any auditor's adjustments, showed $7,055,938.91 as due and payable on account of the principal of the Banks' loan to Flying W and $724,-954.55 as accrued interest payable.

The debtors have been operating the N30FW and N40FW in Alaska since they were purchased. For a time Red Dodge operated a third Hercules N–100–20 aircraft in Alaska—the N50FW. Prior to September 1969 Flying W had contracted with Lockheed to purchase the N50FW at a price initially set at $3,350,000 and later amended to $3,375,800. However, by letter of September 9, 1969, PSL proposed to purchase the N50FW from Lockheed and lease it to Flying W. Flying W thereupon assigned PSL its rights under the contract, with the consent of Lockheed, and on December 30, 1969, PSL purchased the N50FW from Lockheed and immediately leased it to Flying W under a lease agreement bearing the same date.

Under the terms of the Lease, Flying W was to pay as rental for the N50FW the sum of $124,866 each calendar quarter in advance commencing December 30, 1969. The rental was paid for the first quarter, but no quarterly rental payments have been made since that date. Red Dodge used the N50FW in its North Slope operation until April 1970, when it developed a wing crack and was flown to Lockheed in Marietta, Georgia for repairs, where it has remained to this day. The wing section has now been repaired, and the airplane is in storage, but Lockheed's repair bill of $147,862.00 is still unpaid and Lockheed has filed suit in the United States District Court for the Northern District of Georgia against PSL. PSL was denied leave by this Court to join the trustees and debtor as a third party defendant in that action, but has included in its claim filed with the Referee the amount of the repair bill. On October 21, 1970, by stipulation approved by the Court, the trustees relinquished their right to possession of the N50FW.

As of September 24, 1970 (the date of the filing by Flying W of the reorganization petition) the books of account of Flying W and its subsidiaries showed, on a consolidated basis as reflected in the statement of auditors employed by the trustees, assets of $12,816,322 and liabilities as follows:

| | | |
|---|---|---|
| Liabilities having priority (payroll taxes and payroll) | $ | 153,434 |
| Liabilities having collateral | | 9,513,737 |
| General liabilities | | 4,285,443 |
| Deferred credits | | 192,959 |
| Due to related interests (E.B.R. Corp. and Whitesells, who are principal shareholders of Flying W) | | 3,388,502 |
| Total | | $17,534,075 |

There was no shareholders' equity. There was a shareholders' equity deficiency of $4,717,753.

Flying W maintained its records on a June 30 fiscal year. For the three years ended June 30, 1970, and the period from July 1, 1970 to September 24, 1970, Flying W and its subsidiaries, including Red Dodge, on a consolidated basis,

had the following income, expenses and net losses:

| Year ended June 30, | Income | Expenses | Net Income (Loss) |
|---|---|---|---|
| 1968 | $1,130,449 | $1,204,366 | ($ 73,917) |
| 1969 | 1,712,869 | 3,478,493 | ( 1,765,624) |
| 1970 | 4,600,815 | 9,248,806 | ( 4,647,991) |
| July 1, 1970 to September 24, 1970 | 780,181 | 1,658,612 | ( 878,431) |

The determination of depreciation reflected in the debtors' books of accounts was reviewed and approved by Laventhol, Krekstein, Horwath & Horwath ("Laventhol"). The N30FW and N40FW were depreciated at the rate of $49,312.83 per month in accordance with instructions from Laventhol. It will be seen by a review of the figures that the heavy losses are not just due to depreciation. We will defer, until later in this Opinion, a discussion of the financial data pertaining to the operation of Flying W and Red Dodge by the trustees during the reorganization, and of the valuation of the aircraft. While these two areas of our findings are at the core of our adjudication of the issues involved, they are best dealt with separately.

## IV. DID FLYING W, THE BANKS AND PSL ENTER INTO A REFINANCING AGREEMENT WHICH WAS BREACHED BY THE BANKS AND PSL SO THAT FLYING W WAS NOT IN DEFAULT ON THE LOAN TO THE BANKS AT THE TIME OF THE FILING OF THE REORGANIZATION PETITION; IN THE ALTERNATIVE, ARE THE BANKS AND PSL, BY VIRTUE OF THEIR CONDUCT, ESTOPPED TO DENY THE EXISTENCE OF SUCH AN AGREEMENT OR TO ASSERT A DEFAULT?

### A. *Introductory Statement*

We find that, in the latter part of the year 1969, because of a lack of business on the Slope, and the lack of revenue generated by the Aircraft, it became apparent that Flying W could not make the required payments to the Banks in connection with the Hercules loan. In meetings between representatives of the Banks and Flying W during the period from December 30, 1969 to March 13, 1970, the Banks were so advised; they were also informed that the issuance of a pipeline permit was vital to the business of Red Dodge, (and they were advised as to the status of the pipeline permit). During the same period, Flying W determined that it was necessary that it reduce the monthly payments due on the N30FW and N40FW aircraft by refinancing the aircraft over a longer period. Under the Loan Agreement with the Banks, the monthly obligation of Flying W for principal and interest was approximately $160,000 per month, and during the months of February, March and April 1970 would be approximately $248,000 per month. Moreover, the Lease Agreement with PSL for the N50FW obligated Flying W to a quarter-annual charge of $124,866, or approximately $42,000 per month.

On January 28, 1970, Jack Selby ("Selby"), President and Chief Operating Officer of Flying W, wrote to O. H. P. Baldwin ("Baldwin"), Chairman of the Board and President of the Farmers Bank, confirming a request by Flying W that the Banks refinance the N30FW and N40FW aircraft over a 12-year period instead of 8 years. The request was denied by the Farmers Bank. After the negative response, Selby spoke to a number of leasing companies, and he and James Whitesell commenced discussions with Fraser Noble ("Noble"), Vice-President of PSL, about the possibility of PSL's refinancing the N30FW and N40FW. Commencing with March 13, 1970, there ensued a long series of meetings among representatives of Flying W, PSL and the Banks. Most of the meetings were held either at the offices of Farmers Bank in Wilmington or of PSL in Purchase, New York. During this period of time, representatives of these parties engaged in numerous telephone conversations and exchanged many written communications.

It is the position of the debtors and trustees that these meetings, conversations and communications, which will be described in detail below, add up to the fact that the parties had concluded a binding tripartite agreement encompassing: (1) the sale of the N30FW and N40FW from Flying W to PSL, to be financed by (2) a newly created loan from the Banks to PSL which would pay off the prior loan from the Banks to Flying W; and (3) a lease of the N30FW and N40FW by PSL to Flying W along the same lines as the N50FW lease.

The trustees and debtors contend that this binding agreement was breached by the Banks and PSL when they refused to perform thereunder. They further contend that the Banks and PSL led Flying W "down the garden path", inducing it to change its position in reliance on their promises to refinance, and that they, at the last minute, "pulled out the rug" by refusing to perform, thus precipitating the filing of the chapter proceedings. This conduct is alleged to constitute an exercise of bad faith, giving rise to an estoppel either to deny the existence of the refinancing agreement, or to assert an act of default, even if no agreement had been concluded.

The parties agree that no formal or written agreement was ever entered into. The debtors and trustees have therefore attempted to construct an agreement out of: (1) pieces of conversation occurring at the meetings; (2) the correspondence among the parties; and (3) internal memoranda, obtained from PSL and the Bank's records by discovery. Some of the documents emanated from discovery which was permitted by the Court in connection with these proceedings, and some from coordinate discovery which has been conducted in connection with actions pending in the courts of the State of Delaware by the Banks and PSL against the Matlacks, EBR Corporation and the Whitesells seeking recovery on their guarantees of Flying W's obligations.

The Banks and PSL, of course, deny the existence of any refinancing agreement. They were participants in the meetings which we have mentioned, but contend that all of the discussions at those meetings, together with the correspondence and other communications constituted *negotiations* for a refinancing agreement. They assert that there was never a manifestation of mutual consent on all of the essential terms of such agreement, and that the debtors and trustees have attempted to "cut a suit out of whole cloth" by piecing together certain isolated and tentative memoranda from the files of the parties. The Banks and PSL deny that they were guilty of any inequitable conduct such as would give rise to an estoppel and, further, assert that Flying W was guilty of inequitable conduct during the course of the negotiations by withholding important data concerning its financial condition. Finally, asserting the applicability to the proposed agreement of Delaware law, the Banks and PSL argue that the Delaware statute of frauds bars the enforcement of any such agreement, if one is found to exist.

We shall, in the succeeding pages of this Opinion, detail the contentions of the parties with respect to the alleged refinancing agreement. A voluminous record was developed with respect thereto—approximately a week and a half of the plenary hearing was devoted to the question. The matter of the refinancing agreement was not before the Court of Appeals; obviously, however, if the contention of the debtors and trustees is valid, Flying W was not in default of its obligations to the Banks at the time of the filing of the reorganization petition and may not be in default even now (and the Banks and PSL might be liable in damages to Flying W), and if there is no default, there can be no turnover. It is necessary, therefore, to decide whether Flying W is in default on the loan before we reach the question of whether the Banks are entitled to turnover of the Aircraft.

B. *Findings of Fact*

We make the following findings of fact:

### 1. *The Dramatis Personae, Their Roles and Relationship*

To facilitate reference throughout this Opinion, we will, at the outset, identify the principal actors with respect to the alleged refinancing agreement, and their roles.

#### a. *Flying W*

Jack Selby ("Selby") was the president of Flying W during the negotiations in question. Selby's background prior to joining Flying W was as a pilot and as a director of airline operations. He was not experienced in financial affairs when he became executive vice president in December of 1969. Robert W. Matlack was, during 1970, chairman of Flying W's board of directors. Whenever Robert Matlack was present at the meetings which we will describe, he was the Flying W spokesman. At meetings attended by Robert Matlack and Selby, Selby would generally sit quietly except to deal with technical matters that might arise, and he was more of an observer and a listener than a participant in the negotiations. James P. Whitesell and William C. Whitesell were, at all times relevant here, officers and directors of Flying W. During the period of time between late 1969 and the late spring of 1970, James Whitesell had the principal responsibility for Flying W's dealings with PSL. Most of the contact and negotiations with PSL with respect to the refinancing agreement were handled by Whitesell, who had many discussions with PSL when Selby was not present.

#### b. *The Banks*

O. H. P. Baldwin ("Baldwin") was, from January 1, 1970 to September 25, 1970, chairman and chief executive officer of Farmers. His associates who handled most of the details in connection with the Flying W and PSL nego-
tiations were Joseph R. Johnson ("Johnson"), who was, during the same period, a senior vice president and director of Farmers and president of Farmers' Wilmington office, and Cornelius J. Milione ("Milione") who was an assistant vice president of Farmers until July 1970 and thereafter became a vice president. At meetings attended by Baldwin, he was the spokesman for Farmers. Girard's representatives were: William E. Van Norden ("Van Norden"), a vice president of Girard in charge of its special lending division; Harold Ikeler ("Ikeler"), a Girard vice president in charge of Girard's correspondent bank division, through which Girard had been invited into the initial loan participation; and Stuart H. Brown ("Brown"), a vice president of Girard dealing with correspondent bank relations, who reported to Ikeler.

At no time during the negotiations with Flying W and PSL during 1970 did Farmers speak or act on behalf of Girard; similarly, at no time did Girard speak or act on behalf of Farmers. The relationship between the two banks with respect to the April 10, 1969 loan agreement with Flying W is set forth in, and governed by, a participation agreement dated April 10, 1969 by and among Farmers, Girard and Flying W. Selby had seen the participation agreement at the closing of the original loan between the Banks and Flying W. By the terms of the participation agreement, Farmers was prohibited from consenting to any modification of the loan agreement or note, or any collateral therein provided for, or consenting to any release of borrower from liability or waiving any claim against borrower without the prior written consent of Girard. Under the terms of the agreement, the loan participation of Farmers and Girard were 35% and 65% respectively, and the negotiations looking toward a refinancing agreement contemplated similar percentages. At the crucial April 1, 1970 meeting Baldwin stated that he was not speaking for Girard.

### c. *PSL*

Robert G. Clark ("Clark") was, in March 1970, president and a director of PSL, a wholly owned subsidiary of Pepsico Service Industries Leasing Corporation, of which Clark was also president and director. Pepsico Service Industries Leasing Corporation is a wholly owned subsidiary of Pepsico, Inc., and is the instrument for the operation, through various subsidiaries such as PSL, of Pepsico's leasing operation. Fraser Noble was, prior to June 1970, vice president in charge of business development at PSL, with responsibility principally in sales. In June 1970, Noble became president of PSL, and Clark became Chairman of the Board of PSL and of Pepsico Service Industries Leasing Corporation. When Clark was present at a meeting, he was the chief negotiator for PSL.

### 2. *The Preliminary Discussions and the PSL Preconditions*

As we have already noted, in late 1969 and early 1970, Flying W sought to reduce the monthly payments due on the N30FW and N40FW by refinancing the aircraft over a twelve-year period. Among the sources from which they sought refinancing was PSL.

During the winter of 1969, while negotiations with respect to the N50FW lease were taking place, at a meeting attended by William Whitesell, James Whitesell, Clark and Noble, William Whitesell told Clark and Noble that Flying W had an option on two additional Hercules aircraft to be delivered in the spring of 1970. William Whitesell asked Clark if PSL would be interested in entering into an arrangement concerning those two aircraft. Clark responded by saying that PSL would not be interested and that he did not think that Flying W should buy the two additional aircraft. Clark indicated that he felt that before Flying W got involved with additional aircraft, Flying W should develop satisfactory revenues and show that it could successfully operate the three aircraft which it then had. Clark went on to state that if at some time in the future Flying W could show PSL a financially stronger company, or in other words, obtain some additional outside financing, PSL would, at that point, be happy to have Flying W come back to it for some further discussions concerning additional leasing. James Whitesell indicated his agreement with what Clark had said. As a result, the two options on the two additional Hercules were given up.

During the last week of February, or early in March 1970, James Whitesell came to PSL and stated that Flying W would like PSL to consider buying the N30FW and N40FW aircraft and leasing them back to Flying W. In that regard, Whitesell made reference to the conversation which had taken place in the winter of 1969, and indicated that Flying W was now in a position to comply with all of the requirements which had been stated by Clark during the earlier meeting. During the initial contact about the possible purchase and lease back transaction, James Whitesell indicated that Flying W had a financing commitment, making reference to the firm of Elkins, Morris, Stroud & Co. ("Elkins, Morris & Stroud"), an investment banking firm. He gave PSL a copy of Elkins, Morris & Stroud's letter of intent with respect to an equity issue of $3,000,000.00.

James Whitesell also indicated to PSL that Flying W was now operating profitably on the North Slope. He delivered a number of papers to PSL, including a December 31, 1969, pro forma balance sheet showing the conversion of debt owed by Flying W to EBR to equity as well as a forecast showing that the Company would become profitable in 1970. Whitesell delivered a copy of Flying W's 1969 annual report, a Flying W statement for the six months ending December 31, 1969, and a letter which had been sent to Flying W's shareholders along with the annual report and interim report stating that the Matlacks and EBR

had decided to convert their debt position to equity.

Clark indicated to James Whitesell that in light of the foregoing representations, the situation looked attractive. However, there was one further problem. At that time, the money market was extremely tight and Clark told Whitesell that unless financing could be arranged through the Farmers and Girard banks, Clark doubted whether it would be possible to accomplish what Flying W was proposing. In light of the foregoing, the Banks were contacted.

We find, however, that Clark made clear to Whitesell that the following preconditions would have to be satisfied before PSL would enter into any agreement to borrow money from the Banks to pay off the Flying W loan and purchase the N30FW and N40FW and then lease them to Flying W: (a) the debt owing to EBR (the Matlack Family corporation) from Flying W would have to be converted into equity; (b) there would have to be a substantial infusion of new capital into Flying W in the neighborhood of the proposed $3,000,000 Elkins, Morris & Stroud issue; and (c) the profitability of the Red Dodge operation in Alaska would have to be improved. As it happened (see *infra*), the debt conversion was never effected, the equity financing was never obtained, and the profitability of the debtor was never improved. Moreover, we find that, despite the numerous meetings and conversations to which PSL was a party, these preconditions were never altered. In this respect, the refusal of the debtors and trustees to produce Whitesell to refute Clark's testimony was crippling. We use "refusal" advisedly; Whitesell's counsel informed the Court of his availability as a witness, and the Court, sensing the importance of the issue, repeatedly urged debtors and trustees counsel to produce him.

Shortly prior to March 13, 1970, Selby told Johnson that discussions were taking place between Flying W and PSL concerning the possible sale of the N30FW and N40FW. Selby arranged for a meeting to be held on March 13, 1970, at Farmers so that PSL and the Banks could meet. Prior to March 13, 1970, PSL had no dealings with representatives of the Banks concerning the N30FW and N40FW. A meeting was held on March 13, 1970 at Farmers in Wilmington, Delaware. The following individuals were present: Selby, Robert Matlack, James Whitesell, A. W. Weidenmuller ("Weidenmuller", Flying W's comptroller), Clark, Noble, Johnson and Milione.

The meeting was essentially exploratory in nature and served as a vehicle for the Banks and PSL to be introduced. *Inter alia*, Clark asked Johnson whether the Banks had any interest in lending money to PSL to purchase the N30FW and N40FW, and Johnson replied that the transaction sounded interesting and that Farmers would discuss the matter with Girard. No agreement was reached as to the amount of the loan, or the interest rate. It was agreed that PSL would produce financial statements for the Banks and that another meeting would be held.

Following the March 13 meeting, Clark wrote a memorandum to Herman Lay, chairman of the board of Pepsico, Inc. The memo was written so that Pepsico's top management would be fully advised as to what PSL was considering, and so that PSL could benefit from Pepsico's management advices during the course of negotiations. Clark's memo to Lay set forth the basic information which Clark had received from Flying W and requested authority to continue negotiations. The memo also indicated that the factual context upon which the PSL-Flying W discussions had been based included the following specific elements:

a. EBR had recently converted 2.5 million dollars of debt owing to it by Flying W to equity in Flying W;

b. As a result of the conversion of debt to equity, Flying W then had a positive net worth;

c. Flying W operations had improved and as of March 19, 1970, were stated to be profitable;

d. Flying W had been advised by Elkins, Morris & Stroud that an additional public offering of securities having a value of $3,000,000 could be made and that Flying W was planning to have the securities registered shortly;

e. A December 31, 1969 pro forma balance sheet reflecting the conversion of EBR debt to equity, rather than the actual balance sheet as of December 31, 1969, which was attached to the memo, was the balance sheet to be relied upon;

f. Flying W had advised that the current portion of the 1.6 million dollars of accounts payable shown on the balance sheet had been reduced to a figure below $300,000; and

g. A projected statement of income and expenses for the calendar year 1970 showing a profitable operation for the last three quarters of the year and for the calendar year ending December 31, 1970. This was attached and relied upon.

The next meeting among Flying W, the Banks and PSL took place on April 1, 1970 at Farmers. For reasons described below, that meeting is the crucial meeting in connection with the alleged refinancing agreement. However, between the March 13 meeting and the April 1 meeting, no proposal was made by PSL to the Banks, and there were no prospective terms for a possible deal which had been communicated to the Banks. Moreover, prior to attending the April 1 meeting, no representative of Girard had been informed of any terms that were being discussed with respect to any possible transaction, although

14. For instance, in the offer of proof which the Court required of the debtors prior to the plenary hearing with respect to the alleged refinancing agreement, it was asserted, at paragraph 9, that, "on April 1, 1970, officers of Flying W (Robert Matlack, Jack Selby, James Whitesell and perhaps others), PSL (Robert Clark, Fraser Noble and perhaps others), Farm-

between March 13 and April 1, the Banks did receive some financial information from and about Flying W and PSL.

### 3. The April 1, 1970 Meeting
#### a. Introduction

The April 1, 1970 meeting took place at the offices of Farmers in Wilmington. The meeting was attended by Selby, Robert Matlack, James Whitesell, and Weidenmuller (representing Flying W); Clark and Noble (representing PSL); and Baldwin, Johnson (who was present for a short time at the beginning of the meeting and then left), Milione, Brown and Ikeler (representing the Banks). Our findings with respect to that meeting are of central importance, for, from the time that the defense of the refinancing agreement was first interposed, until the time that the debtors and trustees filed briefs concerning the matter after the conclusion of the plenary hearing, the debtors and trustees took the position that the essential elements of the refinancing agreement were concluded at the April 1 meeting.[14] Only in their supplemental brief filed well after the plenary hearing did the debtors and trustees state that they also relied upon events occurring between April 2 and May 26 to establish an agreement. Accordingly, we now set forth our findings as to what transpired at the April 1, 1970 meeting. We also set forth our findings as to what did not transpire at the April 1 meeting; i. e., we will recite the matters with respect to which there was no manifestation of mutual assent by the parties.

#### b. Events of the Meeting

The basic proposal which was presented at the meeting was that Flying W

ers (Joseph R. Johnson, Cornelius J. Milione, O. H. P. Baldwin and perhaps others) and Girard (Stuart Brown, Harold E. Ikeler, Jr. and perhaps others) met at the office of Farmers in Wilmington, Delaware and reached agreement with respect to all material terms of the refinancing agreement."

would sell the N30FW and N40FW and certain spare parts to PSL; that PSL would borrow money from the two banks to buy the aircraft and spare parts; and that PSL would lease the aircraft and spare parts back to Flying W. The figure discussed as the purchase price of the aircraft was approximately $7,-350,000, which was the figure stated by Milione to be the principal balance and accrued interest on the Flying W loan to the Banks. Clark expressed PSL's interest in purchasing the aircraft at that figure if the Banks would make the loan to PSL.

There was some discussion concerning the interest rate for the proposed loan. After a facetious reference to "6%", Clark indicated that he would like the rate in the area of 9–9½% (Selby puts his figure at 10%), but Baldwin stated that he thought a 10½% rate would be better. Clark indicated that PSL would like to borrow the funds for an eight-year term with a twelve-year payoff schedule and a balloon payment at the end of eight years. Although Baldwin stated that he would be interested in making the loan to PSL, he qualified that observation by stating that he was not speaking for Farmers or for Girard, and inquired as to the steps to follow. Clark analyzed the various things that would have to be done on a preliminary basis before they could come up with any conclusion, including financing, documentation, control over the insurance, and security and guarantees for the transaction.

With respect to the $500,000 which was on deposit with the New Jersey banks as security for the N50FW lease, Clark stated that that would have to be spread out as security for the proposed leases of the N30FW and N40FW as well, and that the deposit would be transferred to Farmers. He stated that EBR Corporation and the Matlack brothers would be required to guarantee the lease for the N30FW and N40FW aircraft. Robert Matlack assented to these conditions, although none of his brothers was present. With respect to insurance, Clark stated that, in light of the problems which had existed with respect to Flying W's maintaining its insurance, one of the conditions for PSL's involvement in the transaction which was being discussed would be the effectuation of some type of control over payments for Flying W's insurance. Clark also discussed Flying W's earnings and the question of financing for Flying W and summarized the discussion by stating that there was an awful lot of work to bring about an agreement with respect to the proposed transaction, and that it would be impossible for him to come with an estimate as to when something like the proposed transaction could be put together.

While there was no discussion of the terms of a lease between PSL and Flying W for the N30FW and N40FW, in response to Robert Matlack's question as to whether the terms of the lease of the N30FW and N40FW would be the same as the terms of the lease for the N50FW, a representative of PSL, whom Selby believed to be either Clark or Noble (but he could not be sure which) answered that the terms of the lease would be essentially the same. At the end of the meeting, Baldwin said that the Banks had received a lot of information and that they would consider it. As Brown left the meeting, he said to Baldwin that the Girard people would go back to their bank and consider what they had heard. The parties were aware that extensive documentation would be required for the transaction as proposed.

In a side discussion at the end of the meeting between Noble and Selby, Noble stated that all existing delinquencies from Flying W to PSL would have to be paid at closing, and that more security in the form of a mortgage on the RCA Building, and an extended mortgage on the Flying W Ranch, might be required. We find these facts to have been the extent of the April 1, 1970 meeting.

c. *Background Factors to be Considered in Evaluating the Alleged Refinancing Agreement.*

#### (1) *Introduction*

While our determination of whether or not the parties reached a binding refinancing agreement will be made on the basis of our findings as to whether or not they mutually assented to the material terms, there are nonetheless two considerations by way of general background which are helpful in evaluating the intention of the parties. We turn to these now.

#### (2) *Size of the Proposed Transaction*

We find that the Farmers participation in the 1969 Flying W loan was the biggest loan ever made by Farmers. The proposed loan to PSL would have been an even bigger loan and would have approached the Farmers' legal lending limit for a secured loan. The proposed purchase and leaseback of the N30FW and N40FW would have been the largest aircraft transaction ever entered into by PSL. The transaction would also have been a very large deal for any of the subsidiaries of Pepsico Leasing, Inc. We consider these factors significant in evaluating whether or not the Banks and PSL would have entered into a refinancing agreement in a manner so informal as is herein alleged.

#### (3) *Extent of Documentation Required*

Exhibit D–71, which was received in evidence, was the closing documents for the N50FW transaction. It involved the cash sale of that aircraft from Lockheed to PSL and the lease of the aircraft from PSL to Flying W. This documentation consisted of well over two hundred pages of legal instruments, divided into fifty separate chapters. The memorandum of closing documents contained therein listed no less than sixty documents, most of which were complex, required to be pro-

vided by the various parties. Moreover, the N50FW transaction did not involve a loan such as was proposed from the Banks to PSL. Milione, in a memorandum to Johnson, listed at least sixteen documents which would be needed in that connection. The parties themselves recognized the need for voluminous documentation and that it would take a long period of time to prepare. The Court finds that the documentation involved is not "boilerplate" in nature and that there are innumerable terms contained in the documentation which normally, and in the present case, are the subject of negotiation.

We make findings with respect to the extent of documentation involved because findings upon that matter, just as those with respect to the size of the proposed transaction, bear upon the credibility of the contention of the debtors and trustees that the Banks and PSL intended that the events at the April 1, 1970 meeting, or the events occurring between April 2nd and May 26th give rise to a binding agreement.

d. *Matters Not Agreed Upon at the April 1, 1970 Meeting*

We now proceed to itemize the matters which we consider material to any refinancing agreement upon which we find that there was *no* manifestation of mutual assent at the April 1, 1970 meeting.[15]

#### (1) *Lease Between PSL and Flying W*

We find that there was no manifestation of mutual assent on the myriad terms involved in a lease for the N30FW and N40FW (the N50FW lease contained some 39 pages), including the most important term of all, the quarterly rental payments for the aircraft and spare parts. The amount of the quarterly payments was not discussed and was not calculated.

The debtors and trustees have argued that the lease rental term provision is

15. We consider the presence (or absence) of manifestation of mutual assent upon material terms to be the matrix for determining whether or not a contract exists, hence the use of that terminology. See *infra*, p. 68, et seq.

not missing because of an understanding that the terms of the lease for the N30FW and N40FW would be essentially the same as the terms for the N50FW, and that the lease rental could be calculated by the same "formula" used to calculate the N50FW rental. We find, however, that the formula which was used by PSL to calculate lease rentals varied from case to case, depending, as it did, according to the explanation of Clark, upon such variables as: (1) PSL's evaluation of what it thinks the equipment's value will be at the end of the lease term; (2) what the equipment's value is to PSL on a present value basis; (3) what PSL's over-all profit objective is in the specific transaction; (4) the cost to PSL of the money which it is using in connection with the transaction; and (5) what the market will bear. Moreover, the "formula" in question is based upon PSL's internal cash flow, is exceedingly involved and had never been explained to Flying W. Therefore, there could be no basis for reliance thereon.

Another important term with respect to the lease which was not discussed on April 1 was the number of minimum non-chargeable hours for use of the Aircraft (over and above the basic rental).

In addition to the rental payment, none of the following matters which we find material to any lease agreement were discussed until *after* the April 1 meeting:

(a) The computation of the reserve time on the engines, including a discussion of the exact number of hours on each of the engines;

(b) Security which would be established to protect any parts which might be owned by PSL, including the possibility of constructing a special building or secured area for them;

(c) Insurance which would be maintained on the spare parts; and

(d) The segregation of PSL's parts from other parts which Flying W might subsequently purchase and the establishment of a method by which PSL's parts could be identified.

(2) *The Loan From the Banks to PSL*

We find that there was no agreement arrived at on April 1 to the effect that the Banks would make a loan to PSL. Moreover, when the April 1st meeting ended, there was no agreement on what the interest rate would be in the event of such a loan, or on the terms of the loan itself. PSL had never done business with the Banks. It had, however, established lines of credit with some ninety other banks throughout the country and was accustomed to negotiating loan terms with respect to matters such as default, grace, security etc. None of such technical loan terms was discussed at the meeting.

There were affirmative expressions at the April 1 meeting of the Banks' interest. These expressions, however, do not amount to a loan commitment. We find that there was no manifestation of mutual assent with respect to any of the legal, as well as the financial, terms of the loan agreement.

(3) *Purchase of the Aircraft*

We find that no firm purchase price for the N30FW and N40FW was agreed upon at the meeting. Moreover, there was no discussion of what spare parts (one of the subject matters of sale) would be purchased, whether just rotable (reworkable) parts, or also expendable parts, and, if just rotable parts, what rotable parts would be purchased; nor was there a discussion of the price to be paid for the parts which were to be purchased.

(4) *Guarantees*

While the thought was expressed at the meeting that Matlack, EBR and Whitesell guarantees were the sine qua non of any tripartite agreement, we find that Robert Matlack's statement that he would agree to the guarantee did not bind his brothers, EBR or the Whitesells. We note in this regard that a review of the carefully maintained minutes of EBR Corporation reveals that they accurately reflect all guarantees that the corpora-

tion entered into. The minutes reflect that there was an EBR meeting on April 13, 1970, but neither in this, nor in any other meeting, is there any mention of a resolution or authorization to enter into a guarantee agreement for the performance of all leases between PSL and Flying W.

### (5) *Insurance*

Insurance on the aircraft is one of the most important terms involved in the alleged agreement. The aircraft fly and must be maintained under arduous conditions, and Flying W's insurance premiums approximate $600,000 per year.[15a] While we find that there was general discussion on the subject of insurance at the April 1 meeting, we do not find that there was a mutual manifestation of assent on details with respect to the insurance. There was no discussion of such important matters as the financing of premiums (including the interest rate), the disposition of unearned premiums or premium credits, the frequency of installment payments, the term of the insurance, and the control over cancellation.

### (6) *Payments Due at Closing*

We find that Noble stated to Selby in a "side meeting" at the close of the April 1 meeting that a condition of any refinancing agreement was that all of Flying W's delinquencies would have to be paid at the time of the closing. There was no agreement as to the exact amount due. However, we find that, as of April 1, 1970, Flying W's financial situation was such that it could not have made settlement in the then foreseeable future.

### (7) *Ultimate Findings With Respect to the April 1, 1970 Meeting*

In view of the foregoing itemization, we find that there was no manifestation of mutual assent on the material terms of a refinancing agreement at the April 1, 1970 meeting.

According to the testimony of Selby, when Robert Matlack left the meeting, he went over and shook Clark's hand and said: "Buddy, you've got a deal." This incident is uncorroborated [16] and there is no testimony of a response from Clark. We credit this incident, if it happened, as meaningless in the wake of the failure of the parties to agree upon even the most salient of the terms of the refinancing agreement at the April 1 meeting. We mention it because it is symptomatic of the bootstrap type approach too often put forth by the debtors and trustees in connection with their claim that a refinancing agreement was reached.

### 4. *Events Occurring Between April 2, 1970 and May 26, 1970*

#### a. *Introductory Statement*

As we have indicated above, up until the filing of their reply brief, long after the close of the plenary hearing, the debtors and trustees took the position that the refinancing agreement had been concluded on April 1, 1970. In their initial brief, the debtors and trustees took the position that:

"During the period from April 2, 1970 to May 25, 1970, Flying W, the Banks and PSL took numerous and definitive steps to effectuate . . . the Refinancing Agreement that was reached on April 1, 1970 between Flying W, the Banks and PSL. . . ."

However, in their reply brief, the debtors and trustees went a considerable step further and stated:

"The evidence conclusively establishes that the Banks, PSL, Flying W and others concluded a binding Refinancing Agreement. Even if the agreement reached on April 1, 1970 be thought too indefinite and incomplete to be enforceable, it is clear that a meeting of the minds was achieved

---

15a. The rates for hull insurance for operations in Alaska are almost twice those in the other 48 continental United States.

16. Robert Matlack died prior to the second stage of the plenary hearing and therefore could not testify.

on May 26, 1970. By that date the following events had occurred:

(1) Farmers Bank had agreed to provide a $500,000 accounts receivable loan to Flying W concurrently with the sale of the aircraft to PSL (2805–09—Selby).

(2) PSL had mailed to the Banks a letter confirming the amount and terms of the loan from the Banks to PSL (D–111, D–113).

(3) PSL had performed a substantial obligation under the Refinancing Agreement by advancing $931,556 for insurance on all three Hercules aircraft for the policy year May 1970 to May 1971.

(4) The officers of PSL had received approval from their parent company to enter into the Refinancing Agreement in accordance with the terms of Mr. Clark's May 12, 1970 memorandum to Mr. Lay of Pepsico, Inc. (D–230, D–231). Despite Mr. Clark's attempts in his testimony to explain away this approval, the notation by Mr. Frank at the top of the memorandum (D–231) must be credited. Furthermore, the permission which Mr. Clark requested was to 'finalize the discussions', which necessarily means 'conclude the agreement', for otherwise discussions would not be 'finalized'.

(5) Mr. James of PSL had reported back to his company that Orvis Brothers had made a 'commitment' to provide equity financing for Flying W (D–227). It was after learning of this commitment that Mr. Clark sought and received approval from Mr. Lay to 'finalize the discussions'.

(6) Mr. Noble of PSL had written a letter to Flying W in connection with the advance of money for insurance premiums, stating that the first quarterly payment by Flying W to PSL would be made 'at closing' (D–114). Mr. Noble testified that the closing he referred to was the closing of the 'transaction' between the parties (3682—Noble), which was the Refinancing Agreement.

(7) Flying W and its sureties had executed a note (D–117) and a letter agreement (D–116) agreeing to repay the money which PSL had advanced for insurance. Their understanding, which was derived in part from Mr. Noble's letter (D–114), was that the first installment of the repayment was to be made at the closing of the Refinancing Agreement.

(8) PSL had informed Flying W of the amount of the quarterly payments to be required under the leases for the N30FW and N40FW aircraft and the spare parts, and Flying W had consented to those payments (2896–97, 2963—Selby; 3555—Clark; 3650–52—Noble).

(9) Flying W had given PSL a list of the spare parts to be sold to PSL under the Refinancing Agreement (D–224; PSL–32a; see D–226, p. 3), a statement of aircraft serial numbers and engine serial numbers of the N30FW and N40FW, a statement of transactions on which E.B.R. Corporation was a guarantor, a letter from counsel dated April 28, 1970 (D–104) expressing an opinion on the sale of the N30FW and N40FW aircraft and the E.B.R. Corporation balance sheet at December 31, 1969 (D–225)."

In this section of the Opinion we will set forth our findings as to the events occurring between April 2nd and May 26th, and will analyze specifically the factual contentions of the debtors and trustees which we have set forth verbatim. In this connection, we note here, as we have before, that the debtors and trustees rely, in large measure, upon PSL internal memoranda, and written communications between PSL and the Banks and between the Banks *inter se*, which they have obtained by discovery. We have the gravest doubts as to whether such writings, even if they supported the position of the debtors and trustees, could constitute manifestations of assent to a contract. Notwithtanding those grave

doubts, we will make reference to the internal memoranda and communications in our findings.

### b. *The Aircraft Lease*

We have found that there was no manifestation of mutual assent on the essential terms of a lease for the N30FW and N40FW at the April 1 meeting. Some of the terms which had not even been discussed on April 1st were the subject of discussions in the ensuing period between April 2nd and May 26th. During that period of time, PSL calculated the amount of the quarterly payments that it expected to receive under the lease for the N30FW and N40FW: "approximately $135,000 per aircraft", and had further calculated the quarter-annual payment for spare parts at "approximately $25,000".[17] These figures were communicated to Flying W which evidenced no objection. Flying W had, moreover, transmitted to PSL a list of the spare parts to be sold to PSL under the proposed refinancing agreement,[18] a statement of aircraft serial numbers and engine serial numbers of the N30FW and N40FW, a statement of transactions on which EBR Corporation was a guarantor, a letter from counsel expressing an opinion on the sale of the N30FW and N40FW aircraft, and the EBR Corporation balance sheet as of December 31, 1969. However, we find that the communication, without objection, of the approximate lease rental, even if sufficiently definite to constitute agreement on that important term, and the transmission of the other matters just enumerated do not supply the elements which we found missing at the April 1 meeting; nor are the missing elements supplied by the meetings which we now describe between Flying W and PSL during the April 2nd–May 26th period.

On May 4, 1970, a meeting with the two Whitesells was held at Purchase,

New York, by Clark, Noble and a PSL staff attorney, Robert Frank. At the meeting, there was discussion about PSL's "requirements for further consideration of this deal". Among the items specifically mentioned were: (1) the need for further information from Orvis Brothers with respect to the stock offering which had previously been discussed (the Whitesells confirmed that Orvis was now taking a lead position with respect to the financing, although Elkins, Morris & Stroud was still involved; and (2) the need for current financial information on Flying W. There was a lengthy discussion about Flying W's activities on the North Slope and Flying W's future prospects, and also a discussion about the request of the Whitesells that PSL assist Flying W in maintaining its aircraft insurance which was about to lapse.

A few days later, Clark and Noble flew to Wilmington for a meeting. Afterward, Noble went with William Whitesell to work at the Flying W Ranch; Clark stayed in Wilmington and lunched with Selby and Robert Matlack. During lunch, they talked informally about Flying W's progress in Alaska, Flying W's overhead costs, Flying W's insurance problems and other matters. We find that the net effect of the early May meetings was only to reinforce the preconditions PSL insisted Flying W must accept for there to be a deal.

We turn then to the internal memoranda and correspondence. It is important, however, to refer to *all* of the important internal memoranda and correspondence during this period, not just those upon which the debtors and trustees rely. To refer only to the latter would give a distorted view.

On April 9, 1970, Clark wrote a memo to Noble indicating that further discussion with corporate management about the proposed Flying W lease transaction

---

17. PSL's attorneys, however, were not satisfied as to the exact figure even as of June 17th, when they left it blank in draft documentation forwarded to Flying W's counsel.

18. The first list of spare parts submitted to PSL was returned as unsatisfactory. PSL's attorneys never were satisfied that the spare parts list had been agreed upon.

had brought to light several matters which, in addition to other matters which had been previously discussed, had to be taken care of prior to PSL's being able to agree to anything. Among the matters which in Clark's view had to be taken care of were: (1) the development of figures relating to Flying W's insurance, specifically including the insurance rates and payment terms; (2) a modification of the EBR and Matlack guarantees; (3) expansion of the $500,000 cash escrow to cover all three airplanes; (4) modification of the existing second mortgage on the Flying W ranch and the obtaining of a new second mortgage on the RCA Building; (5) obtaining of current financial statements for EBR, the Matlacks, Flying W, Red Dodge and the Whitesells and a credit check on the Matlacks; and (6) checking of the statements which had been made by Flying W concerning the financing which was (as of that time) to be obtained through Elkins, Morris & Stroud.

We find that Clark's memo indicates that as of April 9th, negotiations were continuing and were still in a preliminary stage.

On April 22, 1970, Noble wrote a memo to Frank indicating that PSL was apparently going to be able to proceed with negotiations concerning the proposed purchase and lease back. The memo specifically notes that Flying W had not been given a "final o. k." with respect to the proposed transaction. In addition, the memo contains discussion about certain provisions which PSL felt it would be desirable to have in any documentation which might be developed.

On April 24, 1970, a memo was prepared by PSL which is captioned "Flying W—Items to be Covered Before Closing Can be Scheduled". The memo demonstrates that as of the time it was written, there was no agreement. Among the areas covered are the following: (1) documentation from the Banks had to be obtained and reviewed and documentation on behalf of PSL had to be prepared and reviewed; (2) further information had

to be obtained about the Elkins, Morris & Stroud/Orvis interim financing; and (3) further financial information had to be obtained from the Matlacks, EBR and Flying W.

On May 8, 1970, Noble wrote a memo to Frank indicating that PSL had decided to proceed with negotiations concerning the proposed purchase and lease back, subject to a multitude of requirements and conditions which had to be fulfilled or complied with before PSL would go ahead with any possible deal. The memo also describes the need for documentation which had to be agreed to by all parties and which, in particular, had to be submitted to the Banks "for approval".

Included among the "requirements and conditions" and among the documents needed for submission to all parties "for approval" were the following: (1) the Aircraft lease agreements; (2) agreements extending the $500,000 security to all three airplanes; (3) documentation for an unlimited second mortgage covering the Flying W Ranch making the security applicable to all Flying W leases; [19] (4) documentation establishing a second mortgage position with respect to the RCA Building, which security was to be applicable to all Flying W leases; (5) a redrawn EBR guarantee to cover all leases to Flying W; (6) a redrawn guarantee by the individual Matlacks agreed to by them so as to cover all leases; (7) guarantees for James and Wm. Whitesell; (8) arrangements covering the security of the spare parts; (9) negative covenant agreements had to be prepared for inclusion in the proposed lease; (10) production of EBR's financials through March 31, 1970 (reflecting the conversion of EBR debt to equity), certified by the three Matlack brothers with an agreement that PSL would receive an audited statement within 90 days; and (11) production of an unaudited Flying W statement through March 31, 1970, certified as to accuracy by Weidenmuller.

Many of the foregoing items had not even been agreed to, much less documented in satisfactory detail. We find

19. Flying W was also leasing other aircraft from Chaneu Air, a Pepsico subsidiary.

that the memorandum indicates, *inter alia,* that, as of May 8, 1970, the matter was still in the negotiating state and reflects that, in view of the extensive documentation required, there would be no agreement until all documentation was approved and signed by the parties.

On May 11th, PSL's James wrote an optimistic memo to Noble reporting on a visit which he had had with the partners of Orvis concerning the Flying W letter of intent. James concluded his memo by saying that, "I conclude that Orvis Brothers has made a commitment to Flying W and they should strengthen the companies' financial area considerably". The debtors and trustees have contended that it was after learning of this commitment that:

"Mr. Clark sought and received approval from Mr. Lay to 'finalize the discussions' ".

This brings us then to the May 12th memorandum, prepared by Clark as he was preparing to leave the country for several weeks, which is the crux of the debtors' and trustees' contention that an agreement was reached between April 2nd and May 26th.

The Clark memorandum to Lay sets forth the nature of the proposed lease transaction as follows:

"Purchase of two additional Lockheed Hercules L–100–20 aircraft (and related parts) from Flying W and leaseback, on a twelve year term, to Flying W. Cost to PSLAL of this year old additional equipment is $7,650,000, compared to present replacement cost of $8,059,000. PSLAL purchase proceeds will be used to pay out present bank financing. The investment tax credit is not a factor in this transaction.

Our back-up financing will be accomplished through a borrowing by PSLAL from Flying W's present lenders, i. e., The Farmers' Bank of Delaware and the Girard Trust Company, who will advance 100% of the cost, without compensating balances, on an eight-year term with balloon, the loan to be amortized on a twelve-year, 10% p. a. payout basis. The loan will be guaranteed by PSALC."

The memorandum further sets forth twelve requirements (some of which appeared in the prior memoranda) of PSL in order to secure the transaction. These requirements include extension of the $500,000 cash security on the N50FW to cover the N30FW and N40FW; guarantees of EBR, the individual Matlack brothers and the Whitesell brothers; extension of the second mortgage lien on New Jersey airport property to cover all Hercules leases; a second mortgage on commercial building (apparently in Cinnaminson); a lease of spare parts to include segregated warehousing and control of same; certain agreements of Flying W and EBR not to incur certain additional obligations without the consent of PSL; certain provisions with respect to insurance; certain requirements as to documentation; certain requirements as to engine and airframe escrow reserves; and the condition that Flying W was to pay all of PSL's accrued and future costs of the transactions, including counsel fees, recording and other out-of-pocket expenses, and to clear away any liens or claim on the equipment or collateral security except the first mortgages previously noted.

Clark concluded the memorandum with the following words:

"Subject to the above conditions, I request approval of the transaction recommended in my memorandum of March 19, so that we may now finalize the discussions we have had with the lessee, the banks and the guarantors."

On a copy of the Clark-Lay memorandum, which is marked for identification as D–231, there appears, in the hand of Frank, a notation that "RGC [Clark] advised that Mr. Lay had approved this transaction". It is the position of the debtors and trustees that this memorandum with Frank's notation demonstrates that the officers of PSL had received approval from their parent company to enter into the refinancing agreement. We do not so find. Neither Frank, who was only a

staff attorney, nor Lay were called upon to testify. However, Clark and Noble, the executive officers of PSL, unequivocally deny that Lay had ever approved the transaction. We do not find that the May 12, 1970 memorandum indicates that agreement. In fact, we find that the tenor of the memorandum, referring, as it does, to the "proposed transaction", and containing many as yet unagreed upon conditions, clearly negates this contention. We do not credit Frank's notation as having any value. Neither do we find that the absence from the Clark-Lay memorandum of specific reference to the preconditions which we have referred to above indicates PSL's abandonment of those preconditions. Clark testified that the May 12th memorandum was intended as an amendment and supplement to the March 19th memorandum in which the preconditions had been set forth. Moreover, the intensive PSL activity during this period with a view towards determining the status of the Orvis brothers commitment demonstrates PSL's concern about the financial situation of Flying W. We find that the purpose of the May 12th memorandum was to obtain authority to negotiate further. At a May 13 meeting, believing that the Orvis commitment was solid, Lay authorized Clark to continue to negotiate and to continue to attempt to develop those terms which they felt were necessary. Clark never advised Frank that Lay had approved the transaction. In fact, the memo itself indicates that before PSL would give a final commitment documentation had to to be reviewed and approved, and we further find that, at this time the documentation was in its early stages.

On May 20, 1970, Noble wrote to Flying W confirming Flying W's knowledge of the fact that PSL had commenced the preparation of documentation for a possible purchase and lease back transaction. Noble stated that in connection with the preparation of documents, PSL was going to incur certain costs and expenses. He then asked for a confirmation that "whether or not the transaction is consummated", Flying W would agree to pay and reimburse PSL for all of its reasonable out-of-pocket costs and expenses. This does not in our view indicate that an agreement had been reached. Noble asked Flying W to indicate its agreement to the contents of the letter by executing and returning a copy. On May 25, 1970, Selby executed a copy of the May 20th letter confirming and agreeing to the substance of the letter.

From the foregoing, we find that, as of May 25, 1970, notwithstanding the matters respecting the aircraft insurance to which we now turn, there was no agreement on the aircraft lease aspect of the refinancing agreement.

### c. The Insurance Package

It is undisputed that on May 26, 1970, PSL advanced the sum of $931,556 for insurance on all three Hercules aircraft for the policy year May 1970 to May 1971. This fact is the second major "prop" of the debtors' and trustees' contention that a refinancing agreement was concluded by May 26, 1970. Moreover, the debtors and trustees contend that this act by PSL constitutes sufficient part performance to take the agreement out of the statute of frauds, if the statute is applicable; we will discuss that aspect of the matter in a succeeding section of this Opinion. There being no dispute that the advance was made, the important consideration for us is why it was made, hence the following findings.

At the April 1 meeting, Clark had raised the topic of insurance when he stated that if any deal was worked out, PSL would want to establish some form of control over Flying W's insurance. There was no discussion concerning his observation. At the May 4th meeting, James Whitesell had pleaded with PSL to do everything possible to find a way to help Flying W get insurance coverage which it was now unable to finance. (Flying W was in default on notes due in connection with the then current year's insurance.) Clark and Noble did not give any commitment, but merely stated

that they would do what they could to help.

After the May 4th meeting Clark and Noble met with PSL's insurance people and developed an insurance package which was profitable for PSL in the form of an advance of the premium by PSL in return for a note bearing 11½% interest, guaranteed by the Matlacks, EBR and the Whitesells. In analyzing the proposed policies, Clark directed his attention to PSL's risk of loss. As the transaction was analyzed, PSL's total maximum exposure was approximately $150,000. Clark considered that exposure to be minimal, especially in light of the guarantees of the Whitesells, the Matlacks and EBR. At the time he was considering the insurance problem, Clark was heavily influenced by the fact that PSL's report had just come back from Orvis indicating that everything looked favorable in connection with the Orvis financing. Therefore, Clark was optimistic about the possibility of reaching an agreement with Flying W on the purchase and lease back transaction, and was partly motivated by his desire to protect the negotiations. In its dealing with Flying W, PSL thought that it was dealing with a viable company. Another factor in deciding to go ahead with the insurance payment was the fact that PSL's own airplane (the N50FW) would be protected as a result of the payment.

On May 26, 1970, Flying W executed, and the Matlacks, EBR and the Whitesells guaranteed, a promissory note covering the amount of the insurance advance. The makers and guarantors of the note also executed a letter agreement providing, *inter alia,* that the insurance company was authorized to cancel the insurance at the sole discretion of PSL and to refund to PSL all refundable premiums. The note and letter agreement were returned to PSL on that day.

While we find that the insurance premiums were advanced by PSL in anticipation that a refinancing agreement ultimately would be concluded, we also find that the advance had an independent and self-sustaining business purpose. Ac-

cordingly, we do not deem the advance of the insurance premiums to be an ingredient in any refinancing plan.

### d. *The Bank Loan to PSL*

We have found that at the April 1, 1970 meeting, there was no manifestation of mutual assent concerning a loan from the Banks to PSL, although there was an expression of interest to lend. We consider there to be a significant distinction between an expression of interest to lend, or even a statement of intention to lend, and an actual agreement to lend and a confirmation of that fact by a formal commitment on the part of a lender.

The debtors and trustees have heavily underscored the fact that on May 20, 1970, Noble wrote to the Banks, *inter alia,* as follows:

"In connection with our proposed purchase from and lease to Flying W Airways, Inc. of its two Hercules aircraft, registration numbers N30FW and N40FW, and certain rotatable spare parts, we wish to confirm our understanding that you and Girard Trust Company will lend to PSL Air Lease Corp. the amount of $7,650,000 for an eight-year term to be amortized on a twelve-year 10% per annum payout basis, secured by a chattel mortgage upon the aircraft and spare parts, a collateral assignment of the lease for the same and the guarantee of the loan by Pepsico Service Industries Leasing Corporation. We also confirm to you that the loan referred to above is a condition of our going forward with Flying W in the proposed transactions. . . .

We have commenced preparation of the necessary documents and expect to close the transaction within the next two to three weeks. We, therefore, would appreciate receiving from you at your earliest convenience a copy of the letter agreement setting forth the terms and conditions of your proposed loan to PSL Air Lease . . . ."

We find, however, that PSL never received a response, either orally or in writing, from either Farmers or Girard to the letter, and observe that Noble referred to the "proposed loan". The Noble letter therefore adds nothing to the debtors' and trustees' case.[20] We also find that there was no negotiation between April 2nd and May 26th of the multitude of terms and conditions which would have normally been set forth in the documentation necessary to a loan commitment. As we indicated above, PSL did not have an established banking arrangement with Farmers or Girard as it did with some ninety other banks, and none of the details which are normally part of a bank loan transaction were ever discussed by PSL and the Banks.

The debtors and trustees also heavily rely upon a letter written on April 10, 1970 from Brown of Girard to Baldwin of Farmers as follows:

"This is to advise you that Girard Trust Bank agrees to the sale by Flying 'W' Airways, Inc. of the two Lockhed [sic] Hercules Airplanes involved in our joint loan to Flying 'W'. This sale is to be made to Pepsico Service Industries Leasing Corp. for an amount equal to the present balance owing us including past due principal and interest. This figure is approximately $7,400,000.

Our agreement for the above is based on the following conditions:

(1) Receipt of a note from Pepsico Services covering the amount presently due our two banks.

(2) Retention of our security interest in the two airplanes in question.

(3) Assignment to us of Flying 'W' and Pepisco Leases.

(4) Assignment of Flying 'W' and Red Dodge Leases (if in existence).

We understand further that the loan will be for a period of 8 years with a 12 year payout and the rate of interest is to be 10% per annum."

We find that Brown wrote this letter because he was asked by Johnson to give Farmers something for its files so that they could rely upon it, indicative to PSL that the Banks desired to proceed with negotiations. We do not find the letter to constitute a bank loan commitment. Moreover, there is no evidence indicating that a copy of Brown's April 10th letter was delivered to PSL prior to September 25, 1970.

There having been no other interim developments, we find that, as of May 26, 1970, there was no manifestation of mutual assent by the parties upon that aspect of the refinancing agreement which contemplated a loan from the Banks to PSL to cover the cost of purchase of the N30FW and N40FW.

e. *The Loan to Flying W to Provide Funds for Settlement*

As will be seen from the succeeding sections of this Opinion, the financial position of Flying W was seriously deteriorating. Flying W therefore needed to raise sums to complete settlement. Considerable sums were already past due to PSL, and, in addition, it had come to light after the April 1, 1970 meeting that Lockheed held a lien on the N30FW and N40FW which would require $125,000 to satisfy (this had not even been discussed at the April 1 meeting at which the debtors and trustees contended that there was an agreement reached!). Accordingly, on May 11, 1970, Selby wrote to Baldwin requesting a loan from Farmers, stating that Flying W's "complete financial requirements" were as follows: (1) an accounts receivable loan in the amount of $500,000 (this was to replace and augment Flying W's present accounts receivable financing, which was with First Pennsylvania Company, and on which there was a balance outstanding); (2)

---

20. It will be noted that the loan amount adverted to in the letter had been increased by $300,000 over the amount which had been discussed at the April 1, 1970 meeting! The reason for increasing the loan amount was that PSL contemplated purchasing additional spare parts which had been sold to Flying W by Charlotte Aircraft Corporation.

an interim loan in the amount of $549,-768.00 to be used to establish engine reserve accounts on the N30FW, N40FW and N50FW; and (3) a loan in the sum of $284,000 to enable the refinancing of loans which Flying W had with the New Jersey banks. We find, however, that Farmers at no time responded to Selby's May 11th letter with a commitment to make the loan and that Flying W would not have been in position to complete settlement without it. We shall see, *infra*, how Flying W's loan requests to provide funds to enable it to complete settlement steadily increased throughout the spring and summer. We find that, on some occasions, Farmers expressed a "willingness" to lend; Baldwin would say from time to time that he thought that a particular loan "could be arranged", but we find no loan commitment in the conventional sense to have been issued.

The fact of the matter is that Flying W would not have been financially able to close even had there been a refinancing agreement without obtaining a closing loan. While such a loan therefore became a necessary ingredient of the refinancing plan, it never was agreed to by Farmers.

### f. Conclusion

We have reviewed the events occurring between April 2nd and May 26th pertaining to the principal terms of the alleged refinancing agreement and have found that there was no manifestation of mutual assent during that period on any of the principal terms. We further find that had there been such manifestation on the so-called *principal* terms that we have discussed, there would by no means have been a mutual manifestation of assent upon *all the material terms* of an infinitely complex agreement. We further find (see *infra*) that the parties did not contemplate that there would be an agreement until the documentation was concluded and the terms reduced to writing, which did not occur between April 2nd and May 26, 1970.

### 5. Events Occurring Between May 26, 1970 and June 25, 1970

Although the debtors and trustees do not contend that a refinancing agreement came into existence between May 26th and June 25th, it is, nonetheless, important that we review the events occurring between those dates, for they shed light on the refinancing agreement claim and bear heavily on the estoppel issue. In so doing, we first find that, during the period from May 26th to June 25, 1970, the parties continued the negotiations which had been underway for several months looking towards the refinancing agreement. However, during this period, a number of events occurred which caused Flying W's position in the negotiations to deteriorate seriously.

*First,* it became apparent to all concerned that Orvis Brothers was in serious financial difficulty and that the Orvis commitment to raise equity financing for Flying W was therefore worthless. In late May, Orvis Brothers failed and went out of business.

*Second,* PSL learned that the N50FW was at Lockheed, Georgia with a defective wing which had cracked during a flight in Alaska, and that a major repair was involved.

*Third,* Clark learned that Weidenmuller had resigned; Weidenmuller was the individual upon whom PSL was relying for figures.

*Fourth,* Clark saw Flying W's March 31st statements for the first time, reflecting the seriously deteriorating financial position of the company.

*Fifth,* on June 11th, Selby wrote to Baldwin with a renewed request for a loan to be made at the time of closing with PSL. This time the loan request had been upped to $805,807. *Inter alia,* Flying W was unable to meet the payment due PSL in connection with the insurance advance in addition to the other sums owed PSL. Included in the letter was a request for the sum of $125,000 for final payment to Lockheed Aircraft Service Company in

order to release liens held on the Hercules aircraft.

On June 16, 1970, a meeting was held at Farmers attended by Selby, Robert Matlack, James Whitesell, Baldwin, Johnson, Milione, and Wesley Newhouse (a representative of First Pennsylvania Bank).[21] The principal subject of the meeting was Selby's loan request of June 11th. Milione said that, in considering a loan of the size requested, the bank was concerned because it could see nothing in Flying W to secure the loan; thereupon a discussion ensued as to possible additional security. Farmers requested further information from Flying W, including an itemization of contingent liabilities and a request, previously made, for a complete listing of all accounts receivable and an aging of those accounts. Although Selby apparently felt that Farmers was committed to an $805,000 loan at the June 16th meeting, we do not so find. On June 24, 1970, Farmers was still investigating the possibility of lending money to Flying W. In a telephone conversation, Johnson so informed Clark and asked him to provide him with financial information which PSL had available concerning EBR and the Matlacks so that Farmers could evaluate the loan request.

After Clark's return from abroad in early June, PSL, still concerned about Flying W's financial situation, had continued to accumulate information on Flying W's liabilities. Noble contacted James Whitesell and asked him to be certain to bring Flying W's current financials to a meeting which had been scheduled for June 25th. Noble had frequent conversations with Whitesell and was discussing with him the financial requirements for Flying W to close the deal. In a conversation with Selby during this period, Noble had reiterated his statement at the April 1st "side-meeting" to the effect that all delinquencies of Flying W to PSL, including the N50FW delinquency, would have to be brought up to date.

The June 25th meeting occurred at the offices of PSL at Purchase, New York. It was attended by Selby, Edwin Matlack, James Whitesell, John O. Sitzler, Esq. (Flying W's corporate secretary), Clark, Noble, and also Robert I. Pagnucco, J. W. Barba and William Foss, all lawyers representing PSL. Prior to the meeting, Selby had been advised by the representatives of PSL that the June 25, 1970 meeting was to be a "pre-closing meeting", and the meeting began with a review of the available documentation. The draft lease was reviewed along with other documents.[22] The significant event of June 25th was a side-meeting in Clark's office, attended by Clark, Noble, Selby and James Whitesell, at which Clark told Selby and Whitesell that the May 31 financial statements which had just been presented to PSL portrayed a different financial picture from that which had been presented to PSL on earlier occasions. These financial statements showed that for the first eleven months of Flying W's fiscal year, the company had lost $3,496,951.61. The loss for the month of May was $268,875.17. The Flying W loss for the first five months of 1970 was shown to be $1,-324,000. Clark stated that he could not take the May 31 financials to Pepsico for approval. During the discussion which followed, Clark made reference to the fact that the statements showed that Flying W had a deficit equity position. He also made reference to the fact that the

21. It is interesting to note that the meeting began, as all meetings at Farmers began, with a report from Selby on the state of the pipeline permit and the state of affairs in Alaska. The hopes for the pipeline never left the picture!

22. In further corroboration of the fact that negotiations were continuing is the discussion at the meeting of one item which had not been discussed previously, relating to a dollar figure which PSL wanted to establish with respect to how much indebtedness Flying W and Red Dodge could incur without the express permission of PSL. Prior to June 25th, a blank had been left in the draft lease for that figure, but on June 25th a one million dollar figure was discussed.

statement presented was an actual statement and did not reflect the conversion of the Matlacks' debt position to equity. Clark was particularly surprised about that fact in light of what he had been previously told by James Whitesell—that the EBR conversion had been effectuated as of March 30th.

During the side-meeting, a number of new requirements for proceeding with the negotiations were discussed. Clark stated: (1) that Flying W should have working capital in an amount sufficient to cover the Corporation's losses for a period of six months to a year; (2) that all accounts payable should be up to date; and (3) that financing for the Anchorage hangar should be arranged. At the time of the conversation, Selby knew that Flying W was going to have to obtain money to make a quarterly advance rental payment with respect to the two Aircraft, and spare parts and money to cure other delinquencies. Clark offered some suggestions as to how Flying W could obtain the financing that was necessary. One of his suggestions was that Flying W should contact the oil companies with whom it was doing business. Selby responded to Clark's comments by stating that,

> "[W]e would try to provide this financing, that we would attempt to go out and get the financing."

James Whitesell responded to Clark's remarks and suggestions by saying that Flying W would try to arrange the requested and needed financing. In the wake of PSL's firm insistence upon its preconditions (and the addition of some new ones), and the lack of Flying W's protestations thereto, it is clear that, in the period between May 26th and June 25th, just as before, there had been no affirmation of mutual assent as to the terms of a lease for the N30FW and N40FW aircraft.

During the period from May 26th to June 25th, the Banks also continued their role in the negotiations. Anticipating that something favorable might happen with respect to Flying W's finances, and

in recognition of the fact that the executive committee of Farmers does not meet in August, Baldwin and Johnson sought and obtained authorization to make a $7,650,000 loan to PSL and a $1,200,000 loan to Flying W from the Wilmington Board of the Bank in late June, and from the Executive Committee of the Bank in its July meeting. However, in accordance with Baldwin's testimony, we find that the actions of the Wilmington Board and the Executive Committee do not constitute approval of the loans, but rather authorization to Baldwin and Johnson to proceed with the loans if they deemed it appropriate. The debtors and trustees also point to a June 3, 1970 letter sent by Johnson to Noble enclosing draft loan papers. The letter had been prepared by Milione, who had understood that PSL was inquiring as to what type of contract Farmers would desire in the event that the parties entered into the loan arrangement which was being discussed, and we find Milione's objective in sending such papers was solely to give PSL a sample of what Farmers had used in the past.

We further find that neither Ikeler, Van Norden nor Brown had authority to commit Girard's participation in a loan of the size contemplated. They met with Raymond Euler, Vice President of Girard, who did have authority to approve a loan of that magnitude. Euler agreed that the concept of such a transaction was desirable, and he authorized Ikeler and Van Norden to proceed with negotiations. He did not, however, authorize or approve the making of a loan, nor do we find that Girard's participation in the loan to PSL was ever authorized by appropriate corporate action.

In view of the deteriorating financial status of Flying W, it is plain that the Banks would have preferred to have its loan paid off and be able to look for payment to a financially sound subsidiary of Pepsico, Inc. instead of Flying W. Notwithstanding this fact, we find no evidence that the aircraft loan aspect of the refinancing agreement had been agreed upon by June 25, 1970.

### 6. Negotiations Looking Towards a Refinancing Agreement After June 25, 1970

We find that the parties continued their negotiations looking towards a refinancing agreement into the early part of September 1970. They also continued to develop the documentation for a proposed transaction. It is important to recite the events of this period because they shed light upon the refinancing agreement claim and bear heavily upon the issue of estoppel.

The first development of significance after the June 25, 1970 meeting involved efforts to obtain a successor to Orvis Brothers with respect to Flying W's equity financing. James Whitesell, Robert Matlack and other representatives of Flying W (aided in some instances by representatives of PSL) sought such financing from numerous sources, including Lehman Brothers, the Alaskan State Bank, the Industrial Valley Bank, the Gulf Oil Corporation, the Humble Oil Corporation, and a number of other groups.[23]

The parties met again at Farmers on June 30, 1970. Selby attended along with Robert Matlack for Flying W; Clark represented PSL, and Baldwin and Johnson represented Farmers. At the meeting, Flying W stated that its minimum requirement for funds to complete settlement was $1,580,000. Clark, however, added that, among items that he wanted taken care of prior to any closing was the $270,000 which was owed in connection with the Anchorage hangar, a tax deficiency of approximately $80,000, and the sum of $250,000 in current accounts payable which had been owing for more than sixty days. Moreover, Clark stated that PSL wanted to be assured that Flying W had sufficient working capital to carry on business for a period of several months, and in that regard, a figure of $450,000 was discussed. Clark recapitulated that there were three general areas with which PSL had to be satisfied before it would agree to the proposed transaction: (1) the financial standing of Flying W; (2) the business management of Flying W; and (3) acceptable lease documentation. We find that the events of this meeting confirm the non-existence of a refinancing agreement, and that the matter was still under negotiation.

The Flying W and PSL interests met again on July 16, 1970 at the offices of PSL at Purchase. The meeting was attended by Selby, the two Whitesell brothers and the three Matlack brothers, along with Clark and Noble for PSL. At this meeting the parties reviewed a memorandum prepared by Noble as to items that PSL insisted be taken care of prior to any settlement. The monetary sum totaled close to $2,500,000. The list included a number of substantial items past due from Flying W to PSL. Among the suggestions made by Clark at the meeting were the merger of EBR and Flying W, which would create a better balance sheet for Flying W, since at that time Flying W had a negative net worth. Robert Matlack told Clark that he would study the matter.

Another meeting was held on August 5, 1970 at Farmers, attended by representatives of Flying W and the Banks. Selby began with a review of the current events and predicted the issuance of a pipeline permit by September! Optimistic projections as to Flying W's expected revenues were made and Robert Matlack indicated that further financing for Flying W was being arranged. In the aftermath of that meeting, Selby developed further financial data which was discussed at an August 28th meeting at Farmers attended by representatives of the Banks and Flying W. At one point during the August 28th meeting, Brown and Baldwin left the meeting room.

---

23. As the summer progressed, those efforts changed basically in character, and looked towards obtaining financing through effecting a merger (as opposed to a loan) with such firms as Saturn Airlines, Inc., Harvard Industries, and Rollins, Inc. None of these efforts met with success. At one point, Flying W even attempted to sell the N30FW and N40FW to the government of South Africa but failed.

Baldwin thereupon told Brown that the amount of money Flying W was requesting had exceeded Farmer's legal lending limit, and that if there was any hope of keeping the negotiations alive, Farmers would have to have Girard's participation in the loan requested by Flying W to complete the closing. Brown's immediate reaction was negative, but he agreed to discuss it with Van Norden, who in turn told Brown that Girard would consider participating only to the extent that the loan could be secured.

The Banks' representatives met again at Farmers on September 1st. They first tried to pin down the amount of the loan which was needed by Flying W, and, second, tried to determine whether there was sufficient good collateral to secure such a loan. Because they had still not received, despite repeated demands, a listing and an aging of all of Flying W's accounts receivable, they had difficulty in determining the adequacy of accounts receivable as collateral. On September 2nd, however, Milione finally received the list and aging of Flying W's accounts receivable, but, in view of the age of numerous of the accounts, was unable to find adequate security. On September 3rd, Van Norden spoke with Clark in an attempt to find out how much money was needed in order to get PSL into the proposed deal. The conversation was inconclusive.

The Banks' study of the Flying W situation increased in intensity during the following week. A meeting among all parties was scheduled for September 8th. The Banks and PSL met first; the Flying W representatives, including Selby and Robert Matlack, joined the meeting some time after it had begun. Robert Matlack expressed his embarrassment to Baldwin and his feeling that he did not want to "hurt the Banks". Baldwin asked him if he would put up the EBR trucking terminals as security. Matlack responded that "he would do anything", and Baldwin asked him to remain in town for a few days. At one point during the meeting, however, Baldwin suggested to Matlack that he should consider closing the book on Flying W because he was exposing his family fortune. Matlack indicated that he was going to see Flying W through to the end and that "he knew that it would succeed".

After further review, the parties met again on September 10th. Baldwin informed Matlack that he had two choices. The first choice was for the Matlacks to admit that they made a mistake in getting involved with Flying W and that the Banks would then repossess the two aircraft and proceed from there. Under the second choice, the Banks would agree to hold the proposed PSL deal in abeyance, and Flying W and the Matlacks would have thirty days to find some new financing for Flying W; however, in exchange for the thirty-day period of time, EBR and the Matlacks would have to sign an affirmation of the suretyship agreement which had been previously executed, and permit the Banks to obtain mortgages against all of EBR's and Matlacks' real estate. Robert Matlack agreed to the second alternative and promised to appear with his brothers at Farmers with the necessary deeds so as to "buy" thirty days' time. The Banks told Flying W that if the conditions set forth during that meeting were not met, the only course of action open to them would be repossession of the aircraft.

Robert Matlack and his brothers did not appear with the deeds as requested. The negotiations for a refinancing agreement were thus at an end, without (see *infra*) the necessary manifestation of mutual assent of the parties, at any time, to the material terms of a contract.

### 7. Request for Closing Under the Refinancing Agreement

We find that at no time after April 1, 1970 did Flying W ever make any demand for closing under the alleged refinancing agreement. We deem this to be a significant fact because, *inter alia,* it demonstrates that Flying W never even thought that there was a binding refinancing agreement, and tends to indicate that the allegation of the refinanc-

ing agreement was an afterthought interposed in defense.

### 8. Status of the Documentation

We find that as of the time that negotiations for the refinancing agreement broke down, although substantial draft documentation had been prepared, the documentation had never progressed beyond the draft stage, and there were substantial differences between the documentation prepared by PSL and the Banks. Farmers' attorneys had been instructed to start the preparation of documentation, but, from time to time, Johnson told them to stop because, in his opinion, there were so many things that had to be settled that it looked unlikely that there would be an agreement. The documentation was, of course, never executed. (We have already set forth our findings that the parties did not intend that there be an agreement until the documentation had been prepared, approved and signed.)

### 9. The Question of Bad Faith—the Banks, PSL and Flying W

The debtors and trustees have asserted that the Banks and PSL, by reason of their conduct from April 1, 1970 to September 10, 1970, are estopped (1) from denying the existence of the refinancing agreement; and (2) from asserting that there was any default by Flying W under the loan agreement of April 10, 1969 or the (N50FW) lease of December 30, 1969. More specifically, the debtors and trustees assert that, during the period in question, the Banks and PSL repeatedly performed acts and made statements which ratified and confirmed the existence of the refinancing agreement, and thereby induced Flying W to rely, to its detriment, upon the expectation that the refinancing agreement would be consummated. By way of prejudice, the debtors and trustees assert: (1) that Flying W and Red Dodge did not, because of these assurances and representations, pursue alternative sources of refinancing the N30FW and N40FW; (2) that they advised creditors and customers that the refinancing agreement had been

reached, and that the closing would be held within a relatively short period of time; and (3) that, with the exception of interest payments made to the Banks in April and May 1970, they did not (because of the representations) make any payments under the loan agreement of April 10, 1969 or the lease agreement of December 30, 1969.

The Banks and PSL, on the other hand, contend that, if any party was guilty of bad faith, it was Flying W because of its delayed disclosure of its deteriorating financial condition, the unreliability of the disclosures and projections which it made, and its misrepresentations about the Matlack debt conversion.

First of all, as we have set forth in our rather lengthy exegesis of the events occurring between April 1, 1970 and September 10, 1970, we do not find that the Banks and PSL repeatedly performed acts and made statements which ratified and confirmed the existence of the refinancing agreement. *Inter alia*, we do not find that the PSL advance for insurance on the N30FW and N40FW constituted such an event; we do not find that the holding of the pre-closing meeting constituted such an event; we do not find that the preparation of the documentation constituted such an event; and in general, we find that both the Banks and PSL made clear to Flying W that there were numerous conditions which had to be fulfilled before a refinancing agreement could be effected, which conditions became more stringent as the summer wore on and Flying W's worsening financial condition became apparent. During this period, the parties were merely negotiating, and Flying W was aware of it.

Moreover, we do not find that Flying W relied to its detriment upon the expectation that the refinancing agreement would be consummated. We find that: (1) the Flying W management was astute and sophisticated, and understood acutely that its situation was desperate and growing worse; (2) payments were not made because Flying W could not afford to make them; (3) Flying W did

indeed look elsewhere for sources of financing and for other means of alleviating its situation; and (4) Flying W made heroic efforts to keep the negotiations going, well beyond the time when it had any reason to expect that they would succeed, which had the effect of protecting, and not damaging Flying W's interest. Certainly, after the meeting of June 25th in Purchase, New York, it was clear that there would be no closing without a massive injection of capital into Flying W. We also find that, commencing in August, the Flying W management began to give thought to the filing of a chapter proceeding. On the other hand, we do not find that the Banks and PSL "led Flying W down the garden path." We find that the efforts of the Banks and PSL at negotiations were sincere through and including the September 10th meeting, and that it was not until following that meeting that the Banks' decision to repossess the aircraft was made.

During the summer of 1970, Flying W submitted to the Banks and PSL considerable financial data. On many occasions, the data was not transmitted promptly after its requisition. During this period, Selby prepared and submitted some eight or ten cash flow projections, based upon expected utilization of the aircraft, all of which turned out to be optimistic in light of the business which eventuated. The optimistic projections might, no doubt, have been expected to engender interest by the Banks and PSL. We do not, however, find sufficient evidence for us to conclude that the optimistic nature of the projections, or the delay by Flying W in supplying financial data, constituted an exercise of bad faith by Flying W. Closer to proving the Banks' and PSL's contentions are the early representations made by James Whitesell for Flying W that the Matlack (EBR) debt had been converted to equity; however, the fact that it had not been converted was discovered at least by June, thereby dissipating the effect of that misrepresentation.

In conclusion, we have found that neither the Banks, PSL nor Flying W was guilty of bad faith in connection with the matters under consideration.

10. *Summary of Findings and Conclusions*

■ In summary, we find that at no time was there a manifestation of mutual assent by Flying W, the Banks and PSL with respect to a refinancing agreement. While the debtors and trustees ingeniously sought to construct such an agreement from selected excerpts from the conversations of the parties, and from their correspondence and internal memoranda, they have, in our view, clearly failed to establish agreement on the myriad terms involved in a refinancing agreement so complex in nature as the agreement toward which the parties were looking. Numerous material terms were not agreed upon on April 1st, between April 2nd and May 26th, or at any other time. Moreover, certain salient preconditions of the PSL-Flying W aspect of the refinancing agreement were never met: the requirements which we find were imposed by PSL to the effect that it would not enter into any such agreement unless and until; (1) the Flying W debt to the Matlack interests was converted to equity, (2) substantial new equity capital (approximately $3,000,0000) was infused into the corporation, and (3) the Alaskan operations were made more profitable. To repeat, despite the numerous entreaties of the Court, the debtors and trustees failed and refused to produce as a witness the chief negotiator for Flying W with PSL, James Whitesell, who was available to testify, and who was the only one who could have refuted the testimony of Robert Clark of PSL about such preconditions.

We find that the numerous meetings and voluminous internal memoranda and proposed documentation constituted but ingredients in the process of negotiation towards a refinancing agreement. We find that the parties did not contemplate

that an agreement would exist until the (voluminous) documentation was prepared, reviewed, approved and executed.

The foregoing findings and conclusions are corroborated: (1) by the size of the proposed transaction for the Banks and PSL and the consequent unlikeliness that they would enter into such a transaction on an informal basis; and (2) by the absence of any request by Flying W for closing under the "refinancing agreement". Finally, we do not find that the Banks and PSL were guilty of any inequitable conduct as to give rise to an estoppel.

## C. *Choice of Law*

■ In determining choice of law, we must apply the rule of Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania, the forum state, has adopted the so-called "most significant contacts" approach to questions of conflict of laws. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964); Mixing Equipment Co., Inc. v. Philadelphia Gear, Inc., 312 F.Supp. 1269 (E.D.Pa.1970), modified and aff'd, 436 F.2d 1308 (3d Cir. 1971). It is clear from our findings of fact that the "most significant contacts" with respect to the alleged refinancing agreement occurred in the State of Delaware. According to the position taken by the debtors and trustees until recently, the contract was entered into at the April 1, 1970 meeting at the office of Farmers in Wilmington. The only negotiations at which Flying W, PSL and both Banks were represented took place in Wilmington. Numerous other meetings between Flying W and the Banks took place in the State of Delaware. Conversely, we find no other state with anywhere near the significant contacts to the transaction as Delaware. Accordingly, the law of the State of Delaware shall be applied to all aspects of the case relating to the alleged refinancing agreement.

## D. *Discussion*

### 1. *Introduction*

■ While our findings of fact with respect to the alleged refinancing agreement have been extremely extensive, they have the virtue of permitting a far briefer treatment of the legal issues involved than might ordinarily be required in a case of this magnitude. This conclusion follows for the reason that the findings as we have made them reduce the legal issues to simple ones, particularly in terms of whether or not the parties met the legal requisites of concluding a binding agreement and as to whether or not the doctrine of estoppel applies. Since the debtors and trustees have asserted the refinancing agreement as a defense, we hold that the burden is upon them to prove the existence of such agreement.

### 2. *Did the Parties Enter Into a Binding Refinancing Agreement On April 1, 1670?*

■ It is hornbook law that an enforceable contract requires that there be mutual assent upon all material and necessary terms, as well as the subject matter of the contract. This concept has been variously formulated by the courts and commentators, but all concur that the significant factor is the *manifestation* of assent. Williston speaks of this as manifestation by overt words or acts. See Williston 3rd Edition § 22. Corbin refers to these words and acts of the parties as " 'expressions' because they are the external symbols of the thoughts and intentions of one party." Corbin § 107. See also Restatement Contracts (First and Second) §§ 20, 21.

From time to time, courts have used the expression "meeting of the minds" to describe the acceptance necessary to form a contract. This formulation has created certain confusion which in turn has led to a great deal of discussion of whether acceptance was to be measured in terms of the actual mental assent of

the parties—their subjective intent—or whether it was to be measured by the outward expressions of assent, notwithstanding the parties' subjective intent. Williston indicates that, even though it was long ago settled that, in contract law, secret intent was immaterial, the phrase "meeting of the minds" still finds its way into judicial decisions. Its use as an ersatz indication of agreement cannot, however, under the prevailing view of the law, be taken to mean agreement of the parties based on their subjective intent,[24] except to the extent that subjective intent remains an important consideration in the area of equivocal offers where the effect of misunderstanding may be crucial.[25] Against this background, we restate that we have found, as a matter of fact, that there was no manifestation of mutual assent as to the material terms of the proposed refinancing agreement at that meeting. We also find, as a matter of law, that no binding agreement was reached on April 1, 1970. It is necessary, however, that we discuss certain of the cases relied on by the parties.

We do not find that this case falls, as asserted by the debtors and trustees, within the rule of Universal Products Co. v. Emerson, 36 Del. 553, 179 A. 387, 394 (1935), or of Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3d Cir. 1965), to the effect that where all substantial terms of a contract have been agreed upon and there is nothing left for future settlement, the fact that the understanding of the parties is that the contract should be formally drawn up and executed does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed. As we have said, the substantial terms of the contract alleged here were not agreed upon at the April 1st meeting, and we

have found that the parties contemplated that there would be no agreement until the documentation was approved and signed.

Tacitly conceding that the terms of the aircraft lease, a crucial aspect of the refinancing agreement, had not been agreed upon on April 1st, the debtors and trustees have argued that the lease rental was adequately fixed by reference to the N50FW contract. They have advanced cases to the effect that an agreement which fixes a price by reference to a mathematical formula, rather than stating specific dollar amounts, is not unenforceable for lack of certainty. California Lettuce Growers Inc. v. Union Sugar Co., 45 Cal.2d 474, 289 P.2d 785 (1955); Southern Fire & Cas. Co. v. Teal, 287 F.Supp. 617 (D.S.C.1968); Seiberling Rubber Co. v. Rednor, 345 F.2d 23 (9th Cir. 1965); Foard v. Snider, 205 Md. 435, 109 A.2d 101 (1954); and Graham County Elec. Co-op., Inc. v. Safford, 84 Ariz. 15, 332 P.2d 1078 (1958). We find all of these cases inapposite because here there was no agreement upon a formula. PSL's cash flow "formula" varied from transaction to transaction, and had never even been communicated to Flying W. We shall not take the time here to repeat our factual findings with respect to the matters not agreed upon on April 1st, for it is clear that, even if the "formula" cases were apposite, the parties would have been far from an agreement.

3. *Did the Parties Arrive at a Binding Refinancing Agreement Between April 2, 1970 and May 26, 1970 or Thereafter?*

The debtors and trustees have asserted that a contract, either express, or implied from the communications of the parties, plus their affirmative acts, occurred at some point between April 2nd and May 26, 1970. Again, it is unneces-

24. We note, however, that the result in this case would be no different if we applied the subjective test.

25. The classic case in this regard is Raffles v. Wichelhaus, 2 Hurl. & C. 906

(1864). See also, Kyle v. Kavanagh, 103 Mass. 356 (1869); Restatement of Contracts § 71.

sary to engage in lengthy legal discussion of this issue, because our findings of fact negate any such conclusion. We have found that, as of May 26, 1970, the parties had not manifested any mutual assent upon the essential terms of a refinancing agreement. With the deteriorating financial condition of Flying W, not even the debtors and trustees contend that an agreement was reached thereafter, and we do not find that one was reached thereafter. There are, however, a number of cases cited to us by the parties which commend discussion.

We have found that the parties did not intend that there be a binding refinancing agreement until all of the documentation was completed, approved and signed. Considering the magnitude and complexity of the transaction involved, our thinking in this regard is not unlike that of the Supreme Court of Pennsylvania in the case of Essner v. Shoemaker, 393 Pa. 422, 143 A.2d 364 (1958), where Mr. Justice Cohen, speaking for the Court, stated:

> "It is difficult to believe that the principals, experienced in real estate dealings as they were, would intend to [assent unequivocally] to an oral agreement in a transaction involving more than a quarter of a million dollars, [and] complicated by assignments, mortgages and taxes * * *." 143 A.2d, at 366, 367. (Emphasis supplied)

The transaction involved here was infinitely more complex than that involved in the Essner case.

■ It is appropriate also to comment upon the legal meaning of the term "close". The debtors and trustees assert that the frequent reference in the record to "closing" indicates: (1) that the parties had agreed upon the essential elements of the contract; and (2) that the "closing" was the event at which time the documents evidencing the parties' agreement would be executed and delivered. The Banks and PSL, on the other hand, have argued and we have found, that there would be no agreement

until actual closing. The cases indicate that the term "close" can be used in both senses. See, for example, Mactier's Administrators v. Frith, 6 Wend. 103, 114, 21 Am.Dec. 262 (N.Y.1830); Duprey v. Donahoe, 52 Wash.2d 129, 323 P.2d 903, 906 (1958). Moreover, on this subject, the Delaware caselaw holds that it is for the trier of the facts to determine whether the intent of the parties was to be bound before the execution of all documents. Universal Products Co. v. Emerson, supra.

Our legal conclusions follow the reasoning of the decision of the Supreme Court of Maine in the case of Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063 (Sup.Ct.1894). In that case, the plaintiff alleged that a binding contract for the shipments had resulted from the correspondence between the parties. The defendant, in turn, alleged that there was not a binding contract because the parties had contemplated that the terms of any agreement would be expressed in a formal document which was to be written and signed before the contract would be complete. The court held for the defendant on the ground that the parties did not intend to be bound until the contract was written and signed because the transaction was complicated and detailed, the amount of money was substantial, and the correspondence indicated that the parties contemplated a formal draft of the agreement, observing:

> "In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details,. whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. . . ." 29 A. at 1066 (emphasis supplied).

The type of contract involved in this case is unusual, contains numerous terms, and is of the type that normally is found in writing. The principles in the *Swift* case were followed and accepted by the Delaware Supreme Court in Universal Products Co. v. Emerson, *supra*.

In Emmons v. Ingebretson, 279 F. Supp. 558 (N.D.Iowa 1968), the court held for the defendant in a suit for breach of an alleged oral contract because (as here) the complexity of the transaction impelled the conclusion that the parties contemplated that the substance of their negotiations would be reduced to writing. Citing the *Swift* case, the court added:

> "An application of the standards articulated in the *Swift* case to the case at hand can lead to only one conclusion—that no contract was intended on the evening of November 14. The Court will not indulge in a lengthy discussion on this matter, but it will mention a few of the more important factors which dictate that result. The total purchase price of the stock was $116,400.00. The option and employment contracts contain numerous details and it would be an understatement to say that the option contract was of the type usually found in writing in order to attain its full expression. It was certainly a unique agreement. It consisted of two interlocking agreements between three principal parties. The remaining criteria have previously been covered. The only test which could be said to militate toward finding a completed contract is the additional standard of whether all details are acceptable to the parties or remain unsettled, but that cannot detract from the force generated by a consideration of all the standards." 279 F.Supp. 572–573.

To the same effect is Michigan Broadcasting Co. v. Shawd, 352 Mich. 453, 90 N.W.2d 451 (Sup.Ct.1958), where the plaintiff sued for specific performance of the defendant's alleged oral agreement to sell all of the common voting stock of a corporation. The Court stated:

> "We conclude that the chancellor was justified in finding no enforceable agreement between the parties. The negotiations were complex, as were the necessitous requirements of attaining the goal of such negotiations. A written agreement was proposed, referred to and suggested as the parties talked and a draft was ultimately ordered and prepared. The involved value and amount was something out of the ordinary, and the agreement toward which the parties were proceeding was 'of that class which are usually found to be in writing.'" 90 N.W.2d at 456.

In In re ABC-Federal Oil & Burner Co., Inc., 182 F.Supp. 928 (E.D.Pa.1960), aff'd, 290 F.2d 886 (3d Cir. 1961), the court denied the claim against the bankrupt estate based upon an alleged oral contract to lease a building because the evidence indicated that the parties intended the alleged contract to be reduced to writing before it would be binding and because essential terms had not been agreed upon, remarking that:

> "The very nature of the undertaking itself, having in mind inter alia the amount of money involved, permits a legitimate inference that the parties did not intend to be bound until the formal contracts were drawn and agreed upon." 290 F.2d at 890.

The court's reasoning supports our conclusion here.

■ The debtors and trustees have placed considerable reliance on what they claimed to be the *intent or belief* of the parties that a contract had been created. While such intent or belief, if it existed (and we have found that it did not) might be relevant on the question of an estoppel (see *infra*), it is not relevant on the question of whether or not a contract exists. As we have stated above, whether or not a contract exists is determined by the expressed intent of the parties; if that intent is not expressed, a court will then look to the actions and words of the parties. Subjective intent, *i. e.*, uncommunicated intent, of a party is not relevant to the

issue of whether a contract existed. Cf. Shofler v. Jordan, 284 S.W.2d 612 (Mo. Ct.App.1955); 17 C.J.S. Contracts §§ 32 and 33.

Finally, in their reply brief, the debtors and trustees have admonished us that:

"It is the duty of the Court to effectuate the intentions of businessmen, not to block them. . . ." Laveson v. Warner Mfg. Corp., 117 F.Supp. 124, 127 (D.N.J.1953).

We cannot, however, find that the parties, by their words, their writings, or their acts, intended anything at any time relevant to this Opinion other than to negotiate towards a final refinancing agreement.[26]

### 4. The Statute of Frauds

■■ Even were we to have found that a refinancing agreement was entered into, such an agreement would be unenforceable under the applicable Delaware statute of frauds. Section 2–201 of the Delaware Uniform Commercial Code, 5A Del.C., § 2–201, provides that a contract for the sale of goods for a price of $500 or more is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought". We find that there is no such document evidencing that a sale of the N30FW and N40FW and identified spare parts has been made. Documents that look toward some sale in the future do not suffice. Cf. Arcuri v. Weiss, 198 Pa.Super. 506, 184 A.2d 24 (1962). In Derden v. Morris, 247 So.2d 838 (Sup.Ct.Miss.1971), the court held that documents which had been introduced into evidence which, when taken

as a whole, indicated that the parties were still negotiating were not sufficient to satisfy the requirements of § 2–201; such is the case here.

■ There were no documents presented which would constitute a sufficient writing to satisfy the statute especially with respect to the specificity with which the terms and conditions of all promises constituting the contract are set forth. See Hull v. Brandywine Fibre Products Co., 121 F.Supp. 108 (D.Del. 1954); Abramson v. Delrose, Inc., 132 F.Supp. 440 (D.Del.1955). The debtors and trustees have selectively introduced PSL's intra-office memoranda, taking a page from here and a notation from there, while ignoring references inconsistent with the existence of a contract. It is true that the writing necessary to satisfy the statute of frauds need not be contained in one document alone, as long as all the documents used are clearly related to one another. Smith v. Onyx Oil & Chem Co., 218 F.2d 104 (3d Cir. 1955); Howell v. Witman-Schwartz Corp., 7 F.2d 513 (3d Cir. 1925). However, we agree with the Second Circuit, which, appreciating the problems inherent in this unlimited extension of the doctrine of "umbilical reference", has held that, although the statute of frauds will permit the piecing together of memoranda to establish the *terms* of the contract, nevertheless, it is essential, in order to satisfy the statute of frauds, that the "signed memoranda", standing alone, acknowledge the existence of a "contractual status". Oswald v. Allen, 417 F.2d 43, 46 (2d Cir. 1969). We do not find the *Oswald* requirement satisfied here. *Accord,* Hull v. Brandywine Fibre Products Co., *supra.*

The alleged refinancing agreement also fails to satisfy Delaware's general

---

26. We also find that the parties did not agree that Flying W was excused from making payments to the Banks under the April 10, 1969 loan agreement and/or the lease agreement for the N50FW; the latter subject was discussed but no agreement reached; the former never was. Both the loan agreement and the N50FW lease agreement provide that they may not

be orally modified. We find that neither the words, writings or acts of the parties constituted a waiver of those provisions. *Cf.* Knight v. Gulf Refining Co., 311 Pa. 357, 166 A. 880, 882 (1933), requiring clear and positive proof of the existence of an oral contract changing the terms of a prior written one.

statute of frauds, 6 Del.C., § 2714(a). That statute prohibits the enforcement of "any agreement that is not to be performed within the space of one year from the making thereof . . . unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith".

Flying W has alleged that the refinancing agreement provided for a 12-year lease of the Aircraft and for PSL's repayment of a loan from the Banks over a period of eight years. Thus, the alleged contract was not to be performed within one year. When there exists a bilateral contract, one part of which cannot be performed within a year, then the entire contract is subject to the statute of frauds. 2 Corbin, Contracts, § 456.

In addition to the foregoing, we find that Flying W never received a writing from the Banks setting forth any material term of any aspect of the alleged refinancing agreement. In Stahlman v. National Lead Company, 318 F. 2d 388 (5th Cir. 1963), the court held that, pursuant to a statute of frauds similar to the Delaware statute under discussion, the writing relied upon to take an alleged oral contract out of the statute must be signed by the party to be charged and delivered to the other party. Since no signed writing was delivered to Flying W by the Banks, any alleged oral agreement is not enforceable with respect to the Banks.

The debtors and trustees have alleged that the advance by PSL of the very substantial insurance premium in May constitutes a sufficient partial performance to take the matter outside of the statute of frauds. We have found that the insurance transaction was separate and distinct from the proposed refinancing agreement and had an independent business basis. However, even if the insurance transaction were to be considered a part of the "deal", it would not obviate the statute of frauds problem, for three reasons: first, the insurance advance is not a part of the alleged purchase price of the aircraft and parts, nor is it a payment for goods; the partial performance provision of the Delaware statute of frauds, § 2–201(3) (c) requires that the partial performance be a payment for goods; second, the doctrine of partial performance is available only when the party seeking to enforce the agreement is the party rendering the partial performance. 49 Am.Jur. Statute of Frauds § 436, and PSL, which made the advance, is not seeking to enforce the agreement; and, third, the partial performance exception is not available to the "not to be performed within one year" portion of the statute. Hull v. Brandywine Fibre Products Co., *supra;* Bryant v. Credit Service Inc., 36 Del. 360, 175 A. 923 (Del.Super.Ct.1934).

The debtors and trustees have sought to avoid the statute of frauds entirely by asserting that the alleged oral agreement regarding the purchase and leaseback of the N30FW and N40FW was intended to create only a security interest in the aircraft for PSL. This argument comprehends within it the contention that it was never intended that PSL get title to the aircraft, and that the lease of the aircraft was not a true lease. We find, however, that the agreement towards which the parties were looking during the negotiations comprehended the true transfer of title of the aircraft to PSL and the true lease of the aircraft to Flying W. (We find that the N50FW lease was also a true lease and not a financing arrangement.) Accordingly, the attempt of the debtors and trustees to avoid the statute of frauds by this argument fails as well.

It seems appropriate to conclude with the observation that the very purpose of the statute of frauds was to protect against the type of contention that has been made by the debtors and trustees in this case.

### 5. *The Question of Estoppel*

In alleging that, by reason of their conduct, the Banks and PSL are estopped from denying the existence of the re-

financing agreement, or from asserting a default by Flying W under the loan agreement, the debtors and trustees have invoked the doctrines of promissory and equitable estoppel. These are distinct doctrines.

▮▮▮▮ The doctrine of promissory estoppel, as set forth in § 90 of the Restatement of the Law, Contracts, has been adopted in Delaware. Metropolitan Convoy Corp. v. Chrysler Corp., Del. Supr., 208 A.2d 519 (1965); Slater v. George B. Clarke and Sons, Inc., 186 F. Supp. 814 (D.Del.1960). The doctrine of promissory estoppel holds that: (1) a promise (2) which the promissor should reasonably expect to induce (3) action or forbearance of a definite and substantial character (4) on the part of the promisee (5) and which does induce such action or forbearance, is binding (6) if injustice can be avoided only by enforcement of the promise. For a number of reasons, we cannot sustain the position of the debtors and trustees on the basis of promissory estoppel.

▮▮▮▮ First of all, the doctrine of promissory estoppel is inapplicable to this case. At the outset, we should note what the doctrine is *not*; it is not an "estoppel" [27] and it is not a means of acceptance of an offer. We believe that the better view is that it is "a substitute for consideration or an exception to its ordinary requirements". See Allegheny College v. National Chautauqua County Bank, 246 N.Y. 369, 159 N.E. 173, 174– 75 (1927). Thus, a promise made without consideration may become binding if detrimental reliance on that promise results; the reliance provides a substitute or equivalent of consideration (not a means of accepting a promise where there is no problem about consideration).

In Corbin's view, the effect of § 90 of the Restatement of Contracts is that "a promise without *any agreed consideration (agreed equivalent in exchange)* is made enforceable by reason of a substantial change of position in reasonable reliance on it." (emphasis added) 1A

Corbin on Contracts § 204 (1963). *Accord*, Grismore on Contracts (rev. ed. by John Murray 1965), where it is stated at § 61 n. 95:

> "if the promise was made under circumstances indicating that a bargain or exchange was contemplated, mere reliance on the promise will not make it binding. The requirement of mutual assent prevents it."

Certainly, it cannot be said that the facts as we have found them indicate that PSL and the Banks made any promises without any "agreed equivalent in exchange" of their promises (if such promises did exist), or that they did not contemplate "a bargain or exchange."

Secondly, we do not find the existence of "a promise". As the Court noted in Rennie & Laughlin, Inc. v. Chrysler Corporation, 242 F.2d 208 (9th Cir. 1957):

> "Obviously plaintiff's actions prior to the making of the defendant's promise cannot call the doctrine into play. . .

> They had engaged merely in preliminary negotiations and discourse. 'Estoppel cannot be established from such preliminary discussions and negotiations.' . . . The most plaintiff was deprived of—under the hypothetical assumption—was a mere expectancy . . . ." 242 F.2d at 212.

▮▮▮▮ Third, we have found no reliance on the part of Flying W. The law requires that any alleged reliance must be justifiable and reasonable. School District No. 69 of Maricopa County v. Altherr, 10 Ariz.App. 333, 458 P.2d 537 (Ct.App.1969); Babler v. Roelli, 39 Wis. 2d 566, 159 N.W.2d 694 (Sup.Ct.Wis. 1968).

Finally, we do not find that enforcement of the promise is necessary to avoid injustice. We have discoursed at length in our findings of fact on the question of the good or bad faith of the parties. We have found that the Banks and PSL have not been guilty of bad faith.

---

27. *See*, 1A Corbin on Contracts § 204 (1963).

The doctrine of equitable estoppel is also known as "estoppel in pais". 28 Am.Jur.2d § 27 defines it as:

"the principle by which a party who knows or should know the truth is absolutely precluded, both at law and equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed."

In Minerals & Chemicals Philipp Corp. v. Milwhite Co., 414 F.2d 428 (5th Cir. 1969), the Court stated:

"The essentials of equitable estoppel are: (1) words and admissions, or conduct, acts and acquiescence, or all combined causing another person to believe in the existence of a certain state of things; (2) in which the person so speaking, admitting, acting and acquiescing did so wilfully, culpably, or negligently, and (3) by which such other person is or may be induced to act so as to change his own previous position injuriously. The parties sought to be estopped must be guilty of conduct which amounts to . . . concealment of material facts at a time when he has knowledge, actual or constructive of the real facts. * * Aetna Casualty and Surety Co. v. Simpson, 128 So.2d 420 [425] (D.C.A. Fla.1961)."

■ While the doctrine of promissory estoppel is classically set in a contractual setting, the doctrine of equitable estoppel can operate in a contractual vacuum; its essence is concealment or virtual fraud.

Having found that the Banks and PSL are not guilty of bad faith, a fortiori they are not guilty of the type of conduct necessary to constitute equitable estoppel. Moreover, to the extent that it could be concluded from the facts that the Banks and PSL were guilty of any bad faith, we find that the conduct of Flying W in delaying disclosure and giving incomplete disclosure to the Banks and PSL of Flying W's deteriorating financial condition and of the status of the Matlack equity conversion at least equalled, if not exceeded, any "bad faith" of the Banks and PSL. We find the facts of the case of Skeels v. Universal CIT Credit Corp., 335 F.2d 846 (3d Cir. 1964), upon which the debtors rely, to be vastly different from the facts here and the case, therefore, is inapposite.

■ For the foregoing reasons, we find no basis for the contention of the debtors and trustees that the Banks and PSL are estopped to deny the existence of an agreement or of an act of default by Flying W.

### 6. Conclusion

For all of the foregoing reasons, we find that the parties did not effect a binding refinancing agreement which excused Flying W's performance of its obligations to the Banks; neither do we find the existence, against the Banks and PSL, of an estoppel to deny the existence of an agreement or to assert an act of default. Accordingly, we now turn to the questions raised by the mandate of the Court of Appeals and by the trustees' petition to extend the time within which to file a plan of reorganization.

## V. THE N30FW AND N40FW AIRCRAFT

### A. The Value of the Aircraft and the Debtors' Equity in Them

#### 1. Introduction

The mandate of the Court of Appeals directed that we consider whether the debtor has any equity in the airplanes. The Court's opinion explains the basis for the mandate by its reference to the opinion of the Court in In re Riker Delaware Corp., 385 F.2d 124 (3d Cir. 1967),

where Chief Judge Hastie, speaking for the Court, wrote:

"A turnover of property in which the debtor had no demonstrable equity could be confiscatory. . . ."

A determination of whether the debtors have an equity in the Aircraft inherently involves a determination of the value of the Aircraft. This determination of value is one of the most difficult questions posed by this entire reorganization proceeding. Three witnesses testified with respect to valuation. The debtors and trustees called Dale Westfall, Lockheed's chief Hercules salesman, and Robert Anson, an aircraft insurance claims specialist; (however, the bulk of Anson's testimony was ruled inadmissible for lack of foundation). The Banks called James G. Biever, an aircraft broker. In proceedings to determine valuation, the principal denominator is generally market value. Our difficulty lies in the fact that there was cogent evidence that there is no market for the aircraft at the present time, and the remaining evidence to the effect that there is a market was largely amorphous. While the record developed in this area was, consequently, somewhat unsatisfactory, we nonetheless must make findings, and we now do.

## 2. *Findings of Fact*

### a. *Balance Due From Flying W to the Banks*

■ As of September 24, 1970, the date of the filing of the reorganization petition, the balance due from Flying W to the Banks on the principal of the aircraft loan (after deducting the set off) was approximately $7,013,000, and the accrued interest payable on that date was approximately $725,000. The value of the aircraft will be compared with this

combined sum ($7,738,000) to determine equity.[28]

### b. *The Value of the Aircraft*

At an earlier stage of this opinion (p. 41), we have described the characteristics of the Hercules Aircraft in some detail. It is a special purpose aircraft, uniquely suited to operations on the Slope because of its large payload, its capacity to aft load lengthy sections of drilling rig pipe from truckbed height, and its short take off and landing capability. We have found that the Hercules is superior to any other cargo aircraft for Slope operations, and we find that there is no airplane presently on the drawing board to rival it. In providing service to the North Slope, the L–100–20 has a competitive advantage over the L–100 because its cargo compartment is seven feet longer.

There have only been 19 L–100–20 (stretched) Hercules in existence at any time, of which ten were built as "stretched" Hercules and nine were converted from L–100's. Of this number, seventeen are still in service. Lockheed has sold only 36 commercial Hercules of all models, including the 19 L–100–20's.[29] However, Lockheed's last domestic commercial sales of Hercules were to Saturn Airways: an L–100–20 it delivered in June 1970 with the agreement that it was later to be converted to an L–100–30, and an L–100–30 sold in June 1970 at a price of approximately $4,100,000 for delivery in May or June 1971. The last new Hercules L–100–20 sold by Lockheed was to Flying W at a price of $3,650,000, but the transaction was not consummated and the aircraft was not delivered.

Lockheed currently has "a catalog price" of $4,360,000 for a Hercules L–

---

28. The general rule is that, unless the value of the security exceeds the principal and interest due (which it does not here, see *infra*), interest on the debtor's obligation ceases to accrue at the beginning of the proceedings. Vanston Bondholders Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162. Accordingly,

we do not include interest after the date of the filing of the reorganization petition in making our calculation.

29. Lockheed has delivered 1155 Hercules of all kinds since it commenced making the plane, but most of them have been for military purposes.

100–20 manufactured to a basic specification. In the last two years, Lockheed has not received any orders from domestic customers at that price or any other price. The Lockheed price includes the cost of training the purchaser's maintenance and flight crews whether or not the purchaser wants the training. Despite an aggressive domestic sales campaign, which engaged twelve men for three years, and which is still continuing with a smaller staff, Lockheed has sold no Hercules to commercial customers in the United States since the last sales to Saturn. We are concerned, of course, with the value of a used Hercules. Factors affecting the valuation or the market price of a used Hercules include, in addition to supply and demand, the condition of the aircraft, age, the time remaining before the periodic inspections and overhaul of airframe and engines required by the FAA, the availability of spare parts to accompany the aircraft being sold, the crash or damage history of the aircraft, and the quality of the maintenance that had been performed on the aircraft.

Some guidance may be found from Flying W's books. Prior to the filing of Flying W's petition for reorganization, Flying W depreciated the aircraft N30FW and N40FW at an aggregate monthly rate of $49,312.82. The cost of the aircraft N30FW and N40FW, less depreciation, was shown in Flying W's accounting records, as of September 24, 1970, as $6,133,356.46, and, as of May 31, 1971, as $5,728,991.25.

The search for valuation of the Aircraft is not aided by evidence of sales of used Hercules. Anson testified that, about a year before the plenary hearing, Saturn Airways purchased three used stretched Hercules from Airlift International of Miami at a price of $2,500,-000 each; however, there was no evidence as to the condition of these planes. Neither Westfall nor Biever, the principal adverse witnesses with respect to valuation, could give evidence of any used stretched Hercules sales.

Interest in Hercules aircraft heightens during the spring of each year, just prior to the opening of bids for the Log-Air and Quick-Trans contracts for the world-wide carriage of military cargo; however, the interest which this event generates has, for the past few years, been for the leasing rather than the purchase of aircraft. The parties also agree that the construction of the pipeline to the North Slope would increase the value of a Hercules L–100–20, although there is no way to establish a dollar figure for such a factor.

Based upon the lack of a new or a used Hercules market, the position of the debtors and trustees is essentially that the valuation of the N30FW and N40FW cannot be ascertained. Westfall's expressed inability to state a market value was not shaken when he was confronted with an estimate he had given Milione of Farmers that "a fair price to expect to realize" from the N30FW and N40FW was between 2.9 and 3.15 million dollars (apiece). Inferentially, the debtors' and trustees' position is that the Lockheed sales price for a new Herk is indicative of its value.

The Banks sought to demonstrate that the value of the N30FW and N40FW is far below the balance due on the loan by attempting to show the "availability" of models of Hercules on the used aircraft market. The parties agree that PSL has been offering the N50FW for sale at an asking price of $3,250,000, that it would discuss a lower asking price, and that it has had no success in making a sale. The Banks submit that this is evidence that the N50FW is worth less than that figure (there is, they assert, *"some* figure" at which there must be a buyer!) and that the N30FW and N40FW's value is in the same range. The trustees rejoin that the N50FW was built as a demonstrator model, is older than the N30FW and N40FW, and therefore worth less. Biever testified that, as of August 27, 1971, there were five or six Hercules of various models available in the used aircraft market in addition to

the N50FW; *i. e.*, that Alaska Airlines had two L–100's for sale for which the asking prices were $1,695,000 and $2,915,000; and International Aerodyne was offering three Hercules, two L–100's and one L–100–20. There was no evidence, however, as to the condition of these aircraft, or the asking price for the L–100–20, so that the testimony is of little value.

The Banks also sought to prove by Biever, whom they had employed to follow up inquiries received by Farmers about the N30FW and N40FW, that the price which the inquirers would be willing to pay was also far below the balance due on the loan.[30] There is a serious dispute between the Banks and the debtors and trustees as to this aspect of Biever's testimony. According to Biever: (1) an agent for the Colombian Air Force thought that a used L–100 Hercules should bring between 2.4 and 2.7 million dollars; (2) George Batcheler of International Aerodyne was interested in spending between 2.5 and 2.7 million dollars for a stretched Hercules; (3) the Italian Air Force was looking to spend about 3.1 million for a Hercules with engines and propellers having zero time since overhaul and no major airframe expenditure in the foreseeable future; and (4) Capital International Airways, Northwest Territorial Airways Limited, and an aircraft broker representing a client in South Africa were all interested in acquiring the N30FW or N40FW. Biever also testified that the Fuller Company, an international construction company which moves heavy construction equipment throughout the world, was considering purchasing the N50FW, which he was attempting to sell for PSL. On the other hand, the debtors and trustees point out correctly that Biever had never seen the N30FW or N40FW, and had never inspected a Hercules aircraft, much less sold one. They submit that his evidence was vague, if not ephemeral, and that, *inter alia:* (1)

International Aerodyne was attempting to *dispose* of Hercules aircraft, not purchase them; (2) Northwest Territorial Airways was refused authority by the Canadian government to operate Hercules-type equipment, and had asked Red Dodge to fly for it; and (3) George Patterson, the chief of operations of Red Dodge, who had formerly been employed with Capital International Airways, was told by Capital's vice-president of finance, a friend for fifteen years, that the only interest of Capital in the N30FW and N40FW was in the spring for the purpose of bidding on the Log-Air and Quick-Trans government contracts.

We find that the testimony of Biever with respect to the market for the Hercules Aircraft was unsatisfactory. Moreover, while Westfall was an impressive witness, the efficacy of his testimony is impaired by the obvious fact that it is not in the interest of the chief salesman for *new* Hercules to express the view that the fair market price for a used Hercules is considerably below his asking price for new ones.

Neither do we draw any aid from the agreement of all of the parties that if the pipeline permit is issued, the value of Hercules aircraft will increase. The debtors and trustees argue that this means that continued use will increase, rather than decrease, the value of the aircraft, and that the Banks will not therefore be harmed by their continued use by Red Dodge. The problem with this argument is the whole problem with the business of Red Dodge: no one knows when the pipeline permit will be issued.

Despite our difficulties with respect to the testimony about valuation of the aircraft, we have garnered many impressions and have been able to draw a conclusion about the subject. Our impressions stem from the testimony about such matters as the following: (1) the purchase price of the N30FW and N40FW reflected by the loan; (2) the

---

30. Biever told each of the inquirers that he was acting for the Banks, but did not hold out the possibility that the N30FW and N40FW were available for sale or lease at that time.

depreciation and present book value of the aircraft; (3) the accident history and present condition (see *infra*) of the aircraft; (4) the purchase price of the N50FW and the inability of PSL to sell the N50FW at $3.25 million; (5) the asking price for a new stretched Hercules; (6) the sales price of the last used Hercules sold; (7) the lack of a present market for used Hercules; and (8) the opinion of Biever, based upon his study of the subject, that the value of a Hercules L–100–20, in what he considers to be the present market, ranges between $2.4 and $2.7 million (he was careful not to opine about the value of the aircraft in question, which he had not inspected.)

We are not able to place a precise dollar value upon the aircraft; however, we are satisfied and we find that the fair market value of the N30FW and N40FW at the present time does not exceed the balance due the Banks for principal and accrued interest ($7,738,-000) at the time of the filing of the reorganization petition.

### c. *Conclusion*

 In view of the foregoing, we find that the debtors had no equity in the N30FW and N40FW aircraft at the time of the filing of the reorganization petition and do not have any at the present time.

### B. *Relationship of the Aircraft to the Reorganization*

 One of the matters into which we were mandated to inquire by the Court of Appeals was "the relationship of the trustees' possession of the airplanes to the trustees' reorganization efforts". Our finding of fact on this matter is simple and direct: possession of the N30FW and N40FW, or equivalent aircraft, is essential to the trustees' reorganization efforts. The vast bulk of Red Dodge's business is the hauling of casing for oil rigs; no aircraft other than the Hercules is equipped to do this. Red Dodge would lose its major oil company customers if it did not have L–100–20 Hercules available (the Hercules L–100 is inadequate to the task). In addition, if it stops flying, it will lose its air carrier rights. Finally, if Red Dodge loses either its customers or its air rights or both, there is no prospect for success of the reorganization.

## VI. PROSPECTS OF SUCCESS OF THE REORGANIZATION PROCEEDINGS

Since their appointment over a year ago, the trustees have been laboring zealously to effect a plan of reorganization. To date they have been without success. The most difficult question before us, in the absence of a crystal ball, is whether there is a reasonable prospect of success. The trustees maintain that there is; the Banks, from the very inception of these proceedings, have maintained that there is not. Our discussion of the subject will range from the business and financial condition of the debtors to the trustees' reorganization efforts and the obstacles impeding a successful reorganization. Our discussion will concentrate mainly on the Alaskan operation, since the business of Flying W Airways in New Jersey, other than the Cinnaminson real estate leased to RCA, has been phased out, and has no significance in a proposed reorganization.

### A. *Findings of Fact*

1. *The Business and Financial Condition of the Debtors—Operations Since the Filing of the Re-Reorganization Petition*

 a. *The Losses Resulting From the Trustees' Operations*

During the course of our hearings, we have received in evidence a substantial amount of financial data reflecting the results of the trustees' operations of Flying W and Red Dodge. We will summarize that financial information in three stages. The first stage will reflect the results of the trustees' operations as reflected on the debtors' books of account. These figures exclude de-

preciation on the theory that it is a fictitious sum, not an actual expense; they also exclude any payment for interest to the Banks on the N30FW and N40FW loan on the theory of the *Vanston* case, *supra*, that interest ceases with the filing of the reorganization petition. Prior to the reorganization petition, the N30FW and N40FW were depreciated at the rate of $49,312.83 per month, in accordance with instructions from Laventhol, Flying W's accounting firm. At the 12% per annum interest rate set forth in the mortgage agreement, interest on the unpaid principal balance of $7,013,-000 amounts to approximately $70,000 per month, or about $2300 per day. In the second and third stages of our summary, we will set forth pro forma figures showing what the results of the trustees'

operations would be had they included depreciation and their debt service in their calculations. We do this because such a pro forma statement gives the only realistic account of the status of the business. One cannot attempt to forecast the future of a business or the prospects of its being reorganized unless he establishes a suitable measure of its performance; such a measure must be in the context of the normal business world where one takes depreciation and pays interest; hence the trustees' figures give an unrealistic appraisal.[31]

For the approximately 14-month period from the filing of the respective reorganization petitions until November 30, 1971, the figures reflected on the debtors' books of account (excluding depreciation and debt service) are as follows:

| | Income | Expenses | Net Income (Loss) |
|---|---|---|---|
| Flying W | $ 624,566.40 | $ 712,805.47 | ($ 88,239.07) |
| Red Dodge | 3,271,605.08 | 3,309,471.21 | ( 37,866.13) |
| Flying W & Red Dodge Consolidated | 3,896,171.48 | 4,022,276.68 | ( 126,105.20) |

When depreciation is added in, the picture changes and the figures, as reflected in the debtors' books of accounts, are as follows:

| | Income | Expenses | Net Income (Loss) |
|---|---|---|---|
| Flying W | $ 624,566.40 | $1,750,809.27 | ($1,126,242.87) |
| Red Dodge | 3,271,605.08 | 3,564,532.47 | ( 292,927.39) |
| Consolidated | 3,896,171.48 | 5,315,341.74 | ( 1,419,170.26) |

When the debt service figure is added in, the figures again change and read as follows:

| | Income | Expenses | Net Income (Loss) |
|---|---|---|---|
| Consolidated | $3,896,171.48 | $6,311,391.08 | ($2,415,219.60) |

We consider a $2.4 million loss in a little over a year to be very substantial.[31a]

We find that there is one other particular in which the records of the trustees do not accurately reflect the financial picture of the enterprise. It is accepted practice to establish, and the proper management of a commercial air opera-

tion requires, reserves for engine and airframe overhaul. The proper method in determining the amount to be set aside for each hour of operation should be based upon an estimate of approximately how much it will cost to perform the overhaul and should take into account the number of hours that will be avail-

31. The fact that a proposed reorganizer might refinance the debt and pay a different interest rate or set up a different depreciation schedule is beside the point. We must begin somewhere, and the debtors books are the proper place to begin.

31a. The debtors' books of accounts also do not reflect any amount for compensation of the trustees or their counsel, other than the interim compensation allowed by the Court.

able during which to build up such a fund. The purpose for the engine reserve is to have a fund of money built up during the period of use so that when the time comes for overhaul, the fund will be available to pay for the overhaul. Prospective purchasers of aircraft and engines take this into account in determining purchase price.

As of November 30, 1971, there was $26,000 in the trustees' tax escrow bank account allocated to engine overhaul reserves. (The trustees have created no cash airframe or engine reserve for the hours flown prior to the commencement of the trustees' operations and are unable to provide such a cash reserve.) We find that a fair and proper engine reserve is $8.00 per hour per engine. This is the sum which the trustees are required to reserve in connection with the lease of the PSL spare Allison engines.[32] According to the trustees' records, utilization of the engines in the trustees' possession during the time of the trusteeship totals approximately 3200 hours; at the rate of $8.00 per engine per hour, over $100,000 should have been escrowed for engine overhaul. Although some of the sum listed on the trustees' books for airframe overhaul reserve may actually belong in the engine overhaul account,[33] the amount actually escrowed

for engine overhaul reserve is clearly and substantially inadequate.

b. *The Level of Red Dodge's Business, its Competition, and its Aircraft Utilization*

There is intense competition for the carriage of air cargo from Anchorage and Fairbanks to the Slope. Red Dodge's principal competitor is Interior Airways, which operates stretched Hercules aircraft; its secondary competitor is Alaska Airlins. The competition is principally in the area of price competition, and Interior has frequently taken business from Red Dodge by charging lower prices. Neither the Alaska Transportation Commission, the Civil Aeronautics Board, nor any other governmental agency regulates or reviews rates for intra Alaska carriage.[34] In recent months, as the result of the price competition, Red Dodge has had to significantly lower its rate to Brinkerhoff and McCulloch for the carriage of fuel to the Slope, although Red Dodge claims that economy of operation from newly purchased equipment has enabled it to absorb the price decrease. A more important development is the recent loss of the business of BP Alaska to Interior. For a long time BP Alaska was Red Dodge's major customer, and it has always been one of its major customers.[35]

32. By March 26, 1970, Selby was proposing the lease of Red Dodge's Hercules to third persons on terms which would have required engine reserves of $15.00 per engine per hour.

33. As of November 30, 1971, there was a total of $63,152.04 in the escrow account for airframe *and* engine overhaul reserves.

34. The Alaska Transportation Commission has initiated an investigation of the operations of carriers using the Lockheed Hercules aircraft, namely Red Dodge, Interior, and Alaska Airlines. The investigation is to determine if any of these carriers have charged discriminatory rates which are fostering unsound economic conditions or encouraging unfair or destructive competitive practices to the serious detriment of the public interest generally. However, the Commission has taken no action to regulate rates. There were also proceedings before the Alaska Trans-

portation Commission challenging Red Dodge's right to operate under its contract air carrier certificate. By opinion and order dated July 19, 1971, the Commission found that the trustees and Red Dodge had violated the Commission's regulations and the limitations of Red Dodge's contract air certificate in the nature and breadth of their efforts to advertise and solicit business. Red Dodge asserts that it is now complying with the Commission's order, although Alaska Airlines and Interior Airways have brought suit against Red Dodge in the Alaska Superior Court, alleging that they have violated the order. This Court has before it a petition to enjoin Alaska and Interior from proceeding further with the suit.

35. During the last hearing, the Court posed as a "hypothetical" question to the trustees' counsel how the business could ever

As we have found above, Red Dodge has no long-term contracts with any customer, and any of them may cancel on short notice. For example, Red Dodge's contract with Humble has now expired, and Humble has not exercised its option to extend it, although Red Dodge continues to carry cargo for Humble. The trustees recently lost an important contract (flying to the North Pole for a University of Alaska research project) despite being the lowest bidder.[36] The intense competitive situation, therefore, continues to impair Red Dodge's business.

A significant measure of the success of the Red Dodge enterprise is found in the concept of aircraft utilization, which measures the number of hours that the aircraft are being used for revenue purposes. Judgments can be made based upon utilization because of past experience of airlines which have flown Hercules. Saturn Airways, by which Selby is presently employed, has found 3,000 hours a year to be a reasonable utilization rate for all three models of Hercules aircraft. The aircraft is susceptible of an even greater rate of use if properly maintained. Saturn employs its Hercules in the Log-Air contract and in its other cargo service at about the 3000 hour rate. Lockheed has also found 3,-000 hours to be a reasonable rate of utilization for Hercules aircraft. While Selby was running the Red Dodge operation, he calculated that 350 revenue hours per month for two airplanes were required just to break even financially. However, during the one year period following the trustees' assumption of duties, the N30FW flew a total of 1331 hours, and the N40FW flew 1136 hours (these figures include both revenue and non-revenue hours), far below both the Lockheed and Saturn standards and the Selby projections. When the utilization figures for the period between October 1st and December 15, 1971, are added in,

the totals for the two Aircraft come to 1665 and 1520 hours respectively, or a total of 3185 hours for both Aircraft. These later figures do not show any increase in aircraft utilization. Even in the peak months of January and February 1971, the utilization figures were only 274 and 331 hours respectively, which was less than the break-even point of 350 per month calculated by Selby for a two-Hercules operation. This totals only about five hours per airplane per day.

The trustees and the Red Dodge management were most concerned about the low level of utilization. At one point Selby was offering the N30FW, N40FW and N50FW for lease, and in the offer, Selby expressed the view that the "Alaska North Slope is generating very little activity". On April 5, 1971, trustee Bernstein sent a telex message to Archer, the trustees' insurance broker:

"Imperative to obtain revenue flights for one Herc outside of Alaska. Interested in short or long term hauling close to break even cost. Request your participation. Please advise."

On May 10, 1971, Patterson sent the following telex to Bernstein:

"Most of the drilling sites have shut down for summer as the ice strips have gone. Had planned to put FW40 on ground as soon as 30 returns unless we hear on Norway deal. This still not let. And go down to two crews as of the 15th also will let another loadmaster go plus two mechanics and a groundman here. Also considering letting Foster go June 1st."

The "Norway deal" was a new business venture sought by Red Dodge. It looked toward the carriage by air of fuel from southern to northern Norway. At that time Bernstein and Patterson were also looking toward the hauling of Alaska salmon beginning toward the middle or end of June 1971. The importance of

survive if, for instance, it lost its major customer, BP. The Court was informed, after the next recess, that BP had been lost to Interior!

36. The North Pole contract events are now being investigated by the Alaska State Legislature.

the "Norway deal" to Bernstein is shown by his telex to Patterson on May 21, 1971:

"Re: Norway Telex. Don't worry about crew. I will fly the damned plane myself. You must send me cost structure on this immediately per my prior Telex."

And Bernstein telexed Red Dodge in Anchorage again on May 21, 1971:

"Tell him [Patterson] under no circumstance is he to lose this Norway deal even if he has to slice a few pennies. Tell him the down time is for 15 days for the Herc and maybe I'll be able to get it to 19 days on Monday. Will he be able to follow the Norway deal with the fish deal for the N30, repeat N30.

Again I want that Norway deal. Tell him not to let it get away. Go ahead."

Red Dodge did not get the business.

In conclusion, the utilization figures confirm the severe problems that Red Dodge has been facing in generating revenue, and they also demonstrate that the situation has not been improving. Our findings with respect to the competitive situation indicate that Red Dodge's position is now deteriorating.

#### c. Red Dodge's Accounts Receivable and Accounts Payable

The status of accounts receivable and accounts payable on Red Dodge's books are additional significant indicia as to the health of its Alaskan air cargo carriage business.

As of November 30, 1971, the accounts receivable of Red Dodge totalled $652,-239.70. However, of this sum, more than $291,000 in accounts were more than ninety days old, and of the $291,000, almost $200,000 was from September 1970 or earlier. Trustee Bernstein testified that, in making his evaluation of accounts receivable, he gives no weight to those accounts receivable that are more than ninety days old. This indicates that a substantial portion of the assets listed on the debtor's books are probably worthless, and that the debtor's condition is far poorer than reflected by the books.

The accounts payable situation is equally serious. As of November 30, 1971, the accounts payable of Red Dodge totalled $173,606.53.[37] However, of this sum, more than $125,000 was over thirty days old, and thirty days is generally considered current. Petroleum Distributing Company, one supplier of aircraft fuel for Red Dodge, went unpaid for two months notwithstanding its requirement for payment in thirty days. Another supplier of aviation fuel refused to sell to the trustees except for cash, and as a consequence, the trustees purchase their fuel from a middleman, who charges a higher price. The trustees, generally speaking, have made no payments to those creditors who have no leverage on debtors' operations. By way of example, the trustees have not paid the substantial sums which they owe PSL for a now lapsed insurance policy. Moreover, the trustees have made no payments to PSL for use of engine 550087, originally on the N50FW but now being used on the N30FW, or for the use, during the period of September 24, 1970 to January 3, 1971, of the three spare engines

---

37. The accounts payable totals do not include the following payments due December 1, 1971:

| | |
|---|---|
| Allen T. Archer Company (Insurance) | $63,170.00 |
| Robert C. Duffy, Esq.—(T'ees Compensation) | 576.00 |
| Adelman & Lavine, Esquires—(Counsel Fee) | 10,000.00 |
| Laventhol, Krekstein, Horwath & Horwath | 4,000.00 |
| | $77,746.00 |

November 30, 1971 figures are used because they were the latest ones available at the last hearing.

leased from PSL.[38] The trustees have made no provision for payments to PSL and do not intend to make any such payments until instructed to do so by their counsel or the Court.

### d. *The Cash Available to the Trustees*

As of November 30, 1971, the trustees maintained a balance of $22,322.80 in their general account, and $183,264.60 in their escrow account (this covers tax escrow as well as engine and airframe overhaul reserves). The sum in the general account is not a particularly handsome one in view of the trustees' unpaid obligations, but it is a magnanimous amount compared to the balance in the general account on March 19, 1971, which was $11.70! Large amounts of cash are necessary to keep a business of the size of Red Dodge operating. For that reason, the $11.70 figure is horrifying, as are the following bank balances, which the trustees' books also reveal:

| | Date | Bank Balance |
|---|---|---|
| 1970 | December 8 | $664.93 |
| | December 9 | 249.03 |
| | December 14 | 928.51 |
| 1971 | January 15 | 354.64 |
| | January 19 | 179.70 |
| | February 19 | 229.72 |
| | March 10 | 866.70 |
| | March 17 | 266.70 |
| | May 3 | 453.54 |

The sums placed in the trustees' tax escrow bank account were not always preserved for the purposes for which they had been segregated. On several occasions, the trustees directed that money be taken from the tax escrow bank account and deposited in the trustees' general bank account to be used to pay operating expenses. On several dates from February to April 1971, the general account would have been overdrawn by sums ranging from $23,000 to $44,-000, but for the "loan" from the tax escrow account.

While the cash situation of the debtor has somewhat improved, the foregoing incidents are far from sanguine indicators of the health of the business. Moreover, had the trustees set aside in escrow proper engine overhaul reserves, the cash balances of the trustees might again be alarmingly small in proportion to the size of the business they are running.

### 2. *The Future Business Prospects of Red Dodge—The Role of the Pipeline*

We conclude from the findings which we have made with respect to the business and financial condition of the debtors during the trusteeship that unless some event occurs which causes a dramatic increase in the utilization of the Aircraft, and, consequently, the revenues of Red Dodge, that the substantial losses which the trustees have incurred will continue and may well increase. It is obvious from the setting of the case that what could change the picture would be: (1) the grant of the permit for the trans Alaska pipeline, followed by (2) commencement of construction of the pipeline, resulting in (3) an increase in the level of oil exploration activity and construction activity on the Slope, necessitating (4) substantial additional air cargo capacity for support. We observed in our preliminary statement, in discussing the pipeline, that no one knew if, or when, or over what route it would be built. At this point in the Opinion, at which we continue to make findings of fact, it is our duty to report that we can make no finding that the pipeline will be built or when or over what route it will be built. While we may believe that the pipeline permit will ultimately be issued, we have no facts or foundation of record to support such a belief, or, more to the point, to support a belief that the pipeline permit will be issued in the foreseeable future. Neither do we have evidence to permit a finding that the granting of

---

38. The trustees' defense to that payment has been referred to Referee Goldhaber as special master to hear and report.

the pipeline permit or the commencement of construction of the pipeline will result in an increase in air cargo activity to the Slope; it is possible that only the completion of the pipeline would markedly increase the level of activity.

These subjects did not go unnoticed during the course of the plenary hearing. The Court repeatedly urged the trustees to produce evidence on the prospects of the pipeline permit. At one point in the proceedings, the trustees represented that they intended to produce United States Senator Theodore Stevens of Alaska and representatives of the Department of Interior to testify about the matter of the pipeline permit. At another point, the trustees represented that they would produce representatives of BP Alaska, Inc. or one of the other oil companies to testify as to their drilling plans, for, regardless of the pipeline situation, if the oil companies would increase their drilling activities, there might be more business for Red Dodge. However, none of these witnesses appeared. The Court has adverted in the preliminary statement to matters of common knowledge with respect to the pipeline situation. The Court reads the newspapers, as do we all, and not a month goes by that there is not some prominent reference in the media to the ecological dispute, the pending ecological lawsuits, the pipeline's engineering problems, the controversy over whether the pipeline should be built across Alaska or across Canada, etc. There are, to be sure, occasional predictions that the pipeline permit will be issued by a certain date (usually "next month"), but these predictions are difficult to credit for purposes of concluding that the pipeline permit will be issued in the foreseeable future, in view of the failure of the pipeline permit to evolve after so many similar predictions in the past.

In light of the foregoing, for us to find that the pipeline will be built at any time within the foreseeable future would be to engage in sheer speculation. In the absence of a conclusion that the pipeline will soon be built, we find no prospects that the business of Red Dodge will improve to the point where the Company. will, on its own merits (in contrast to someone's speculation based upon expectation about the pipeline), be a desirable candidate for reorganization.

As will be seen *infra,* at least two of the prospective reorganizers seem to have their own estimates of the pipeline situation, and apparently believe that the permit will be issued within a period sufficiently near to make their consideration of a proposal worthwhile. We do not draw any conclusions from the unsupported and, in fact, unexpressed opinions of these parties, and base our judgments as to the prospects of success with these two parties on the status of their discussions with the trustees. We note, by way of contrast, that at least one prospective reorganizer (Alaska Airlines) withdrew from discussions, *inter alia,* because of its pessimism over Slope activity and prospects for the pipeline in the foreseeable future.

3. *The Maintenance and Operation of Red Dodge Aircraft and the Risk of Loss to the Banks from Their Continued Operation*

### a. *Introduction*

One of the factors which we must consider in connection with the question of turnover of the N30FW and N40FW is the risk of loss to the Banks by virtue of the continued operation of the Aircraft in Alaska. The Banks argue that their risk of loss is considerable because of the following factors: (1) normal depreciation of the Aircraft from continued use; (2) extraordinary hazards to which the Aircraft are subjected by virtue of the submarginal flying conditions in Alaska; and (3) inadequate maintenance and shoddy operation of the Aircraft by the trustees, caused by lack of cash and inadequate personnel. The trustees deny these allegations.

### b. *Findings of Fact*

The trustees have experienced considerable difficulty with maintenance of the N30FW and N40FW aircraft, principally because their shortage of cash has left them with an insufficiency of spare parts, spare engines and personnel. The shortage of cash has also required frequent deferral of maintenance.

Spare engines and spare parts are necessary to the operation of Red Dodge; without them, the Aircraft must be grounded and revenue flights lost. During the course of the proceedings, trustee Bernstein testified that Red Dodge operations required "four spare engines that were operable". Selby testified that a minimum of three spare engines was necessary to insure uninterrupted aircraft capability, and George Patterson, his successor as the operational head of Red Dodge, testified that Red Dodge needed two operable spare engines. This disparity of opinion is not encouraging. The following examples are indicative of the spare engine problem.

As of June 27, 1971, Flying W owned or leased sixteen Allison engines. Twelve were mounted on the aircraft N30FW, N40FW and N50FW, and four (numbered 550007, 550061, 550136 and 550146) were nominally "spares". However, of the four spares, only one (550061) was at Anchorage, and the other three were at Aviation Power Supply Inc., at Burbank, California ("APS") for repair. From February 14, 1971 to August 27, 1971 the Trustees had only one spare engine at Anchorage. As of August 27, 1971, the lone spare engine in Anchorage was not operable because a part was missing. On April 29, 1971, the trustees did not have the funds to repair the three engines at APS and the trustees could not persuade their suppliers to extend credit to them. As of the plenary hearing, the trustees had not authorized the repair of engines 550136 and 550146 and had no intention of authorizing the repair of either of those engines unless it was needed for the trustees' operation of Red Dodge's business. Subsequent to the plenary hearing, engine 550136 was repaired; however 550146 has not been, and apparently will not be (APS has estimated its cost of repair to be $59,000).

It was the standard practice, both before and during the reorganization proceeding, to take parts from spare engines to maintain or repair the engines on the N30FW and N40FW. This is also standard practice in many airline operations. However, Red Dodge went beyond what Selby and Patterson, who are experienced airlines operations men, regarded as normal in this regard. The excessive "pirating" of parts was necessary because the trustees did not have the spare parts in their inventory. There have been several occasions, perhaps 10 or 15, when the N30FW and N40FW have been grounded and revenue flights delayed or postponed because of a lack of spare parts. Numerous critical situations have been managed either by pirating a part or borrowing a part (from another airline) in order to keep the Aircraft flying. At trustee Bernstein's direction, Patterson has been personally involved in the determination of what spare parts should be purchased. As consequence, fewer parts have been ordered and the inventory is smaller than it was before the trustees assumed operations. Bernstein had also instructed Selby to purchase fewer spare parts than Selby thought necessary. During the five weeks in May and June 1971 that the N40FW was grounded, parts were pirated from it to keep the N30FW flying. Because of the missing parts, the N40FW was not airworthy and could not have been flown.

Maintenance of the Aircraft has also been deferred from time to time except where the item affects airworthiness. As of July 18, 1971, Coward, the Red Dodge chief of maintenance, reported: (a) with respect to N30FW, "there are several items which should be done by maintenance, but due to shortages all items have been deferred"; and (b) with respect to the N40FW: "status of this aircraft is fair. Several major items have been deferred and should be

repaired but due to lack of parts there has not been much in the way of maintenance." In June 1971, repair work on one of the Aircraft was delayed because a supplier would not proceed with the work until it was paid.

During the period of the trustees' operations there have been occasions when Red Dodge could not supply service when requested by the customer. At those times the customers employed Red Dodge's competitors. Because Red Dodge was unable to provide service during a period of the N40FW's repair, Red Dodge lost the business of Forest Oil Company which was one of Red Dodge's largest customers. Forest still has not returned as a customer.

On June 24, 1971, Coward reported to trustee Bernstein by telex: "Aileron boost cylinder is leaking heavily on N40FW. This is a grounding condition; and all items needed have been requested. This constitutes a grounding condition. We need parts." The N40FW had been flown for an unknown number of flights with that booster cylinder leaking. On August 23, 1971, Coward reported to trustee Bernstein:

"We desperately need an ATM for N30FW as the one on the aircraft is completely inoperative. This means we must run an engine at all times we are on the ground away from home base. The expense of this type operation is enormous. Additionally, this practice is dangerous to all personnel working near the aircraft. Eventually someone will be caught in the propeller."

Although the need for the part was known on August 19th, when it was ordered, and the condition was not corrected until August 23, 1971, the aircraft was flown on August 20th.

Because of the shortage of cash, the trustees have substantially reduced the number of Red Dodge employees. When they assumed the operation of the debtors, they employed about fifty people.

As of June 25, 1971, the number of employees was about 30 or 31, and almost all of the reduction was in Red Dodge personnel. Prior to mid-April 1971, Bernstein caused reductions in the amount of the debtors' payrolls by about 25%. When Bernstein learned in May 1971 that the 3400-hour overhaul of the N30FW would cost about $25,000 or $28,-000 (instead of the original estimate of $12,000), he instructed Patterson to cut the Red Dodge payroll by 20%, notwithstanding Patterson's protest that such a cut was too great. As of August 25, 1971, Red Dodge had 30 employees; [39] those in addition to Patterson included three flight crews (each comprised of captain, first officer, flight engineer and loadmaster), six mechanics, an inspector, a director of maintenance, four dispatchers, an office employee at Anchorage, and a station manager and a mechanic at Fairbanks. As of that date, Patterson, who ran the Red Dodge operation, wanted an additional dozen employees, but they could not be afforded.

The principal problem with the reduction in personnel was with respect to the number of mechanics. While Selby, who ran the Red Dodge operation prior to Patterson, believed that the mechanics employed by the trustees were qualified, he also believed that there were times when the number of mechanics employed by the trustees was insufficient for the work to be done. Selby did not agree with the elimination of mechanics at Fairbanks because there were maintenance functions to be performed there in the turnaround of the Aircraft when there were pressures to get the Aircraft back into the air for the next revenue flight. Selby also believed there was an insufficient number of mechanics at Anchorage. The consequence was that it took 5 days to replace an engine on the N30FW when it should have taken 12 hours or less. There have been times when Red Dodge employed mechanics who were not certified by the FAA. As of August 25, 1971, only two of Red

---

39. At this time, there were four persons employed by Flying W in Newcastle, Delaware. Trustee Bernstein operated out of Newcastle.

Dodge's four dispatchers were certified by the FAA.

There have been occasions when the reduction in the number of mechanics was responsible for the delay in and the deferral of maintenance of the Aircraft. There also have been a few occasions when the reduction in the number of mechanics has resulted in the postponement of revenue flights. One of the personnel who left Red Dodge, Simonsen, the director of maintenance, had 35 years of experience and had been a director of maintenance for several large organizations, including Braniff Airways. There was no one else at Red Dodge with Simonsen's background or experience, including his successor in the job, Coward.

The reduction in personnel also involved a reduction in the number of flight crews. The FAA imposes a limitation upon the number of hours that flight crews may fly, and as a result, in late June 1971, Red Dodge lost revenue of about $20,000 because it did not have the crews permitted by FAA regulations to fly the Aircraft. One of the Red Dodge personnel who left was Crow, Red Dodge's chief pilot. A factor in his leaving was that he and others had not been paid for services performed before the trustees' operations.[40]

In addition to ground and flight crew personnel, Red Dodge has also incurred a reduction in supervisory personnel: (1) the position of chief flight engineer has been eliminated; (2) the functions of the director of ground training and manuals have been reassigned to other personnel; (3) Patterson, in addition to his full-time duties as executive vice president and general manager, has also assumed the duties and responsibilities of director of operations; and (4) the office of president is still unfilled. Patterson's role is consistent with a statement made by Bernstein at a hearing on April 14, 1971:

"We employ three people to do five people's job".

The Banks submit that the facts add up to the conduct by the trustees of a distinctly submarginal operation. They argue that this condition in and of itself entitles them to turnover of the N30FW and N40FW, the security for their loan, because of the risk to that security by virtue of the trustees' continued operation. However, the foregoing findings are not the only ones which we make concerning the trustees' maintenance and operations of the Aircraft.

The facts are also that the trustees have run an airline, day in and day out, conducting hundreds and hundreds of flights to and from the Slope without major mishap.[41] The FAA keeps a close surveillance on the Red Dodge operation. FAA inspectors regularly review the airline's flight logs and frequently accompany the aircraft on flights to and from the Slope for inspection purposes. The FAA requires periodic inspections and overhaul of the airframe, engines and propellers of the N30FW and N40FW. The check of the airframe occurs after 3400 hours of flying time, and

40. On April 23, 1971, after hearing, the Court entered an order authorizing the trustees to pay wages and salaries to the present employees of Red Dodge for the one-week period prior to the filing of the petition for reorganization for which they had not been paid. The Red Dodge flight and ground personnel had threatened to quit en masse if the wages were not paid.

41. There have been a number of minor mishaps. In the winter of 1969–1970, the pilot erred and crashed one of the Aircraft into the trees or ground short of the airstrip while landing. In the winter of 1970–1971. Evans, a Red Dodge pilot, taxied one of the Aircraft into the tail of another aircraft parked at the Humble North Slope airstrip. In February 1971, a propeller on one of the Aircraft was damaged by a loose cable laying in the snow. The pilot was Goodnough, who was thereafter fired. In July 1971, it was necessary to make "extensive repairs to the fuselage pressure skins" of the N30FW which were damaged by a piece of falling cargo. In August 1971, a Red Dodge pilot taxied the N30FW into a hanger in Seattle. The left wing-tip of the N30FW was damaged.

the check of an engine generally occurs after each 4000 hours of use. The 3400 hour airframe overhauls of the N30FW and N40FW have been completed, and, by virtue of an extension of overhaul time on engine 550087 to 5000 hours (the other engines are below 4000 hours), Red Dodge is in compliance with these FAA regulations. There is no evidence of persistent failure by the trustees to comply with FAA regulations, or of major violations.[42]

Turning to the intrinsic nature of conducting an aircargo operation to the Slope, we find the principal problems to be in the areas of landing conditions and maintenance. The landing conditions on the North Slope are unique. The increased risk of loss or damage to aircraft on the North Slope arises primarily because, as Selby puts it, "the landing aids available to a pilot are fewer on the North Slope than they are elsewhere in the world", although the situation is improving. There are about 40 to 50 airstrips on the North Slope that can be used in the cold weather, but there are only about six or seven of them with electronic and visual landing aids that permit landings during any weather condition when visibility is between 1000 and 200 feet. Only about four or five Slope airstrips can be used throughout the year.

The conditions on the Slope result in the FAA fixing higher minimums for vertical and horizontal visibility. The FAA requires a 500-foot ceiling and a one-mile forward visibility for the Slope, as contrasted with a 200-foot ceiling and a one-half mile forward visibility for Anchorage. There were occasions when Red Dodge aircraft did not land on the Slope airstrips because of the blowing snow, and on one occasion a Red Dodge pilot was disciplined for landing at Prudhoe Bay with the visibility partly obscured by blowing snow.

The Slope airstrips are incapable of handling jet aircraft because of runway lengths. There are also very few maintenance facilities on the Slope. Another difficulty in operating on the North Slope arises when the aircraft are used on airstrips which become marginal because of thawing; in landing or taking off, the prop-jet engines tend to ingest loose gravel and the tires tend to sink into loose gravel causing damage.

The visibility problem affects the safety of operations in other portions of Alaska. The fog in Fairbanks (sometimes a condition known as "ice fog") frequently closes down the operations there for long periods during the winter. The low temperatures in Alaska do not affect the aircraft while it is operating; those temperatures there are no different from those to which aircraft are subject while flying over any portion of the world at 30,000 feet. However, when the aircraft has been exposed to long periods of cold, starting does cause problems, and there have been an abnormal number of failures of aircraft components. This is particularly true at Fairbanks, where there have been sustained periods of extreme cold.

The cold, particularly at the North Slope and at Fairbanks in the winter, makes it extremely difficult to perform aircraft maintenance outside of a heated hangar. If maintenance is done outside in low temperatures, the quality of maintenance must suffer. For example, a mechanic would have to work with his gloves on. If he took his gloves off and touched a metal surface, his hand would stick to the metal and he would lose his hand. Red Dodge has encountered difficulty in obtaining the services of qualified maintenance people

---

42. Red Dodge has received some notices of FAA violation. A civil penalty of $1,000 was imposed for a transatlantic flight of the N40FW over an unapproved route with a navigator who did not meet the FAA initial training requirements.

Other FAA notices related to certain maintenance practices in conducting 100-hour inspections at Fairbanks in the winter of 1969–1970; to errors in Red Dodge's operation specifications; and to five overweight landings in one month.

in Fairbanks because of the extreme winter temperatures which average forty degrees below zero or colder. Red Dodge had leased a hangar for indoor maintenance in Fairbanks but has now given it up and is ferrying the aircraft to Anchorage for maintenance. There are no hangars on the Slope, and when a maintenance problem arises there, the plane must also be ferried back to Anchorage for service. To be sure, the Alaskan operating conditions which we have described are not substantially different from the conditions which existed when the Banks undertook the loan risk on which they now seek to foreclose. But we must nonetheless take the conditions involved in an Alaskan operation into account because they affect the risk of loss to the Banks of continued operation of the aircraft by Red Dodge.

Our summary finding with respect to the Red Dodge operation and maintenance program and the risk of loss to the Banks contains several ingredients. First of all, while we find that the operation is a marginal one, we find that it is nonetheless essentially a safe one. However, we do find there to be a substantial risk of loss to the Banks from continued operation of the aircraft which is essentially two-fold: (1) the aging, wear and tear, and depreciation of the aircraft by continued daily use; and (2) the risks flowing from the essentially hazardous nature of the Alaskan operation, particularly with respect to the condition of the landing fields on the Slope and the maintenance problems. The trustees' operation has, to date, accommodated to the nature of Slope operations, but there is a realistic possibility that serious difficulties may be encountered at any time.

We also find that the marginal nature of the Slope operation has had significant effect upon the *business* of Red

Dodge. For the most part, when a part was missing or maintenance was necessary, the trustees have simply grounded the aircraft instead of operating with risks to the structure of the plane or injury to its personnel. This means a loss of revenue, and a loss of customers, and lack of revenue and customers is the big problem facing Red Dodge. As we have seen, it is the principal impediment to a successful reorganization plan.

#### 4. *The Trustees' Reorganization Efforts*

The subject upon which more testimony was taken than any other at the plenary hearing was that of the trustees' reorganization efforts. Further testimony on the subject was taken during the course of the hearing on the trustees' petition to extend the time for filing of a reorganization plan. At an early stage of the hearings, trustees' counsel interposed the objection that testimony in open court as to the trustees' reorganization efforts might thwart those very efforts for the very reason that negotiations with a proposed reorganizer are sensitive, and the parties with whom the trustees were conducting negotiations did not wish their identity disclosed. The Court apprehended that such disclosure, which would be available to competitors and others in the industry, might indeed impede the progress of negotiations looking towards a plan. Considering it the duty of the Court to protect the interest of all the parties, we ruled that the testimony with respect to the trustees' negotiations with proposed reorganizers would be held *in camera*.[43]

Negotiations have been carried on by trustee Eugene M. Bernstein ("Bernstein") and by Lewis H. Gold, Esq., counsel for the trustees. Bernstein has testified concerning negotiations with

---

43. During the in camera aspects of the proceedings, the Courtroom was closed to the public; the parties and counsel were, of course, present, but disclosure of the content of the in camera proceedings to third parties was prohibited. Since the writing of this Opinion necessitates disclosure of the identity of the prospective reorganizers for the purposes of making findings, we will this day enter a separate Order releasing the in camera aspects of the proceedings to the public record.

over forty persons, groups and corporations. In connection with his discussions, Bernstein has delivered to each of the prospective reorganizers certain basic financial data with respect to the reorganization debtors. For some reason, Bernstein has not given most of the prospective reorganizers copies of monthly profit and loss statements prepared by W. W. Tarburton, the firm's resident accountant. In his discussions with prospective reorganizers, Bernstein gave them the following "ball park" figures for their preliminary consideration: $600,000 for the costs of administration; $150,000 for priority payments; $200,000 for trade creditors; and $400,000 for unsecured creditors. He also said that any prospective reorganizers would have to negotiate with secured creditors with respect to their claims. The information given prospective reorganizers included the Laventhol report for the period ending September 24, 1970.

At a hearing in April 1971, Bernstein estimated that he would require six months in order to present a plan of reorganization. On July 1, 1971, Bernstein testified that four or five more months would be sufficient time to communicate with and investigate possible proponents of plans of reorganization and he stated that, if there were going to be a reorganization, he would have "a final proposal, a written proposal, a petition from a reorganizer" within six months, on the outside. In Bernstein's own words: ". . . I would say that if I am not able to accomplish it in the next six months, I feel that the possibility of me doing anything in any longer than that is zero." He also said that six months from July 1, 1971 is "a maximum ample time" to effect a reorganization without regard to whether or not a pipeline permit is issued, and that, if there was no firm proposal then, he would ask the Court to terminate the chapter proceedings. However, on December 8, 1971, the trustees requested that the time for filing a plan be extended until April 3, 1972. At a hearing on January 3, 1972, Bernstein testified that he believed that the proceedings should not be terminated because he felt that he could work something out with his present prospects.

There would be no point to discussing all the various persons, groups and corporations with whom the trustees have negotiated, for, with the exceptions hereinafter noted, those negotiations have all terminated. The Court finds that the trustees have done a diligent job in seeking out and contacting the types of entities which were reasonable prospects to reorganize the debtors, including the oil companies and the supplemental and cargo air carriers.

At various times, Bernstein has testified that some of the persons or companies with whom he was dealing were seriously considering reorganization of the debtors. On April 30, 1971, Bernstein believed the Saturn Airways, Inc. was a substantial prospective reorganizer. On July 1, 1971, Bernstein believed that Saturn, Joseph Tischenor of Anchorage, Alaska, CEC Corporation of Clearwater, Florida, and McCulloch Oil Corporation were substantial prospective reorganizers. On August 26, 1971, Bernstein testified that Saturn, Universal Airlines Company, Bank of America, TransAmerica, McCulloch and the Janov-Ettinger group of Flying W stockholders were substantial prospective reorganizers. As of August 26, 1971, the trustees believed they had substantially covered the field of prospective reorganizers.

The Tischenor negotiations failed when the trustees' efforts to communicate with Tischenor failed. The CEC negotiations failed when they developed to what Bernstein described as a "point of no interest". On August 26, 1971, Bernstein testified that "we are pretty well down the road" with the Janov-Ettinger group and that the group had been asked by the trustees to deposit $500,000 by September 15, 1971, as evidence of good faith and financial responsibility. On August 25, 1971, Bernstein was told by Janov that he had

pledged $300,000 to the group. However, when Bernstein testified about reorganization developments on September 13, 24 and 27, 1971, he did not report that the Janov-Ettinger group had deposited $500,000 or any sum. Although, as of his last appearance before the undersigned on January 3, 1972, Bernstein continued to report interest by the Janov-Ettinger group, he did not report the deposit of the $500,000 or any other sufficient developments in these long-standing negotiations to lead the Court to believe that the group is a serious prospective reorganizer.

Saturn is a supplemental air carrier, with both passenger and cargo services. It operates seven Hercules aircraft and three DC-8's. On April 30, 1971, Bernstein testified (with respect to the Saturn negotiations):

> "I have one that is at a point of real conclusion except for refinement of certain portions of it. The status of this one has reached the stage where, if we can resolve some of the problems with respect to the tax loss carry forward and a few other minor details, I think it ought to be close enough to put into written form for the Court's approval."

However, by letter dated August 20, 1971, Howard of Saturn informed Bernstein that Saturn was not interested in proposing a plan of reorganization. Among the reasons cited by Howard for this decision were the following:

> "As a result of a more extensive evaluation of the business climate, the attitude of regulatory agencies, and the general economic condition, I wish to inform you that we have concluded that Saturn is no longer interested in making a proposal for the acquisition of the aforesaid company."

As of the January 3, 1972 hearing, notwithstanding that he had received no communication from Howard contra his letter, Bernstein continued to assert that Saturn was interested in proposing a plan of reorganization. However, in view of the long-standing history of negotiations which have borne no fruit whatever, the Court does not consider Saturn to be a serious prospective reorganizer.[44]

Bernstein has testified on a number of occasions about the interest of the Bank of America in proposing a plan of reorganization. After a series of abortive attempts, a meeting was finally held in San Francisco on November 29th, but all that resulted from that was a decision to meet with the Bank's representatives in New York. That meeting has yet to take place. There is no evidence whatever that the trustees' discussions with the Bank of America have even reached the state of preliminary negotiations. Accordingly, the Court does not consider the Bank of America to be a serious prospective reorganizer.

Since July 1, 1971, Bernstein has asserted that McCulloch has a "genuine" interest, a "deep" interest, in reorganizing the debtors. McCulloch is a conglomerate with three principal divisions: an oil producing company which is, *inter alia,* drilling in Alaska; an aviation company, and a land-development company, which brought the London Bridge to Lake Havasu, Arizona, and which is heavily engaged in real estate activities there. As of the hearing of January 3, 1972, Bernstein testified that because of McCulloch's involvement at Lake Havasu, he was unable to sit down with the proper parties to commence serious negotiations, and not even preliminary discussions with the authorized parties of McCulloch have as yet taken place. Accordingly, the Court does not consider McCulloch to be a serious prospective reorganizer.

Deferring, for the present, a discussion of the trustees' negotiations with Universal Airlines Company ("Universal"), we note that the Court has found that none of the entities which the trustees

---

44. At one point in the proceeding, Selby testified that Saturn's interest in Flying W and Red Dodge was in acquiring the N30FW and N40FW, which Saturn's officers had agreed had a value of $2,500,000 each or $5,000,000 for both.

considered to be serious prospects as of the close of the plenary hearing are in fact serious prospects to reorganize the debtors.

At the December 16, 1971 hearing on the trustees' petition to extend the time for the filing of a reorganization plan, Bernstein listed, in addition to Universal, McCulloch, Bank of America, Saturn, and the Janov-Ettinger shareholders group, the following new parties with whom he was having discussions looking towards a plan of reorganization: Harvard Industries, Overseas National Airways, an investors group represented by F. Steven Berg, Esq. of Buffalo, New York, Alaska Airlines, and a group headed by John O. Sitzler, Esq. of Palmyra, New Jersey, Flying W's corporate secretary. However, by the January 3, 1972 hearing, three of these new prospects were already considered by Bernstein to be out of the picture. Alaska Airlines had communicated its lack of interest,[45] and Bernstein had heard nothing in response to his submission of data to Overseas National Airways and the Sitzler group and testified that he did not consider them to be serious prospects.

Harvard Industries is a Florida-based conglomerate engaged in aircraft leasing and government component manufacture. Harvard's subsidiary, Transarctic, owns a hangar in Fairbanks which Red Dodge leased in 1970–71 for winter maintenance. Following an initial contact in May, Bernstein met in Miami on October 29, 1971 with William Hurley, President of the corporation, and furnished him the usual data. Hurley expressed interest in the matter, and a meeting was thereupon arranged with the Banks and their counsel to discuss the Banks' secured claim. The meeting took place at Girard on December 7, 1971. Stating the events of the meeting succinctly, Hurley made no definite proposal to the Banks. His tentative proposal: "no cash to the banks at the outset with 'modest' periodic payments with a balloon payment at some unspecified time, funds for payment of the debt to come from operations of the reorganized company (which would include Transarctic) with the first balloon payment to come from equity financing somehow to be rearranged" was rejected out of hand by the Banks. The Banks expressed interest in the submission by Hurley of a more detailed proposal, but Hurley is yet to be heard from. There is also a question (see *infra*) as to Harvard's capacity to fund a plan of reorganization. We do not consider Harvard Industries to be a serious prospect to reorganize Flying W and Red Dodge.

F. Steven Berg, a Buffalo attorney, appeared at the January 3, 1972 hearing to express the interest of his clients in reorganizing Flying W and Red Dodge, and to testify in support of the trustees application for extension. Berg is the President of the Lincoln National Bank of Buffalo, New York and Chairman of the Board of Scott & Dillon Corp. He was unwilling to identify his clients, and the Court, consistent with its prior ruling that it would not require disclosure of matters which would thwart negotiations looking towards reorganization, did not require him to do so. Berg also was unwilling to do what he described as negotiate from the witness stand and therefore did not disclose *any* financial details as to what his clients might propose. Berg testified that his clients were financially fully capable of reorganizing the debtors and were sincerely interested in doing so; he described the considerable time that he had expended in the matter already, including several meetings with the trustees and one with the Banks and their counsel.

---

45. In a letter to Bernstein, the General Counsel of Alaska Airlines cited, *inter alia*, the facts that: "North Slope activity . . . is apparently at an indefinite standstill, the North Slope companies apparently are questioning . . . whether or not the pipeline will in fact be constructed for some period in the immediate future."; and that Red Dodge had lost the BP contract, and the University of Alaska contract.

The meeting with the Banks produced, after some haggling, an offer by Berg to pay three million dollars in cash to purchase the Banks' entire interest. The Banks rejected the offer. While one of the Banks' attorneys, Donald Beckman, stated at one point that the Banks were not willing to discuss the matter except in the range of 5 to 7.5 million dollars, Berg testified that his impression was that the Banks would require some seven million. While the meeting concluded on the note that, at that figure, there was no point to further discussions, Berg testified that he has since changed his mind in the wake of alternative proposals that he has conceived. Berg's group's accountants have gone to New Castle to inspect the debtors' boosk and make a cash flow analysis; and representatives of the group have recently gone to Alaska to inspect the equipment and facilities there.[45a] Berg testified that he will know by "about mid-February" whether his group will propose a plan.

The only light that Berg shed upon his clients' approach to the matter was his testimony that they had two approaches to reorganization in mind. The first approach, predicated upon the group's estimate that the pipeline permit would be issued within a certain time (which he declined to state) contemplated acquisition of the company as a going concern. The second approach, operative in the event of his clients' assumptions that the pipeline permit would not be issued within a reasonable time, looked toward acquisition of the assets of Red Dodge, including the N30FW and N40FW Aircraft.

Does the foregoing permit the court to conclude that there is a reasonable prospect of a successful reorganization through the Berg group? The Court would like to think so, since a reorganization is preferable to a liquidation, and counsel for the trustees have strenuously urged the Court to believe that the Berg group represents a realistic reorganization prospect. In the final analysis, however, the Berg group's prospects are cloaked in mystery. The Court knows nothing of the group's identity or financial responsibility (neither do the trustees), and lacks even the most rudimentary notion of its intended proposals; yet an ample knowledge of all of these matters is a condition precedent to being able to form any judgment as to whether the Berg group can be expected to propose an acceptable reorganization plan. Nor is there evidence that the discussions with the Berg group have reached the serious negotiation state. The Court cannot predicate a finding upon apparent sincerity or fervent assurances or even feverish activity. Accordingly, the Court cannot consider the Berg group to present a reasonable prospect for a successful reorganization at this time.

Universal Airlines Company, an Oakland, California based supplemental air carrier, is the only prospective reorganizer which has submitted anything in writing with respect to its intentions. Following the transmittal of the initial financial data, a meeting in Universal's offices in Oakland, a physical inspection by Universal personnel of the Red Dodge facilities in Anchorage, and a meeting with members of the Alaska Transportation Commission, on September 23, 1971 Thomas B. Lief, Vice President and General Counsel of Universal wrote Bernstein to express Universal's interest in proposing a plan of reorganization under which it would succeed to the interests of Flying W and Red Dodge. Its "basic plan" was essentially as follows:

> "Universal Airlines Company proposes to acquire all of the assets or all of the stock of Flying W and its subsidiaries

---

45a. On January 31, 1970, the Court met with counsel, *inter alia*, to give them an opportunity to update the January 3, 1972 record with respect to any developments they considered significant on the prospects for reorganization. The above matters were then reported to the Court (along with the fact of Universal's inspection trip to Alaska and scheduled meeting with the Banks) and are incorporated in our findings.

partly for cash and partly for stock in Universal Airlines Company free and clear of all contingencies and liabilities. This proposal is subject to approval by the Universal Airlines Company board of directors, by certain creditors of Universal Airlines Company, by the United States Civil Aeronautics Board and if necessary, the President of the United States and judicial relief from all outstanding claims and liabilities of whatever kind or nature, subject to the foregoing, Universal Airlines Company proposes to:

A) Pay in cash all costs of administration, including compensation and expenses of the trustees and their counsel, counsel for the debtors and all other persons to whom the court authorized compensation for their efforts in the reorganization proceedings to the extent the foregoing are allowed by the District Court.

B) Pay in cash all priority claims as allowed by the District Court including claims of the United States and any state or local government with respect to debts incurred by the corporations.

C) Provide to the holders of all valid mortgages against properties of the debtors and to the holders of non-mortgage lien claims, neither to exceed the extent of their 1R1R valid and allowed security interests payment in cash or satisfactory security or long term debt or a combination thereof as may be agreed upon, but not to exceed the value of the respective collateral.

D) Negotiate with representatives of general unsecured creditors in order to reach agreement with respect to the amount which will be acceptable to this class of creditors, the agreed upon amount to be payable in cash or securities or both."

At the December 16, 1971 hearing, Lief appeared as a witness. He described Universal as being thoroughly experienced in air cargo operations and as being interested in acquiring Red Dodge on the assumption that the pipeline would be constructed approximately within the next few years. He testified that if that assumption were to change, Universal's interest would cease. Lief conceded that nothing had been done with respect to Universal's interest in proposing a plan since September, but ascribed this to the fact that his entire time since then had been consumed with matters related to the acquisition by Universal of a Boeing 747 jumbo jet aircraft (and he was the party at Universal responsible for the negotiations). For this reason, a meeting tentatively scheduled with the Banks for mid-December had been cancelled, but he contemplated being able to meet with the Banks by mid-January 1972.

The Banks questioned Universal's capacity to propose a plan. Lief conceded that the company had a negative working capital,[46] had lost $769,000 after taxes during the first nine months of 1971, and, by virtue of its failure to comply with certain terms of its agreements with certain major long-term lenders, was in the position that it could be placed in default and be required to pay the loans in full. He nonetheless insisted that Universal was financially strong enough to propose a plan.

Lief admitted the existence of two salient areas which had to be fulfilled on Universal's end before a plan of reorganization could be consummated. First, several of its principal lenders, including those for the 747, would have to consent. Second, approval of the Civil Aeronautics Board ("CAB") would be required. According to the testimony of Herman F. Scheurer, Esq., a Washington attorney who specializes in CAB work and represents, *inter alia,* PSL, such approval is required on two bases. First of all, Universal's certificate (and that of ten other supplemental carriers) specifically restricts it from operating in Alaska. Secondly, Part 28.3(c) (1) of

---

46. Universal's current liabilities exceed current assets by over $3 million.

the CAB Economic Regulations prohibits supplemental air carriers from engaging in air transportation within Alaska. Scheurer explained that for Universal to succeed in obtaining Alaskan certification would require both an amendment to its certificate and an amendment to the Rules, and that other supplemental carriers who might also desire to fly in Alaska would have the right to appear and be heard.[47] While declining to give an estimate of how long such CAB proceedings might take, his description of the CAB's administrative process indicates that it cannot be accomplished in a brief time.

Lief testified that, with the exception of the CAB problems, he expected to be able to submit a plan of reorganization by April 1, 1972. Regrettably, as of this writing, he still has not met with the Banks or communicated to the trustees his company's intentions as to any details encompassed within the framework of his September 23, 1971 letter. The undertaking of negotiating with the secured and unsecured creditors is not even to the preliminary discussion stage. According to trustees' counsel, Universal's technical people have recently gone to Alaska for a second physical inspection of the Red Dodge facility and Lief is supposed to meet with the Banks on February 3, 1973. However, it is apparent that Universal's first priority is the Boeing 747 which it is in the process of acquiring. The path of the Universal negotiations, while paved with "good intentions," does not inspire the Court to confidence of success. Accordingly, even without consideration of the CAB problems which appear to be significant, we do not consider Universal to present a reasonable prospect to effect a successful plan of reorganization at this time.

The Court has a high regard for its trustees and finds that they have been able and diligent in attempting to reorganize the debtors. They have apparently tried not to thwart negotiations with prospects by asking too many questions about their financial ability to propose a plan. This, unfortunately, has placed the Court in the position of being unable to evaluate that important matter. In addition to the financial problems of Universal, it appeared at the hearing that Harvard Industries had serious financial problems. It's net loss after taxes for the year ending September 30, 1970 was $10.9 million. It is in arrears under its financing agreements in the approximate sum of $595,000, giving the banks to whom the payments are due the right to demand accelerated principal payments. It faces IRS claims of about $14,000,000. Moreover, its Alaskan subsidiary, Transarctic, failed in the Alaskan air cargo business and its air fleet is for sale or lease. Bernstein testified that his criterion for measuring the seriousness of a prospect is whether the prospect is willing to spend time in negotiations with foreknowledge of the basic conditions. The Court does not approve this criterion.

We consider it to be possible that the Berg group or Universal will propose a pan. However, we do not consider it probable that this will occur. Having reviewed the prospects which Bernstein considers serious, we find that none of them presents a reasonable prospect to reorganize Flying W or Red Dodge at this time or within the foreseeable future. There are two ingredients in this finding. First, we find no reasonable prospect that a plan of reorganization will be presented in the foreseeable future. Second, based upon the discussions and tentative proposals submitted thus far, we find no reasonable prospect that a plan of reorganization, if submitted by Berg or Universal or anyone else, will be one which will be approved, in the foreseeable future, by the creditors, secured and/or unsecured. Beyond that is only speculation. The trustees having failed in their burden of proof on prospects of success (see *infra*), we cannot base a finding upon speculation. We note in conclusion that the attitude of the Banks

---

47. The Court considers such intervention to be a real possibility.

towards the "proposals" to date has been less than sanguine.

## VII. THE RIGHT OF THE BANKS TO THE AIRCRAFT PRIOR TO THE REORGANIZATION PROCEEDINGS

Before we can rule upon the question of turnover of the aircraft in the context of the reorganization proceedings, we must first ascertain whether the Banks would have had a right to possession to the N30FW and N40FW absent the proceedings.

Under the terms of the loan agreement between Flying W and the Banks, the principal of the loan from the Banks to Flying W was to be repaid in monthly installments on the first of each month, beginning August 1, 1969. Interest on the unpaid principal balance was also due on the first of each month. As we have already found, on October 20, 1969, the installment of principal and interest due October 1, 1969 was paid, but since that time no installment of principal has been paid and, with the exception of three interest payments on March 9, 1970, April 6, 1970 and May 12, 1970, interest has not been paid.

 Paragraph (13) of the Mortgage Agreement sets forth the events of default as follows:

"(13) *Default shall exist hereunder if Mortgagor shall fail to pay any part of any payment hereunder when due;* if Mortgagor shall fail in the prompt and faithful performance of any of the covenants, conditions, terms and obligations hereunder; if Mortgagor shall discover reasonable evidence that any of the warranties, covenants or representations of Mortgagor contained herein and in an accompanying loan agreement dated April 10, 1969, or any statements made in any credit application or statement filed with the Mortgagee are false; if Mortgagor shall become insolvent or make an assignment for the benefit of creditors; if there shall be instituted by or against Mortgagor bankruptcy, insolvency, reorganization, arrangement, debt adjustment or liquidation proceedings; if the said aircraft shall be subject to or threatened with attachment, levy, seizure in any legal proceedings, condemnation, forfeiture proceedings, concealment, misuse, confiscation or misappropriation; or if any insurance company cancels as to Mortgagor any policy of insurance against any of the hazards required to be insured against." (Emphasis added.)

We find that, without considering any other event (and having rejected the defense of the alleged refinancing agreement), each failure to pay the installment of principal and interest due on the first of each month beginning in November 1969 was a default.

Paragraph (14) of the Mortgage Agreement expressly provides for the repossession of the aircraft by the Banks upon default:

"(14) *Upon the occurrence of a default, Mortgagee shall have all the rights and remedies of a secured party under applicable laws, including, but not limited to, the following: to declare immediately due and payable the entire unpaid balance and any other sums lawfully due hereunder;* to require Mortgagor to deliver the aircraft to Mortgagee at a place to be designated by Mortgagee which is reasonably convenient to both parties, it being agreed that the place where Mortgagor took delivery to the aircraft is one such reasonably convenient place which Mortgagee can designate; *to take immediate possession of the aircraft wherever found, with or without process of law, and, in taking possession, Mortgagee may peaceably enter any premises where the aircraft may be found and take possession of the aircraft and custody of anything found in it or render the aircraft unusable; and any and all rights of a secured party under the Uniform Commercial Code as adopted in the State of Delaware. . . .*" (Emphasis added.)

 The 1969 loan agreement was negotiated and executed in Delaware.

Farmers was the spokesman for the Banks, and its offices, like Flying W's offices, were located in Delaware. Accordingly, Delaware law applies to this question. Section 9–503 of the Delaware Uniform Commercial Code provides:

"Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. . . ."

We find that under the Mortgage Agreement and the Delaware statute, the Banks were entitled to repossess the aircraft prior to the filing of the petition for reorganization on September 24, 1970.

The mandate of the Court of Appeals requires us to determine who is to bear the cost of returning the aircraft to Alaska, from whence they were taken by the Banks in connection with their repossession. A determination of that issue requires the making of findings, *inter alia,* with respect to the circumstances surrounding the repossession of the aircraft. Those findings are made in a succeeding section of this opinion, dealing with the question of who should bear the costs of return. It is not necessary to make those finding at this juncture, where the question is one of entitlement to possession not in the context of a private repossession, but rather of a judicial proceeding.

## VIII. SHOULD THE N30FW AND N40FW BE TURNED OVER TO THE BANKS?

### A. Introduction

Having considered the facts relevant to probability of success of the reorganization, the equity of the debtor in the airplanes, and the relationship of the trustees' possession of the airplanes to

the trustees' reorganization efforts as we have been mandated to do, we turn now to a discussion of applicable legal principles and the enunciation of our response to the Court of Appeals mandate, *i. e.,* whether or not we should adhere to the turnover order entered by Judge Kraft on September 25, 1970.

■ At the outset, it is appropriate to note that we are not here determining whether the reorganization petitions were filed in good faith, or whether the chapter X petition should have been approved.[48] Such determinations would have to be made upon the record facing Judge Kraft in September 1970, and would be subject to the test set forth by the Third Circuit in In re Business Finance Corporation (1971) 451 F.2d 829, where it was held that approval of a chapter X petition may not be withheld unless it is

"abundantly clear that there is no possibility that a plan of reorganization can be effected, and, any doubt as to whether a plan can be effected should be resolved in favor of the approval of the petition".

By way of contrast, our mandate from the Court of Appeals was to develop a present record to determine whether there are prospects of success, whether the debtors have any equity in the aircraft, and so forth, so as to form a basis for determining whether the turnover order should be adhered to. The Court of Appeals was aware that the reorganization was ongoing, and we do not read its opinion as restricting us to developing the facts as they existed at the time of Judge Kraft's order. In any event, we also have before us the Banks' prayer for reclamation of the aircraft filed on November 4, 1970 and the trustees' petition to extend the time for filing a plan, both of which require the present record and justify the action we ultimately will take.[49] The test which we apply is

---

48. While these questions were raised in the Banks' answer to the reorganization petition, the point has not been pursued.

49. Since the record which developed in the proceedings before us was inherently more complete than that which Judge

therefore the "reasonable prospect of success" test (see *infra*), not that set forth in In re Business Finance Corporation, *supra*.

### B. *Burden of Proof*

■ This matter originated with the petition of the trustees requesting that the Banks be ordered to turn over the aircraft which they had repossessed in Alaska, and our mandate charges us with determining whether to adhere to that order. In a turnover proceeding, after the trustee has established a prima facie case, the burden of going forward shifts to the other party. However, the ultimate burden of proof or the "risk of non-persuasion" in a turnover proceeding is upon the trustee, and he must meet it by "clear and convincing evidence". Maggio v. Zietz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); 2 Collier on Bankruptcy, § 23.10(2) p. 561.

### C. *Discussion*

■ One of the primary purposes of the enactment of the Chandler Act of 1938 was to encourage resort to bankruptcy reorganization as a means of avoiding premature liquidation—the destruction of the debtors' going concern and the forced sale of the debtors' assets. See, *inter alia*, Claridge Apartments Co.

v. Commission of Internal Revenue, 323 U.S. 141, 149, 65 S.Ct. 172, 89 L.Ed. 139 (1944); Breeding Motor Freight Lines Inc. v. RFC, 172 F.2d 416 (10th Cir. 1949); In re Muskegon Motor Specialties, 366 F.2d 522, 525 (6th Cir. 1966). In adjudicating this case, we are, therefore, ever mindful, as trustees' counsel has admonished us to be, of the words of Judge Goodrich in the case of Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 174 F.2d 783, 786–87 (3d Cir. 1949):

> "[I]t must be kept in mind that there is a sharp difference between straight bankruptcy proceedings and those for reorganization. In bankruptcy the object is to liquidate the assets of the bankrupt, to pay off his creditors as quickly and inexpensively as possible and to free the bankrupt from the burden of accumulated debt so that he may begin his business life anew. But the purpose of reorganization is not liquidation at all. If reorganization is successful the debtor corporation will continue to function, to pay its creditors, and carry on its business. The purpose of reorganization is to save a sick business, not to bury it and divide up its belongings."

It is obvious that a successful reorganization is possible in the present case only if the debtors continue to operate.

Kraft might have developed, because of the passage of time (we now have, for instance, the data on the trustees reorganization efforts which were then in their incipient stage), we cannot be sure of what decision he may have reached with respect to turnover had he held a plenary hearing then. In view of the considerable stakes involved, we do feel that the fact that there have been sixteen interim months for the trustees to attempt to reorganize (which perhaps they might have done had the pipeline permit been issued in late 1970) has been desirable, for the case is now adjudicated on an ampler record. We also take the liberty of observing that, in view of the time and effort involved in the plenary hearing, had Judge Kraft delayed his decision to conduct such a plenary hearing, the reorganization probably would have been aborted by his very act of doing so, for had the aircraft remained in New

Castle, Delaware for the months and months necessary to hear and adjudicate all of the facts, Red Dodge would have lost all of its customers as well as its air rights. Because of the unusual nature of this case, we do not believe that either Judge Kraft or the Court of Appeals could have foreseen what was involved in the plenary hearing. However, on some appropriate occasion, we would urge the Court of Appeals to reconsider the rule announced in In Re O. V. Corp., 378 F.2d 361 (3d Cir. 1967), and In The Matter of Flying W Airways, Inc., 442 F. 2d 320 (1971), requiring a plenary hearing before the entry of a turnover order, to the extent of permitting the district judge to enter a temporary turnover order, subject to the holding of a plenary hearing, where it appears prima facie that the turnover of the property would, in and of itself, abort the reorganization proceedings.

Regrettably for the debtors and trustees, however, the foregoing cases which state the general principles that the purpose of chapter X is to preserve the going concern value of the business through the continuation of operations are neither dispositive nor terribly helpful to resolution of the issues before us. The fact is that, for some sixteen months now, the Court has given reign to the implementation of these principles without noticeable success. What controls our determination is another precedent; one of equal importance within the framework of chapter X and of fundamental fairness—the decision of the Third Circuit in In re Riker Delaware Corporation, 385 F.2d 124 at 125–126 (1967):

> "Section 257 gives the trustee 'the right to immediate possession of all property of the debtor in the possession of . . . a mortgagee under a mortgage.' . . . However, the cases properly suggest that a court's disposition of such a matter as this should be predicated upon determination and weighing of potential advantage of the requested turnover in facilitating corporate reorganization on the one hand, and the likelihood of loss to the secured creditor in possession on the other. In re Third Ave. Transit Co., 2d Cir. 1952, 193 F.2d 703; cf. In the Matter of O. V. Corp., 3d Cir. 1967, 378 F.2d 361; Caplan v. Anderson, 5th Cir. 1958, 256 F.2d 416. An ex parte, unconsidered or routinely entered turnover order would disregard the harsh character of the imposition upon the secured creditor in possession and the danger that he be subjected to serious impairment of his security without real prospect of compensating advantage to all concerned through a successful reorganization of the financially embarrassed debtor. *A turnover of property in which the debtor had no demonstrable equity could be confiscatory. And a turnover without prospect of reorganization would be alien to the purpose of a Chapter X proceeding.*" (Emphasis added.)

Judge Van Dusen, speaking for the Court of Appeals in In re Flying W Airways, Inc., *supra*, points to the *Riker* case as the principal basis for the Court's mandate to us to consider the debtors' equity in the airplanes and the probability of success of the reorganization. What *Riker* says is that, if there is no reasonable prospect of success of the reorganization, the protection of the Bankruptcy Act becomes oppressive to secured creditors whose security becomes impaired through continued use. They are remediless and yet without hope that their situation will be salvaged by a successful reorganization. The law is thus that secured creditors should not be denied their right to realize upon their security while the trustees pursue some "elusive equity" for stockholders and unsecured creditors who have nothing else to lose. See In re Franklin Garden Apartments, Inc., 124 F.2d 451, 454 (2nd Cir. 1941). Neither must the secured creditors be required to forebear if the reorganization is what Judge Kauffman referred to in the *Yale Express* case, *supra*, as a "mere will-o'-the-wisp", or if we are merely clogging our docket with what the Supreme Court described in Tennessee Publishing Company v. American National Bank, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936) as "visionary or impractical schemes for resuscitation".

In the present case, however, it is important to be even more precise than the phrase "reasonable prospects of success". As we have pointed out above, there is nothing in the record to substantiate a finding that the pipeline permit will be issued in the foreseeable future. Having carefully so announced, it is nonetheless necessary to the advancement of our analysis that we state that we believe it to be probable that at some indefinable time in the future the following events will probably occur: (1) issuance of the pipeline permit; (2) construction of the pipeline; and (3) a consequent increase in oil drilling and construction activity resulting in a substantial and sustained

increase in the business of carrying cargo by air to the Slope. Implicit in these assumptions (they are not findings), however, is the notion that the events may be many years away. This means that the concept of time is extremely crucial in this case. All reorganization proceedings must proceed within certain parameters of time; we consider that the Court of Appeals intended us to find whether there was a reasonable prospect of success of the reorganization within a "reasonable time"; cf. Central RR Co. of New Jersey v. Manufacturers Hanover Trust Company, supra, and in this context, we deem a reasonable time to refer to the foreseeable future.

It is obvious that no rule of thumb can be found as to what constitutes a "reasonable time", or the "foreseeable future"— each case turns on its own facts. However, a reading of the cases interpreting the Act impels the feeling that Congress intended expedition without delay. The most oft quoted statement in the cases is that the purpose of chapter X is to "effectuate quick reorganization, and not to nurse indefinitely an ailing enterprise". In re McGann Mfg. Co., 190 F.2d 845 (3d Cir. 1951). The early cases were especially stringent. In In re Utilities Power & Light Co., 91 F.2d 598 (7th Cir. 1937), the Court, observing that a bankruptcy reorganization must be undertaken expeditiously and proceeded with diligently stated: "if plans are not submitted promptly the proceedings should be dismissed. . . ."

The McGann case, supra, involved a chapter X proceeding which was delayed for some five years because of the uncertainty of the debtors picture due to litigation by the trustee under the War Contract Hardship Claims Act which, if successful, presumably would have salvaged the debtor's situation. The court observed that the extent to which the lien creditors should suffer the possibility of ultimate loss in order that the debtor and other creditors may have an opportunity to effect a plan of reorganization lies within the discretion of the District Court, and that exceptional circumstances may justify delay; but in so doing, it also announced the policy of "quick reorganization". We deem that policy to be the law of this Circuit.

The debtors and trustees have called to our attention the fact that many chapter X proceedings go on for years and years, with losses of similar or greater magnitude than those incurred by Flying W and Red Dodge; that may be so, but each case must stand on its own, and the precedents which they have cited in that regard are not helpful.[50] Moreover, while our findings of fact have dealt principally with the question of whether a plan will be presented, the mandate directing us to inquire into prospects of a successful reorganization requires that we consider the prospects that a plan will be approved. Cf. Oakland Hotel Co. v. Crocker First National Bank of San Francisco, 85 F.2d 959 (9th Cir. 1936), upholding the trial judge's dismissal of a

---

50. The case most stressed by the debtors and trustees is In The Matter of Spectrum Arena, Inc., (E.D.Pa. #30437), in which Judge A. Leon Higginbotham, Jr. recently confirmed a plan of reorganization. The Spectrum proceedings consumed approximately three years. However, there are important distinctions between the Spectrum case and this one. In Spectrum, the subject matter of the reorganization was a sports arena located in Philadelphia, used by the Philadelphia professional basketball and ice hockey teams and for a variety of other musical and sporting events. There never was any doubt in Spectrum that a plan of reorganization ultimately would be filed, and neither was there any opposition from the secured creditors to extensions of time for filing a plan until the point was reached when a plan was actually filed and extensions were sought for consideration of alternative plans. Moreover, the asset involved, which was essentially real estate, has a much longer useful life than the airplanes and is not subject to the types of hazards and depreciation as the airplanes are. Finally, the losses incurred by the trustees in this case are considerably greater than those incurred by the Spectrum trustees.

chapter X proceeding predicated upon the finding of a special master that there was no hope of a reorganization plan which would be acceptable to the requisite number of bondholders. At this juncture of the case, in addition to the submission of a plan, we are still confronted with approval by the secured and unsecured creditors, and possibly the shareholders, the making of findings that the plan meets the requirements of §§ 199 and 216 of the Act, 11 U.S.C. §§ 599, 616, (fair, equitable and feasible), and that the proposal and acceptances were made in good faith, etc. We turn then to the question of whether there are reasonable prospects of a successful reorganization of Flying W and Red Dodge in the foreseeable future. Our voluminous findings of fact obviate the necessity for a protracted discussion of this question.

There are only two possibilities for reorganization: first, through the trustees' operation of the business; and second, through the infusion of substantial amounts of money by a merger with or acquisition by some third person. With respect to the first possibility, having found that the trustees' present operation is submarginal and that there have been no developments presaging any foreseeable increase in aircraft utilization or revenue, we conclude that the trustees' operation of the debtors' business will not, by itself, bring about a successful reorganization. Interestingly, at one point during the plenary hearing, trustee Bernstein himself conceded this point. Secondly, our analysis of the trustee's efforts at reorganization has persuaded us that there is no realistic prospect of a successful reorganization within the foreseeable future. First, we have found no reasonable probability that any of the parties with whom the trustees are or have been negotiating are reasonable prospects to propose a reorganization plan. We believe that the losses which the trustees have continued to incur, the intense competitive situation which has resulted in the loss of Red Dodge busi-

ness, and the low aircraft utilization, even in the peak winter months, will discourage other proposed reorganizers. Notwithstanding the "hope that springs eternal", there has been no evidence presented to us that the trans Alaska pipeline will be approved and built at any time within the foreseeable future, or, more important, that anyone will propose a plan of reorganization bottomed upon such hope. A grave question also exists as to whether Red Dodge could survive the hiatus between the issuance of the pipeline permit and the pickup in Slope cargo business as a result thereof. Neither do we find there to be any reasonable prospect that a plan will be submitted which will meet with the approval of the Banks.

What has been involved in this matter is simply a question of time. "The pipeline is sure to come" say the debtors and trustees; "how long, oh how long must we wait?" say the Banks. In so saying, the Banks are representative of other creditors who, without prospects of success, feel that there must be a day of reckoning with respect to their claims. While the point of demarcation in matters such as this is inherently difficult to fix, we believe that the sixteen months of valiant efforts by the trustees are a good measure of prospects of success. One telling indication of the failure of the trustees' efforts is their own admission that, if they did not effect a reorganization by the end of 1971, they could not do it at all.

Coupled with our finding that there is no reasonable prospect of success of the reorganization within the near future is our finding that the trustees have no equity in the aircraft and that continued operation of the planes involves a significant risk of loss to the Banks. While the Banks are protected by the insurance in the event of a total disaster, they have no protection against the decline in value of the aircraft through continued hours of use or the risks of mishap inherent in the nature of the Alaskan operation.[51]

51. The Court of Appeals mandate required us to fashion an order, *inter alia*, with

respect to adequate insurance on the Aircraft. We find that adequate insurance

While the grant of the pipeline permit might provide a market which would increase the aircraft's value, again we are faced with measuring the *possibility* of that increase against the *probability* of a decline in value by continued use; as a finding of fact, we have opted for the latter. Moreover, the failure of the trustees to keep adequate reserves for engine overhaul creates a problem for a proposed purchaser who must take into account the time since the last overhaul (and consequently, the time until the next one) in determining the price he will pay for the aircraft.

This Court would like to believe, for the benefit of the shareholders, creditors (both secured and unsecured) and employees of Flying W and Red Dodge that the Alaska pipeline will be authorized tomorrow and built expeditiously, culminating in the rescue of Red Dodge in this reorganization. We are, to repeat, mindful of the consequences to the shareholders and unsecured creditors of a turnover order. But, the Banks also have the right to protect their security in a huge loan, and a duty to their depositors.[52] The Banks are not obliged to suffer indefinitely the consequences of a bad investment.

There is still another factor which inveighs against any further delay in filing this adjudication. The Banks (and PSL) are relying upon the security and guarantees of Flying W's obligation made by the Matlack's and EBR Corporation. Further delay increases the risk of diminution of that security.[53]

 We have a duty to respond promptly to the Court of Appeals mandate; we cannot further delay our decision in this matter on account of straws in the wind or hope of a change in the pipeline situation. Having found that the debtors have no equity in the aircraft, and that there are no reasonable prospects of success of the reorganization, and being bound by the *Riker* and *Flying W* holdings, we order turnover of the N30FW and N40FW to the Banks.

The events of September 1970 (see § XI *infra*) indicates that there are numerous details involved in the transfer of the aircraft, particularly with respect to insurance. Accordingly, we will make our turnover order effective on February 14, 1972.

## IX. ARE THE TRUSTEES ENTITLED TO A TURNOVER ORDER AGAINST THE NEW JERSEY BANKS?

### A. *Introduction*

On December 24, 1970, the trustees filed a Petition for a Turn-Over Order against the Provident Bank of New Jersey and the First National Bank of Beverly, New Jersey. That petition alleges that the turnover to the trustees of the funds sought "would best serve the purpose of the reorganization proceedings" and "that by reason of the Debtor's poor cash position it is presently necessary and essential to the continued operation and maintenance of the Debtor's business, and that of its wholly owned subsidiary, Red Dodge Aviation, Inc., . . . that the funds . . . be immediately turned over to your Trustees to be used as working capital in the operation of the Debtor's business". The Petition represents that any lien or security interest in the funds can be adequately protected by transferring any such lien or encumbrance to the assets and receivables generated by the Trustees. For reasons previously stated, we recalled this matter from Referee Goldhaber for determination in connection with the plenary hearing.

---

on the Aircraft has been in effect at all times since receipt of the mandate.

52. Farmers is a relatively small bank to which the loss involved is a very significant one in proportion to its loan reserves.

53. As noted above, Robert Matlack died during the course of these proceedings.

## B. *Findings of Fact*

We have described above (at page 43) the principal elements of the N50FW transaction which resulted in PSL's purchase of the aircraft from Lockheed and its lease to Flying W. The September 9, 1969 letter agreement, pursuant to which the transaction was ultimately consummated, provided that, as a condition of the proposed transaction, a security deposit fund of $500,000 was to be created by Flying W to secure to PSL its performance of its obligations under the proposed lease of the N50FW. This term was incorporated into the December 30, 1969 lease agreement describing the security as being held "for the benefit of Lessor, to be held as security for the performance of all of Lessee's obligations under this Lease. . . . "

On December 30, 1969, the day of settlement,[53a] PSL and Flying W entered into security deposit agreements with the First National Bank of Beverly, New Jersey and the Provident Bank of New Jersey under which the sums of $270,000.00 and $230,000.00 in cash respectively was deposited with the Banks to secure to PSL performance by Flying W of its obligations under the N50FW lease. The agreements provided that the Banks would hold the funds "solely for the benefit of and subject to the directions of PSL only".

Under the terms of the lease, Flying W was to pay as rental for N50FW the sum of $124,866.00 each calendar quarter in advance commencing December 30, 1969, and was to establish engine reserves at the rate of $8.00 an hour for each of the four engines on the N50FW. The rental was paid for the first quarter but, despite demand, no quarterly rental payments have been made by or on behalf of Flying W to PSL under the lease since that date. By terms of the stipulation approved by the Court on October 21, 1970, Flying W and the trustees have specifically renounced any and all claim to possession of the aircraft and have agreed that PSL has title thereto.

The parties have stipulated that five quarterly rental payments commencing March 20, 1970 and totalling $874,062.00 and five monthly engine overhaul reserve deposits commencing February 10, 1970 and totalling $17,725.00 were called for under the lease agreement and were not paid by Flying W. In addition, PSL asserts liability over against the security deposit fund: (1) for the cost of repairs by Lockheed of the center wing crack ($147,862) should PSL be held liable for same by the United States District Court in Georgia; and (2) for interest on late payments and legal fees under § 14.3 of the N50FW lease.

We have made extensive findings on the prospects of success of the reorganization proceeding. Because prospects of success are relevant in adjudicating the petition for a turnover order against the New Jersey banks, we incorporate those findings here. We do find that the trustees need $500,000 (and far more) to support their reorganization efforts, and that they cannot obtain such funds from voluntary lenders through ordinary market channels. However, we also find that the infusion of $500,000 capital into Flying W would not materially enhance the prospects of success of the reorganization and that there would be no protection for PSL, the secured creditor, if the $500,000 security were turned over to the trustees, for the likelihood is high that their $500,000 security would be dissipated in the Alaskan operations.

## C. *Burden of Proof*

As we have ruled above, in connection with the petition of the trustees for turnover with respect to the aircraft, the burden of proof in a turnover proceeding is at all times upon the trustees, to be met by "clear and convincing" evidence. Maggio v. Zeitz, *supra,* 2 Collier on Bankruptcy § 23.10(2) p. 261, and cases cited therein.

---

53a. Flying W's lease obligations were guaranteed by each of the Matlack brothers individually and EBR, all of whom have appeared and filed an answer.

## D. *Discussion*

The principles governing this aspect of the case are those established by the Third Circuit in Central Railroad Company of New Jersey v. Manufacturers Hanover Trust Company, 421 F.2d 604 (3d Cir. 1970), at 607–608. Referring to In re Third Avenue Transit Corp., 198 F.2d 703 (2nd Cir. 1952), as the leading case in a situation where the trustee is authorized to draw down mortgaged funds to pay for operating expenses,[54] the court approved the Second Circuit's test for such an order:

"[T]he court's far more drastic power under Section 257 [to authorize the reorganization trustee to take possession of any or all property of the debtor], requires proof of the most extraordinary circumstances * * *. [W]e believe that that power should never be exercised absent findings, based on the clearest evidence, not only that it is imperative to obtain the funds and that they cannot be obtained * *

through ordinary market channels * * * but also that there is a high degree of likelihood (a) that the debtor can be reorganized in accordance with the Act, within a reasonable time, and (b) that the secured creditors whose security is being compulsorily loaned will not be injured. The reorganization trustees here had the burden of proving all these matters." *Id.* at 706–707 (footnotes omitted).

Accordingly, we turn to the question as to whether the trustees have established by clear and convincing evidence: (1) that it is imperative for the trustees to obtain funds; (2) that the trustees cannot obtain funds from voluntary lenders through ordinary market channels; (3) that "there is a high degree of likelihood . . . that the debtor can be reorganized in accordance with the Act, within a reasonable time"; and (4) that "there is a high degree of likelihood . . . that the secured creditors [PSL] whose security is being compulsorily loaned will not be injured".[55]

---

54. The Indenture Trustee there appealed from an order authorizing the Reorganization Trustee to draw down $500,000 from the mortgaged funds account for "working capital" in order "to continue operations." *Id.* at 705. In return, the Indenture Trustee received from the Reorganization Trustee a certificate bearing 1¾% interest, the times and amounts of repayment to be settled by further court order on the application of either party.

55. PSL has asserted that this Court lacks jurisdiction to hear and determine the claim of the trustees to the funds in the hands of the two Banks by means of a petition for turnover order (with the consequent exercise of the summary jurisdiction of this Court), as distinguished from resort by the trustees to a plenary action. PSL submits that the funds in the New Jersey banks do not constitute property in the physical possession of the bankrupt at the time of the filing of the reorganization petition, and that PSL's claim to the funds held by the New Jersey banks is adverse to that of the trustees. PSL then cites Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944) wherein it was held that:

"A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court. Thompson v. Magnolia Co., 309 U.S. 478, 481 [60 S.Ct. 628, 629, 84 L.Ed. 876]. If the property is not in the court's possession and a third person asserts a *bona fide* claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated 'in suits of the ordinary character, with the rights and remedies incident thereto.' [citations omitted] . . . Once it is established that the claim is not colorable nor frivolous, the claimant has the right to have the merits of his claim passed on in a plenary suit and not summarily. Of such a claim the bankruptcy court cannot retain further jurisdiction unless the claimant consents to its adjudication in the bankruptcy court. . . ."

The trustees have argued that the funds are within the constructive possession of the Court, that PSL's adverse claim is without merit, and that, in any event, because of the discovery which the Court has permitted, the proceedings before Referee Goldhaber, and the extensive plenary hearing, the rights of a person asserting

We have already found that there is no reasonable prospect of success that Flying W and Red Dodge can be reorganized within a reasonable time. A fortiori, there is no "high degree of likelihood" that this can be done. The test imposed by Central Railroad Company of New Jersey v. Manufacturers Hanover Trust Company, *supra* is more stringent even than that imposed by In re Riker Delaware Corporation, *supra* and the other cases cited in the section of this Opinion discussing the turnover of the aircraft, and is not met here. We also have found: (1) that there is a high degree of likelihood that PSL, whose security would compulsorily be loaned if the trustees' petition were granted, would be injured; and (2) that there are no assets of the debtor available to use as collateral to protect PSL against injury in the event of compulsory turnover of the funds. In order to grant the trustees' petition, we would have to make opposite findings.

In view of these conclusions, it cannot matter that the trustees can indeed use the funds and that they cannot obtain such funds by borrowing through ordinary market channels. We note further that, in view of the enormity of PSL's claims, there is serious doubt as to whether Flying W has any equity in the $500,000 on deposit. It is not necessary for us in this Opinion to allow or disallow any particular claims, and, accordingly, although we find that PSL's claim to sums approximating $500,000 is more than just colorable, we do not expressly decide the equity question.

■ Since the debtors have not proved by clear and convincing evidence:

(1) a high degree of likelihood of success of the reorganization proceedings; and (2) that the grant of turnover would not prejudice the security of PSL, we conclude that it would be inequitable to grant the trustees' petition for turnover against the New Jersey banks, and the petition is therefore denied.[55]

## X. SHOULD THE TRUSTEES BE GRANTED ADDITIONAL TIME WITHIN WHICH TO FILE A PLAN OF REORGANIZATION?

■ Notwithstanding the record which has supported the foregoing findings and conclusions of the Court, the trustees have continued to maintain optimism as to their ability to effect a plan of reorganization with Universal Airlines Company, with the Berg investors group, or with some other prospect. While we have received a mandate from the Court of Appeals with respect to the question of turnover of the N30FW and N40FW, and have responded thereto, we are under no mandate from that court with respect to the time for filing a plan of reorganization. We are aware that it is probable that the turnover of the aircraft may render the question of extended time moot because of the inability of the trustees to carry on business (or perhaps even protect Red Dodge's air carrier rights) without aircraft. However, it is possible that the trustees may be able to arrange, through Universal, the Berg group, or others, for a lease of other Hercules aircraft with which to continue their operation for the present. It is also conceivable that the Alaskan picture

a bona fide adverse claim have been more than vindicated here. We shall assume, without deciding, our jurisdiction of the petition for turnover order and shall proceed to adjudicate it. We note that the trustees have claimed that the $500,-000 is important to their continuation of the reorganization proceedings, and, further, that a decision of the range of issues adjudicated in this opinion adverse to them will abort the proceedings. On the basis that all matters affecting the reorganization should be decided by this Court, these observations support our assumption of jurisdiction of the trustees' turnover petition.

55. The debtors have also asserted in their brief that "the estoppel existing against . . . PSL precludes . . . PSL from obtaining the security monies deposited by Flying W." We have already dealt with the estoppel issue, and it is not necessary to repeat our findings and conclusions here.

may quickly change. Incorporating what we have said in section VIII of this Opinion, we are unwilling to make a finding of prospect of success based upon a possibility. However, having fulfilled the Court of Appeals mandate, and being mindful of the ultimate impact of our turnover order upon the unsecured creditors and shareholders, we will permit the trustees until March 20, 1972 to pursue the possibilities with Berg and Universal before dismissing the reorganization proceedings or relegating the matter to straight bankruptcy.[56]

We do not grant a longer extension because we believe that there must be a time at which the line must be drawn and the creditors claims reckoned with. As we observed above, both the Banks and PSL are relying upon the Matlack and EBR guarantees, and further delay may lead to the diminution of their security. Moreover, the wear and tear on PSL's spare engines continues and the trustees are not building up adequate engine overhaul reserves. Our grant of an extension is not to be construed as a modification of our turnover order with respect to the N30FW and N40FW.

## XI. WHO SHOULD PAY THE COSTS OF RETURN OF THE AIRCRAFT TO ALASKA?

### A. *Introduction*

In the opinion in which it remanded the matter to us for a plenary hearing, the Court of Appeals stated:

"On remand, the district court should also reconsider whether the cost of returning the airplanes to Alaska should be borne solely by the Banks. In reconsidering this part of its September 25, 1970, order, the district court should consider whether, in light of paragraph 4 of the September 24 order and the failure of the trustees to qualify immediately by filing the prescribed bond,[5] the Banks were

"5. The docket entries show that the trustees did not file their bond, and documents 4 and 5 show that the affidavits establishing their qualifications were not filed until September 25, 1970."

bound by the September 24 order when they caused the airplanes to be flown to Wilmington. The district court should also consider whether causing the airplanes to be flown to Wilmington was a violation of the terms of the September 24 order, especially in light of the Banks' contentions concerning lack of insurance to cover the airplanes while they were in Alaska." 442 F.2d at 324

This determination will involve findings of fact in two particular areas: (1) the facts surrounding the Banks' repossession of the Aircraft in Alaska; and (2) the reasonableness of the Banks' contentions concerning lack of insurance to cover the Aircraft while they were in Alaska.[57]

### B. *Findings of Fact*

#### 1. *Events Surrounding the Repossession of the Aircraft*

Following the failure of Robert Matlack and his brothers to appear at Farmers in Wilmington with the deeds to the Matlack terminals on September 14, Baldwin gave instructions to Johnson to repossess the aircraft. On September 19, 1970, Farmers sent communications to Flying W, both by registered mail, return receipt requested, and by telegram, notifying Flying W that, because of its default, the entire amount of Flying W's obligation to the Banks had been declared due and payable. The letter and wire also contained a demand for possession of all security for Flying W's obligation, including the N30FW

56. See 11 U.S.C. § 636.

57. In their brief, the Banks have stated: "However, in the circumstances as they were known to the Banks on September 24, the flight to Wilmington was the only prudent course the Banks could have taken to assure continuous insurance protection for all those who might ultimately have an interest in the several million dollar value of the Aircraft, including the Trustees."

and N40FW. When Selby arrived at Flying W's office in New Castle, Delaware on September 21, 1970 at 8:00 a. m., the telegram was there. Johnson had delegated to Milione the details of arranging the repossession, including the securing of necessary flight crews and arrangement for insurance.

At 5:00 a. m. on the morning of September 21, 1970, the N30FW was at the International Airport in Fairbanks. At that time, representatives of the Banks, including a lawyer and an armed security guard, went to the aircraft, which was unoccupied. They connected a tow-bar to the nosewheel of the aircraft and to a towtruck they had brought with them, and posted in the cockpit of the aircraft a certificate of repossession of encumbered aircraft and a pink copy of an FAA application for aircraft title. Shortly thereafter, the procedure which had just been followed was explained to airport security police, and the aircraft was towed to the front of the Transartic hangar, with a pilot and a copilot aboard. When the Red Dodge maintenance foreman appeared, he was shown the documents in the cockpit; when a Red Dodge pilot appeared, he too was permitted aboard. Later that day, the Red Dodge pilot and mechanic inspected the aircraft; it was then moved into the Transarctic hangar.

On Thursday, September 24, 1970, at about 10:45 a. m., the Alaska State Police came to the plane following a telephone call from the Red Dodge pilot, but they refused to take any action. The security guards or employees of Transarctic who had been employed by the Banks remained with the Aircraft until it left for Wilmington, Delaware at approximately 11:52 a. m. on September 24, 1970.

At 5:00 a. m. on the morning of September 21, 1970, the N40FW was on the parking ramp of the Red Dodge property at Anchorage International Airport. The Banks' representatives boarded the empty plane, attached the same type of documents, and the Banks' flight crew inspected the aircraft and started its engines. During the start-up procedures, a Red Dodge dispatcher appeared and was informed of the proceedings. The Banks' representatives thereupon taxied the aircraft to the control tower area of the Anchorage Airport, where it remained in the presence of the security guards until it left Anchorage for Wilmington at approximately 1:20 p. m. on September 24, 1970.

On September 21st, Flying W and Red Dodge commenced an action against the Banks in the Alaska Superior Court. On the same day, they obtained a temporary restraining order preventing the Banks and their representatives from removing the aircraft from Alaska. On September 23, 1970, a hearing was held on the petition of Flying W and Red Dodge seeking a preliminary injunction against the removal of the aircraft. The hearing recessed for negotiations. When the court reconvened on the morning of September 24, 1970, it was informed by counsel of the filing and approval of the petition for reorganization and the order appointing trustees. Concluding that the federal district court had exclusive jurisdiction, the Alaska court dissolved its temporary restraining order.

The reorganization petition was filed at 9:25 a. m. E.D.S.T. on September 24. The order approving the petition was signed at about 11:25 a. m. E.D.S.T., and a certified copy of the order was served on the Girard Bank at 12:00 noon on that day. The order was read to counsel for the Banks in Alaska at 1:45 p. m. (E.S.T.) on that day. The Banks' caused the Aircraft N30FW and N40FW to be flown from Alaska to Wilmington, Delaware without attempting to communicate with Judge Kraft. Moreover, the aircraft left Alaska after the Banks had knowledge of the order of September 24, 1970.

The trustees' petition requesting turnover was filed on September 25, 1970, and, as we have seen, after hearing, Judge Kraft entered an order directing the Banks to return the aircraft to the trustees in Alaska at the sole cost of the Banks. The trustees' bond was ap-

proved by the Court on the same day. On September 26th and 27, 1970, the Banks returned the aircraft to the trustees in Alaska at a cost to them of $17,960.

### 2. *Facts Concerning the Insurance on the Aircraft*

Policies providing hull liability insurance on the N30FW and N40FW were placed in May of 1970 through the London insurance market by Wilson & Allen, New York insurance brokers. The Flying W account was handled by one Gilbert White ("White"). As we have found previously, the insurance premiums were advanced by PSL, which had retained the right of cancellation. The insurance was in effect on Monday, September 21, 1971, by which time Milione had called White and informed him that the Banks were planning to repossess the aircraft. He requested White to arrange for insurance covering ferry flights of the aircraft from Anchorage to Wilmington, and insurance covering the aircraft while otherwise in the Banks' possession. White informed Milione that, because of a technicality in the existing policies, they would not apply if the aircraft were repossessed, and that underwriters approval to cover the Banks' interests under the circumstances would be required. White then proceeded to arrange the requested coverage through Wilson & Allen's London correspondent.

On September 22nd, William Eggers ("Eggers"), who was in charge of insurance at PSL, called White to tell him that PSL was exercising the right given to it in the premium finance agreement to cancel the insurance on the N30FW, N40FW and N50FW for the interest of Flying W. Eggers told White that the coverage for the interest of the Banks' could be continued at their expense. White so informed the London correspondent. After the conversation with Eggers, White spoke with Beckman, an attorney for Girard, and informed him that PSL was exercising its right to cancel the insurance for the interest of Fly-

ing W as of noon, September 22, 1970, but that PSL was satisfied to keep the existing insurance in effect if the Banks would pay the premium (and in any event, to have it kept in effect to protect the interest of the Banks). On September 22, 1970, White had received confirmation of ferry flight insurance. On September 23, 1970, White and Beckman finalized agreement to the effect that the Banks would pay prorated premiums to maintain the existing insurance coverage until the ferry flights commenced. This was confirmed by letter.

Having stated these findings, it is equally important to set forth three other matters with respect to the insurance situation. *First*, there was no evidence that uncertainty about the insurance coverage for the aircraft, if any such uncertainty existed, was in any way related to bringing the aircraft to Wilmington. We find that the insurance picture was not affected by whether the aircraft were in Anchorage or Wilmington. *Second*, there being no evidence that the insurance was in effect on September 21st, the repossession date (and we have found that it was in effect), and no evidence that there would be any difficulty in obtaining coverage to protect the aircraft in the event of repossession (and there was no difficulty), we find no basis for the Banks' claim of "uncertainty". *Third*, there is no evidence that the Banks made any effort to dissuade PSL from exercising its rights to cancel the insurance.

### C. *Discussion*

The foregoing findings of fact obviate the necessity for protracted discussion of whether the transportation of the airplanes to Wilmington was a violation of Judge Kraft's September 24 Order. We find that it was.

We will not speculate upon the motives of the Banks in bringing the aircraft to Wilmington. The fact is that they did so with full knowledge of Judge Kraft's Order and of the fact that their rights to the aircraft could have been

litigated while the aircraft were in Anchorage. We find no reasonable basis for the Banks' claim of uncertainty about the insurance. We find no reasonable basis for a belief that the insurance, or lack of it, was in any way related to whether the planes were in Anchorage or Wilmington. And we find that the Banks' action was not motivated by any feeling of insecurity about the trustees' bond, which was filed (promptly) on the day following the trustees' appointment.[58] We therefore hold that the costs of returning the airplanes to Alaska should be borne solely by the Banks.[59]

## XII. CONCLUSION

In such a lengthy Opinion, a conclusion is no place for recapitulation. If this Opinion is not exhaustive of this matter, it at least has been exhausting, both in the writing and doubtless in the reading. Hence, our conclusion is for a different purpose; it is to recognize the efforts of the lawyers who have tried this case. Rarely has the Court seen such diligence, dedication, and ability as has been demonstrated by these lawyers, Raymond W. Midgett, Jr. for the Banks, Lewis H. Gold for the Trustees, Neil G. Epstein for the Debtors, and J. Grant McCabe, III and Frank L. Bate for PSL. Credit, too, belongs to the associates who have assisted trial counsel. Counsel have been cooperative with the Court in the extreme, and did much to lighten its burdens, so we take this opportunity to express our thanks.

In view of the foregoing Opinion, we enter the following Order.[60]

58. One of the trustees, Mr. Duffy, is a well known Philadelphia attorney, and the Banks do not assert that they had any doubt as to his ability to procure a bond. We also note that the reorganization court has exclusive jurisdiction of the debtor and its property wherever located. This jurisdiction, and the broad powers given to the Court over the debtors' property in sections 114, 115, 116 and 148 of the Act are in no way dependent upon the filing of the trustees' bond.

59. The debtors and trustees have asserted as an additional ground for holding the Banks liable for the cost of return that the seizure of the Aircraft with the aid of armed guards constituted: (1) a felony under Alaska statutes §§ 23.10.025 and 23.10.035; and (2) a breach of the peace in violation of § 9–503 of the Uniform Commercial Code (Alaska statutes § 45.05.786). We disagree, and find the cases cited by the debtors and trustees to support this view inapposite.

60. It will be noted that our turnover order with respect to the Aircraft contains a proviso that the Court is retaining jurisdiction over the Banks so as to enable it to subsequently adjudicate the question of whether the Banks may be held liable for a share of the administration expenses if the debtors' assets not subject to liens are insufficient to cover them. As was said by Judge Staley, speaking for the Court in In re Riddlesburg Mining Company, 224 F.2d 834 (3d Cir. 1955):

"Section 246 of the Bankruptcy Act, 11 U.S.C.A. § 646, gives the judge authority to allow reasonable compensation for administration expenses incurred during a reorganization attempt. There is no limitation with regard to secured or unsecured assets. Whether, and to what degree, the mortgage creditors should run a risk of loss in order to make possible a reorganization was wholly within the discretion of the district judge, who properly exercised his discretion." (footnote omitted). Id. at 837.

In the Riddlesburg case, the secured creditors argued that it would be inequitable to pay administration expenses from proceeds of the mortgaged premises. The Court held that the district court had authority to retain jurisdiction to adjudicate this question, and that the determination was one based upon equitable considerations. Our retention of jurisdiction is not to be construed as an intimation that we will necessarily charge the Banks with administration expenses. There are other secured creditors whose situation is parallel to the Banks' in this regard, and neither do we intimate that they will be charged. We will adjudicate this question if and when it becomes necessary. In the meantime, however, the Banks may release the charge against the Aircraft by satisfactory representations to the Court that they will stand bound for such administration costs as the Court may impose.

## ORDER

And now, this 3rd day of February 1972, in consideration of the foregoing Opinion, it is ordered that:

1. On or before February 14, 1972 at 6:00 P.M. Alaska Standard Time, Eugene M. Bernstein and Robert C. Duffy, trustees, shall deliver possession of the Hercules aircraft N30FW and N40FW to the Girard Bank and the Farmers Bank of the State of Delaware, or their duly authorized representatives, at Anchorage, Alaska or Fairbanks, Alaska, or such other place or places as the trustees and the Banks shall agree. The trustees shall give the Banks at least seventy-two (72) hours notice of the intended time and place of delivery of the aircraft.

2. The Order entered by this Court on September 3, 1971 is hereby modified as follows: On or before March 17, 1972, at 5:00 P.M. E.S.T., the trustees shall prepare and file a plan of reorganization for the debtors or a report of their reasons why a plan cannot be effected. A hearing shall be held on such plan or report, and for the consideration of any objections which may be made, or on such amendments which may be proposed with respect thereto, on April 5, 1972 at 9:30 A.M. in Courtroom 14, United States Courthouse, 9th and Market Streets, Philadelphia, Pennsylvania. In the event that the trustees file a report that a plan of reorganization cannot be effected, a hearing shall be held on April 5, 1972 as aforesaid, on the question (11 U.S.C. § 636) as to whether the Court should adjudge the debtors bankrupt or dismiss the proceedings under this chapter. On or before March 21, 1972, the trustees shall give written notice of the date fixed for hearing and the purpose thereof to the debtors, creditors and stockholders of the debtors, the Secretary of the Treasury and the Securities and Exchange Commission. A copy of any plan proposed by the trustees or report of their reasons why a plan cannot be effected shall accompany such notice, together with a brief summary of the principal grounds of the foregoing Opinion.

3. The turnover of the aircraft N30-FW and N40FW is subject to the following condition: the Court hereby retains jurisdiction over the Banks and the aircraft N30FW and N40FW for the purpose of determining whether the Banks should be required to pay an equitable portion of the costs of administration incurred in connection with these chapter proceedings, in the event that it should eventuate that the assets of the reorganization debtors not subject to valid security interests are insufficient to cover them. *See* In re Riddlesburg Mining Company, 224 F.2d 834 (3d Cir. 1955). However, upon the posting of an appropriate bond or the submission to the Court by the Banks of their assent to pay such administration costs as may be imposed upon them (reserving, of course, their right to contest the imposition of such costs and to appeal any such imposition), the aircraft N30FW and N40FW shall be released free and clear of any charge for administration expenses.

4. The cost of returning the aircraft N30FW and N40FW to Alaska in September 1970 is hereby imposed solely upon the Banks.